No. 23-1922

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

CLEMENTE PROPERTIES, INC.; 21 IN RIGHT, INC.; ROBERTO CLEMENTE, JR.; LUIS ROBERTO CLEMENTE; ROBERTO ENRIQUE CLEMENTE,
Plaintiffs – Appellants,

v.

HON. PEDRO R. PIERLUISI-URRUTIA, Governor of Puerto Rico, in his official and individual capacity and as representative of the Commonwealth of Puerto Rico; THE COMMONWEALTH OF PUERTO RICO; EILEEN M. VÉLEZ-VEGA, Secretary of the Department of Transportation and Public Works, in her official and individual capacity; FRANCISCO PARÉS ALICEA, Secretary of the Department of the Treasury, in his official and individual capacity; RAY J. QUIOÑES-VÁZQUEZ, Secretary of the Department of Sports and Recreation, in his official and individual capacity; PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY,
Defendants – Appellees,

JOHN DOE; CONJUGAL PARTNERSHIP DOE-VELEZ; JANE DOE; CONJUGAL PARTNERSHIP QUINONES-DOE,
Defendants.

_____

On Appeal from the United States District Court for the District of Puerto Rico, San Juan, Honorable Gina R. Méndez-Miró, District Judge

_____

### APPELLANTS' OPENING BRIEF

_____

TANAIRA PADILLA-RODRIGUEZ
Ave. Ponce de León 1225
VIG Tower, Suite 1500
San Juan, PR 00907
787-620-0527
tanairapadilla@yahoo.com

WENCONG FA
Beacon Center of Tennessee
1200 Clinton St, Suite 205
Nashville, TN 372023
Tel.: 615-383-6431
Fax: 615-383-6432
wen@beacontn.org

_Attorneys for Plaintiffs-Appellant_

## CORPORATE DISCLOSURE STATEMENT

Clemente Properties, Inc. and 21 In Right, Inc. do not have parent corporations, and no publicly held company has a 10% or greater ownership interest in them.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ......................................................................... iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................ xiii

JURISDICTIONAL STATEMENT ............................................................... 1

STATEMENT OF THE ISSUES ................................................................... 1

INTRODUCTION ...................................................................................... 2

STATEMENT OF THE CASE ..................................................................... 3

I.      The Clementes and the Roberto Clemente trademark ..................... 3

II.     Puerto Rico's trademark theft ...................................................... 5

III.    Proceedings below ....................................................................... 8

SUMMARY OF ARGUMENT ................................................................... 11

STANDARD OF REVIEW ........................................................................ 12

ARGUMENT .......................................................................................... 13

I.      The Clementes' request for retrospective relief is not barred by
        sovereign immunity ................................................................... 13

        a.      States cannot invoke sovereign immunity to defeat the self-
                executing Just Compensation guarantee of the Fifth Amendment ..... 13

        b.      Puerto Rico is not entitled to sovereign immunity ............................ 19

        c.      The Lanham Act abrogates the immunity of Puerto Rico and its
                officials ........................................................................................ 21

II.     The Clementes are entitled to prospective relief .......................... 25

III.    The Clementes stated a plausible claim for relief under the Lanham Act ................................................................................................ 28

      a.    *The District Court improperly dismissed the Clementes' claim under 15 U.S.C. § 1114, 1225(a)(1)(A), 1125(c) and in relation with Law 67-2022 sua sponte.* ............................................. 28

      b.    *Violation of 15 U.S.C. § 1114* ............................................. 30

      c.    *Violation of 15 U.S.C. § 1125 (a)* ...................................... 37

      d.    *Violation of 15 U.S.C. § 1125 (c)* ...................................... 42

IV.    The Clementes stated a plausible claim for relief under the Takings Clause of the Fifth Amendment................................................... 44

      a.    *The Roberto Clemente Trademark is a constitutionally protected property right under the Fifth Amendment's Takings Clause* ........... 44

         1.    Trademarks derive from state and common law..................... 45

         2.    Trademarks bear the hallmark of constitutionally protected property and adhere to traditional property law principles ................................................................. 47

      b.    *Puerto Rico's appropriation and unauthorized use of the Roberto Clemente trademark is a categorical taking requiring just compensation* ................................................................. 49

V.    Defendants are not entitled to qualified immunity for their appropriation of the Roberto Clemente trademark...................................... 53

CONCLUSION ................................................................................ 60

CERTIFICATE OF COMPLIANCE................................................ 61

CERTIFICATE OF SERVICE ......................................................... 62

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Alden v. Maine,*
   527 U.S. 706 (1999)....................................................................14, 19

*Allen v. Cooper,*
   140 S. Ct. 994 (2020)..................................................................16, 24

*Álvarez Guedes v. Marcano Martínez,*
   131 F.Supp.2d. 272 (D.P.R. 2001) ....................................................41

*Armstong v. United States,*
   364 U.S. 40 (1960)...........................................................................15

*Bay Point Props., Inc. v. Mississippi Transp. Comm'n,*
   937 F.3d 454 (5th Cir. 2019) .............................................................13

*B&B Hardware, Inc. v. Hargis Indus., Inc.,*
   575 U.S. 138 (2015)....................................................................24, 46

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.,*
   376 F.3d 8 (1st Cir. 2004)......................................................39, 40, 43

*Blatchford v. Native Vill. of Noatak,*
   501 U.S. 775 (1991).....................................................................19, 20

*Bos. Duck Tours, LP v. Super Duck Tours, LLC,*
   531 F.3d 1 (1st Cir. 2008)..................................................................32

*Cedar Point Nursery v. Hassid,*
   141 S. Ct. 2063 (2021).........................................................50, 51, 52

*Cent. Va. Cmty. Coll. v. Katz,*
   546 U.S. 356 (2006)..........................................................................16

*Century 21 Real Est. Corp. v. LendingTree, Inc.,*
   425 F.3d 211 (3d Cir. 2005) ..............................................................32

*Chicago, B. & Q.R. Co. v. City of Chicago,*
  166 U.S. 226 (1897)....................................................................15

*Chute v. Walker,*
  281 F.3d 314 (1st Cir. 2002)......................................................29

*Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.,*
  228 F.3d 24 (1st Cir. 2000)........................................................39

*Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Board,*
  527 U.S. 666 (1999)........................................ 22, 23, 24, 45, 47, 48

*Cortés Camacho v. Quizno's Sub, Inc.,*
  173 D.P.R. 254............................................................................46

*Davis v. Burke,*
  179 U.S. 399 (1900)....................................................................14

*DeCosta v. Viacom Int'l, Inc.,*
  981 F.2d 602 (1st Cir. 1992).......................................................32

*In re Deister Concentrator Co.,*
  48 C.C.P.A. 952, 289 F.2d 496 (C.C.P.A. 1961) ...........................51

*Dorpan, S.L. v. Hotel Meliá, Inc.,*
  728 F.3d 55 (1st Cir. 2013).........................................................46

*ETW Corp. v. Jireh Pub., Inc.,*
  332 F.3d 915 (6th Cir. 2003) ......................................................40

*Edelman v. Jordan,*
  415 U.S. 651 (1974)....................................................................27

*Electra v. 59 Murray Enterprises, Inc.,*
  987 F.3d 233 (2d Cir. 2021) .......................................................41

*Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.,*
  143 S. Ct. 1176 (2023)..........................................................19, 21

*First Eng. Evangelical Lutheran Church of Glendale v. County of Los Angeles,*
    482 U.S. 304 (1987)................................................................16, 17, 27

*Fitzpatrick v. Bitzer,*
    427 U.S. 445 (1976).................................................................15

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.,*
    925 F.Supp.2d 1067 (C.D. Cal. 2012) ..................................32

*Florida Prepaid Postsecondary Educ. Expense Board v. College Sav. Bank,*
    527 U.S. 627 (1999)................................................................23

*Gómez v. Toledo,*
    100 S. Ct. 1920 (1980)..........................................................54

*Geoffrey, Inc. v. Toys 'R Us (Nosotros Somos Los Juguetes), Inc.,*
    756 F. Supp. 661 (D.P.R. 1991)...........................................56

*González-González v. United States,*
    257 F.3d 31 (1st Cir. 2001)....................................................29

*Green Giant Co. v. Tribunal Superior,*
    104 D.P.R. 489 (1975)...........................................................28

*Guillemard-Ginorio v. Contreras-Gómez,*
    490 F.3d 31 (1st Cir. 2007)....................................................54, 55

*Hana Fin., Inc. v. Hana Bank,*
    574 U.S. 418 (2015)................................................................32

*Hanover Star Milling Co. v. Metcalf,*
    240 U.S. 403 (1916)................................................................45, 46, 48

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)................................................................54, 56

*Horne v. Dep't of Agric.,*
    576 U.S. 351 (2015)................................................................44, 51, 53

vi

*Hutto v. S.C. Ret. Sys.*,
    773 F.3d 536 (4th Cir. 2014) ...............................................................................18

*In re Int'l Flavors & Fragrances, Inc.*,
    183 F.3d 1361 (Fed. Cir. 1999) ...............................................................46, 47, 56

*Jack Daniel's Properties, Inc. v. VIP Prod. LLC*,
    143 S. Ct. 1578 (2023)...........................................................................................42

*K Mart Corp. v. Cartier*,
    485 U.S. 176 (1988)........................................................................................48, 50

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979).................................................................................................47

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
    927 F.3d 396 (6th Cir. 2019) ...............................................................................26

*Knick v. Township of Scott*,
    139 S. Ct. 2162 (2019).................................................................................15, 17, 18

*Kotabs, Inc., v. Kotex Co.*,
    50 F.2d 810 (3d Cir. 1931) .....................................................................................37

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
    811 F.2d 26 (1st Cir. 1987)......................................................................................43

*Leathersmith of London, Ltd. v. Alleyn*,
    695 F.2d 27 (1st Cir. 1982)......................................................................................36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................................................................38

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)...................................................................................51, 52, 53

*Maloy v. Ballori-Lage*,
    744 F.3d 250 (1st Cir. 2014)...................................................................................12

vii

*Matal v. Tam,*
    582 U.S. 218 (2017)..................................................................32, 45, 55, 56

*Maysonet-Robles v. Cabrero,*
    323 F.3d 43 (1st Cir. 2003)......................................................................19

*Mihos v. Swift,*
    358 F.3d 91 (1st Cir. 2004)......................................................................55

*Milliken v. Bradley,*
    433 U.S. 267 (1977).................................................................................27

*Monongahela Navi. Co. v. United States,*
    148 U.S. 312 (1893).................................................................................16

*Nat'l Bank v. County of Yankton,*
    101 U.S. 129 (1880).................................................................................20

*Palmore v. United States,*
    411 U.S. 389 (1973).................................................................................20

*Park'n Fly v. Dollar Park & Fly,*
    469 U.S. 189 (1985).................................................................................47

*Parks v. LaFace Recs.,*
    329 F.3d 437 (6th Cir. 2003) ..................................................................41

*PennEast Pipeline Co., v. New Jersey,*
    141 S. Ct. 2244 (2021).............................................................................16

*Phillips v. Wash. Legal Found.,*
    524 U.S. 156 (1998).........................................................................44, 52

*Pierson v. Ray,*
    386 U.S. 547 (1967).................................................................................25

*Porto Rico v. Rosaly,*
    227 U.S. 270 (1913).................................................................................20

*Puerto Rico v. Sanchez Valle,*
   579 U.S. 59 (2016) ....................................................................19, 20

*Reich v. Collins,*
   513 U.S. 106 (1994) ..........................................................................18

*Riverdale Mills Corp. v. Pimpare,*
   392 F.3d 55 (1st Cir. 2004) ..............................................................55

*Román-Cancel v. United States,*
   613 F.3d 37 (1st Cir. 2010) ..............................................................28

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984) ..............................................................44, 48, 49

*S.F. Arts & Ath., Inc. v. United States Olympic Comm.,*
   483 U.S. 522 (1987) ..........................................................................48

*San Diego Gas & Elec. Co. v. San Diego,*
   450 U.S. 621 (1981) ..........................................................................17

*Saucier v. Katz,*
   533 U.S. 194 (2001) ..........................................................................55

*Suboh v. District Att'y's Off. of Suffolk Dist.,*
   298 F.3d 81 (1st Cir. 2002) ..............................................................55

*Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.,*
   704 F.3d 44 (1st Cir. 2013) ..............................................................32

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
   535 U.S. 302 (2002) ....................................................................49, 50

*Trade-Mark Cases,*
   100 U.S. 82 (1879) ................................................................45, 46, 48

*Trusted Integration v. United States,*
   679 F.Supp.2d 70 (D.D.C. 2010) ....................................................35

*Tyler v. Hennepin Cnty.,*
    143 S. Ct. 1369 (2023)..........................................................................45

*United States v. Causby,*
    328 U.S. 256 (1946)............................................................................53

*United States v. Padilla,*
    415 F.3d 211 (1st Cir. 2005)..............................................................19

*United States v. Zannino,*
    895 F.2d 1 (1st Cir.1990)..............................................................53, 58

*United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.,*
    128 F.3d 86 (2d Cir. 1997) ...............................................................35

*Value House v. Phillips Mercantile Co.,*
    523 F.2d 424 (10th Cir. 1975) ..........................................................56

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,*
    535 U.S. 635 (2002)...........................................................................26

*VersaTop Support Sys., LLC v. Georgia Expo, Inc.,*
    921 F.3d 1364 (Fed. Cir. 2019) ...................................................31, 35

*Waits v. Frito Lay, Inc.,*
    978 F.2d 1093 (9th Cir. 1992) ..........................................................41

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015)......................................................................10, 35

*Wyatt v. Cole,*
    504 U.S. 158 (1992)...........................................................................25

*Yale Elec. Corp. v. Robertson,*
    26 F.2d 972 (2d Cir. 1928) ...............................................................37

*Ex parte Young,*
    209 U.S. 123 (1908)......................................................................26, 27

## CONSTITUTION

U.S. Const. amend. V ................................. 1, 9, 12, 13, 14, 16, 17, 27, 44, 45, 47, 49

U.S. Const. amend. XI ....................................................................13, 14, 22

U.S. Const. amend. XIV .............................................. 15, 16, 22, 23, 24

U.S. Const. art. IV, § 3, Cl. 2 ..........................................................20

U.S. Const. art. VI, cl. 2 ..................................................................41

Puerto Rico Const. Art. I, § 3 .........................................................28

## STATUTES AND RULES

15 U.S.C. § 1057(b) ........................................................................48

15 U.S.C. § 1059 .............................................................................48

15 U.S.C. § 1060 .............................................................................48

15 U.S.C. § 1065 .............................................................................48

15 U.S.C. § 1072 ........................................................................32, 55

15 U.S.C. § 1114 ................................................. 28, 29, 30, 33, 35

15 U.S.C. § 1115(b) ........................................................................48

15 U.S.C. § 1116 .............................................................................44

15 U.S.C. § 1117 .....................................................................29, 42, 44

15 U.S.C. § 1121 ...............................................................................1

15 U.S.C. § 1122(a) ........................................................................21

15 U.S.C. § 1122(c) ........................................................................24

15 U.S.C. § 1125 ................................................................................22

15 U.S.C. § 1125(a) ...........................................................37, 38, 40, 42

15 U.S.C. § 1125(a)(1)(A) .............................................................28, 29

15 U.S.C. § 1125(b) ............................................................................22

15 U.S.C. § 1125(c) ..............................................................28, 29, 42, 44

15 U.S.C. § 1127 ................................................... 22, 24, 30, 31, 38

15 U.S.C. § 1501(a) ...........................................................................46, 47

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1367 ..................................................................................1

28 U.S.C. § 2201 ..................................................................................1

28 U.S.C. § 2202 ..................................................................................1

48 U.S.C. § 2144(a) ............................................................................21

10 L.P.R.A. § 223a..............................................................................46

H.R. 489 ..............................................................................................59

Joint Resolution No. 16-2022 .................................. 5, 7, 8, 10, 27, 37, 41, 49, 50, 58

Joint Resolution No. 17-2022 .................................. 6, 7, 8, 10, 27, 37, 41, 49, 50, 58

Puerto Rico Law 67-2022 ........................... 6, 8, 9, 25, 26, 28, 36, 37, 41, 49, 50, 59

Puerto Rico Law 139-2011 ...............................................................30, 54

Puerto Rico Law 139-2011, Art. 5.......................................................41

Fed. R. Civ. P. 15(a)..................................................................29

## OTHER AUTHORITIES

2 W. Blackstone, Commentaries................................................49

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
§ 28:15 (4th ed. 2002)........................................................41

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..........15

Black's Dictionary, tenth edition ............................................39

J. Locke, The Second Treatise of Civil Government, ch. 5 (J. Gough ed. 1947)....49

S. Rep. No. 100-515 (1988) ..................................................31

*Trademark Manual of Examining Procedure* (TMEP), United States Patent and
Trademark Office, July 2022, section 1207.01(c)(i) Legal Equivalents –
Comparison of Words and Their Equivalent Designs .........................................33

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Oral argument is warranted because this case raises important and complex issues involving sovereign immunity, the Takings Clause of the Fifth Amendment, and the Lanham Act. Co-counsel for Plaintiffs-Appellants ("the Clemente Family" or "the Clementes"), Mr. Fa and Ms. Padilla-Rodríguez, intend to move this Court to divide argument time evenly among them so that they can address different aspects of the case for which they were responsible. Mr. Fa will present argument on the Takings Clause, whether sovereign immunity is a bar to just compensation under the Takings Clause, and whether Puerto Rico is entitled to sovereign immunity. Ms. Padilla-Rodriguez will present argument on the Lanham Act, whether the Lanham Act abrogates sovereign immunity, and whether Defendants-Appellees are entitled to qualified immunity.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the federal questions here pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121. The Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, furnishes the basis for declaratory relief, and the district court had jurisdiction to consider the state-law claims pursuant to 28 U.S.C. § 1367.

This Court has jurisdiction because the Clementes appeal from a final judgment disposing of the claims. *Id.* § 1291. The district court entered judgment on September 22, 2023. Add. 70. The Clementes timely appealed on October 19, 2023.

## STATEMENT OF THE ISSUES

1. Does Sovereign Immunity bar the Clementes' claims under the Takings Clause and the Lanham Act?

2. Are the Clementes entitled to prospective relief?

3. Does the Clementes' complaint properly state a claim that Defendants' actions violate the Takings Clause of the Fifth Amendment?

4. Does the Clementes' complaint properly state a claim that Defendants' infringement of their trademark violates the Lanham Act?

5. Are Defendants entitled to qualified immunity?

**INTRODUCTION**

Plaintiffs—three adult children of baseball legend Roberto Clemente and the late Doña Vera Clemente—brought this case to protect their family's legacy. For decades, the Clementes have used the Roberto Clemente trademark to continue the family's humanitarian efforts after Roberto Clemente's untimely death in 1972 while en route to deliver aid for earthquake victims in Nicaragua. The goodwill they built for decades was destroyed, however, when Puerto Rico appropriated the trademark for its own use in Roberto Clemente license plates and registration labels that it forced Puerto Ricans to buy during hard economic times. Even worse, Puerto Rico intends to use the money to create a Roberto Clemente Sports District that the Clementes never approved and replace a sports district that Roberto Clemente helped create.

After repeated pleas to Puerto Rico officials fell on deaf ears, the Clementes raised Takings Clause and Lanham Act claims in federal court. Yet the district court dismissed the case based on its mistaken belief that Puerto Rico's immunity allowed it to take trademarks and property without having to provide a penny in compensation. The district court's analysis on the merits fared no better. It concluded that the sale of Roberto Clemente trademark embedded in license plates and vehicle tags cannot be considered commercial use merely because it is "clear government activity," and that the Clementes could not plead a takings claim because the

Clementes were still free to use their trademark. That reasoning is not only incompatible with the governing precedent but would eviscerate important protections for trademarks and other property rights. This Court should reverse.

## STATEMENT OF THE CASE

### I.    The Clementes and the Roberto Clemente trademark

Roberto Clemente is a baseball legend. A native of Puerto Rico, Clemente won several batting titles, Gold Glove awards, two World Series championship trophies, a Most Valuable Player award in 1966, and a World Series Most Valuable Player award in 1971. A13 (¶ 3.2). Over his nearly two decades with the Pittsburgh Pirates, Clemente amassed over 3,000 hits and became the first Latin-American player inducted into the National Baseball Hall of Fame. *Id.*

Roberto Clemente's work as a humanitarian was just as important. In 1972, Clemente was en route to Nicaragua to deliver aid to earthquake victims in Nicaragua. A14 (¶ 3.9). He died at 38 when the plane crashed into the Atlantic Ocean. *Id.*

His widow, Doña Vera Clemente, dedicated her life to preserving the legacy and humanitarian efforts of her late husband. *Id.* (¶ 3.10). Doña Vera died in 2020, leaving her sons Roberto, Luis Roberto, and Roberto Enrique—all of whom Doña Vera raised to serve as leaders in the community and protectors of Roberto Clemente's legacy. A14–15 (¶¶ 3.11, 3.18). Through the hard work of the

Clementes,[1] Roberto Clemente continues to enjoy worldwide recognition as a sports hero, humanitarian, and champion for justice. A15 (¶ 3.12).

Roberto Clemente's continued fame and philanthropy can be attributed to his longstanding trademark. That mark has been in use since 1955, A14 (¶ 3.3), and the Clementes have undertaken several measures to protect the trademark from misuse. *Id.* Roberto Clemente Jr., Luis Roberto Clemente, and Roberto Enrique Clemente are the sole owners of Clemente Properties, Inc., a Delaware corporation that registered the Roberto Clemente trademark with the United States Patent and Trademark Office. A13–14 (¶¶ 3.1, 3.3). The Clementes are also the sole owners of 21 In Right, Inc., a Pennsylvania corporation with the right to license the Roberto Clemente trademark. A12, A15 (¶¶ 2.2, 3.16). The Clementes retained the services of a leading intellectual property management agency, CMG Worldwide, Inc., as the family's exclusive, worldwide business representative for Clemente Properties, Inc. and 21 in Right, Inc. A16 (¶ 3.19). The Clementes entrust CMG with the duty to monitor and address unauthorized use of the Roberto Clemente mark and to license such mark to select companies for high-quality merchandise and endorsements. *Id.* CMG recently secured the domain name RobertoClemente.com from an unauthorized user. *Id.* (¶ 3.20).

---

[1] For ease of reference, this brief refers to all Appellants as the Clemente family or the Clementes and the Puerto Rico government defendants as "Puerto Rico." The brief also uses "trademark" to denote "trademark, name, image, and likeness."

The Clemente family's efforts have maintained the value of the Roberto Clemente trademark. Today, the mark is routinely licensed for all kinds of initiatives, including events, products, awards, and so on. A15 (¶ 3.14). The trademark appears not only in commerce, but also promotes the Clementes' humanitarian efforts. The Roberto Clemente Foundation and the Roberto Clemente Museum in Pittsburgh are two examples of the work that the Clementes have initiated—in joint ventures with other respectable members of society—to use, promote, and exalt the Roberto Clemente trademark. *Id.* (¶¶ 3.13, 3.14).

## II.    Puerto Rico's trademark theft

In 2021, Puerto Rico enacted two resolutions that authorized government officials to use the Roberto Clemente trademark without his family's permission. Under Joint Resolution No. 16, Puerto Rico residents who acquired a license plate had to pay an additional $21 dollars for an image of Roberto Clemente with the number "21" (for Clemente's jersey number), the number "50," the word "anniversary," and the phrase "3,000 hits." A17–18 (¶¶ 3.27–3.29). Puerto Rico transferred the revenue generated from the sale of the Clemente trademark patterned in the license plates to the Roberto Clemente Sports District Fund, which is unaffiliated with the Clementes but is instead administered by the Puerto Rico Department of Treasury for the exclusive use of the Department of Sports and Recreation. A18 (¶ 3.30).

Resolution No. 17 further imposed an extra charge of five dollars for the trademark pattern in the commemorative vehicle registration labels to celebrate the 50th anniversary of Roberto Clemente's 3,000th hit. A18–19 (¶ 3.33). The Department of Transportation and Public Works issued vehicle permits that referred to a Roberto Clemente fund, which is not associated with the Clemente family, next to the five-dollar charge. A19 (¶ 3.39).

Puerto Rico also enacted Law 67-2022. A25 (¶ 3.69). That law created the Roberto Clemente Sports District, which will be overseen by the Department of Sports and Recreation. A25–26 (¶ 3.72). Law 67-2022 also allocates $150,000 per year to the Puerto Rico Convention District Authority, so that it can plan and organize the facilities in the sports district. A27 (¶ 3.74). The same law calls for a transfer of land from Ciudad Deportiva Roberto Clemente, Inc.—which Roberto Clemente himself created to provide a sports facility to children—to the Roberto Clemente Sports District. A25, 28 (¶¶ 3.71, 3.80).

These laws shocked the Clementes. Law 67-2022 stated that Puerto Rico will create the Roberto Clemente Sports District to honor the memory of Roberto Clemente and implies that Clemente would have wholeheartedly endorsed the project. A29 (¶ 3.84). But the Clementes—who possess the right to use the Roberto Clemente mark and endorse the project—have made it abundantly clear to

6

government officials that they oppose Puerto Rico's creation of the district. *Id.* (¶ 3.85).

Worse yet, Puerto Rico funds one unauthorized misuse of the Roberto Clemente trademark with two others. The Clementes have always been opposed to the fees imposed by Resolutions 16 and 17—particularly when many people in Puerto Rico were going through difficult economic times. A21 (¶ 3.46). Before Puerto Rico proposed Resolution No. 16, the Clementes had authorized Ciudad Deportiva to raise funds by issuing commemorative license plates, which would be available to the people of Puerto Rico in exchange for a *voluntary* donation of $2.10. *Id.* (¶ 3.50). The Clementes informed Governor Pierluisi of this plan in February 2021, and less than one month later, Puerto Rico proposed an earlier version of Resolution No. 16. *Id.*

The Clementes still made every effort to resolve the issue with government officials. Luis Roberto Clemente informed Governor Pierluisi—before Pierluisi signed the resolutions into law—that no one from the government had sought approval to use Roberto Clemente's trademark in license plates or registration labels. A22 (¶ 3.52). Governor Pierluisi then signed the joint resolutions into law—despite knowing that they called for the unauthorized use of the Roberto Clemente trademark. A23 (¶¶ 3.55–3.57). Puerto Rico made around 15 million dollars from its

7

misuse of the Roberto Clemente trademark in license plates and vehicle registration labels. A34 (¶ 3.110).

Puerto Rico's misuse tarnished the Roberto Clemente trademark. Puerto Rico citizens resented the Clementes for contributing to the impoverishment of Puerto Rico by collecting money during financial crisis—even though the Clementes had *opposed* Puerto Rico's Roberto Clemente license plate and registration label program and received none of its proceeds. A21 (¶ 3.47). But Puerto Ricans were understandably confused—given that Puerto Rico had used the Roberto Clemente trademark—and attacked the Clementes in the press, social network, events, and other activities. A20–21 (¶¶ 3.45, 3.47). What's more, the Clemente trademark had become embroiled in the dispute between the government and the Clementes—one which the Clementes sought to avoid through private conversations with the Governor's office. A32 (¶ 3.99). Puerto Rico's misuse of the Clemente trademark limits the Clementes' ability to do business, generate income, and protect Roberto Clemente's legacy. A32–33 (¶¶ 3.103, 3.108).

## III.    Proceedings below

The Clementes filed their lawsuit in the United States District Court for the District of Puerto Rico. The amended complaint alleges that Puerto Rico's previous misuse of the Roberto Clemente trademark in Resolution Nos. 16 and 17, and its plan to further misuse the trademark under Law 67-2022 violates the Takings Clause

of the Fifth Amendment, the Lanham Act, and the laws of Puerto Rico. The Clementes sought injunctive relief, declaratory relief, damages, and just compensation against Puerto Rico officials in their individual and official capacities, and the Puerto Rico Convention District Authority. *See* Dkt. 27. The Authority, the Secretary of the Department of Sports and Recreation, and the other Puerto Rico officials filed three motions to dismiss, *see* Dkt. 36, 38, 42,[2] and the Clementes filed three responses. *See* Dkt. 44, 45, 53.

The district court granted the motions to dismiss. Add. 69. Although the court acknowledged that the Supreme Court recently reserved the issue, it noted that it was bound by circuit court precedent extending the doctrine of state sovereign immunity to Puerto Rico even though Puerto Rico is not a state. *Id.* at 21–25. The court then recognized that neither the First Circuit nor the Supreme Court has squarely addressed whether the Takings Clause abrogates sovereign immunity but held that neither the Takings Clause nor the Lanham Act abrogated Puerto Rico's sovereign immunity. *Id.* at 25–30 (Lanham Act); *id.* at 51–56 (Takings Clause). As for the Clementes' request for prospective relief, the district court ultimately sidestepped Law 67-2022's planned trademark infringement and declared that the Clementes had "provided the Court with no basis from which it can infer any possibility of an

---

[2] Unless otherwise noted, citations to the docket refer to the district court proceedings in this case.

9

ongoing violation of federal law." *Id.* at 35–36. The court also dismissed both the Lanham Act and the Takings Clause claims on the merits. As for the Lanham Act, the court cited a First Amendment case as support for its conclusion that "issuing motor vehicle license plates and tags cannot be considered commercial use, as it is a clear government activity." *Id.* at 43 (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)). The court then dismissed the Takings claim because Joint Resolutions Nos. 16 and 17 did not deprive the Clemente family of "all economically beneficial use" and because the Clementes "remained free to use their trademark." *Id.* at 56. The court declined to allow the Clementes' claims against the government officials in their personal capacity to proceed because of the court's determination that the complaint's allegations do not plausibly establish a claim. *Id.* at 63. And the court dismissed the state-law claims without prejudice given its dismissal of the federal claims that justified the federal court's exercise of supplemental jurisdiction. *Id.* at 69–70. This appeal follows.

## SUMMARY OF ARGUMENT

Puerto Rico appropriated the Roberto Clemente trademark and sold it through license plates and vehicle registration labels over the Clementes' objections. Even worse, Puerto Rico used the proceeds from one trademark infringement to support another: Puerto Rico sought to create a Roberto Clemente Sports District that was never authorized by the Clementes, and replaces the sports district created by Roberto Clemente himself.

*First*, the district court erred in holding that the Commonwealth of Puerto Rico had sovereign immunity over the claims here. Although an *en banc* First Circuit (or the Supreme Court) should hold that Puerto Rico is not entitled to sovereign immunity, a panel of this Court should hold that Puerto Rico cannot use immunity to evade liability under the Takings Clause or Lanham Act.

*Second*, the Clementes are entitled to an injunction preventing Puerto Rico and the Sports Authority from using the trademark in connection with the Roberto Clemente Sports District in the future.

*Third*, the Clementes properly pleaded claims under the Lanham Act. The district court's conclusion that the use of trademarks on license plates and vehicle certificate tags "cannot be considered commercial use, as it is a clear government activity" defies both common sense and the facts here, which involves roughly 15

million dollars in *sales* of license plates and vehicle registration labels that bear the Roberto Clemente trademark.

*Fourth*, the Clementes pleaded a claim under the Fifth Amendment. Trademarks are entitled to protection under the Takings Clause. The district court erred in focusing on the fact that the Clementes can still use their trademark rather than Puerto Rico's destruction of the Clementes' ability to exclude others from using the Roberto Clemente trademark.

*Fifth*, the doctrine of qualified immunity does not shield the government officials, who had both constructive and actual knowledge that their actions infringed on the Roberto Clemente trademark, from liability.

## STANDARD OF REVIEW

The Court reviews de novo the district court's dismissal of a complaint. *Maloy v. Ballori-Lage*, 744 F.3d 250, 252 (1st Cir. 2014). In deciding whether the district court properly dismissed a claim, this Court determines whether the complaint states a plausible claim to relief on its face, accepting the plaintiffs' factual allegations and drawing all reasonable inferences in the plaintiffs' favor. *Id.* (citations and quotation marks omitted). To cross the plausibility threshold, the plaintiffs must plead factual content that allows the court to draw the reasonable inference that the defendants are liable for the misconduct alleged. *Id.* (citations and quotation marks omitted).

# ARGUMENT

## I.     The Clementes' request for retrospective relief is not barred by sovereign immunity

### a.     *States cannot invoke sovereign immunity to defeat the self-executing Just Compensation guarantee of the Fifth Amendment*

Neither this Court nor the Supreme Court has ruled on the interplay between the Constitution's express guarantee of just compensation and its implicit provisions for state sovereign immunity. *See Bay Point Props., Inc. v. Mississippi Transp. Comm'n*, 937 F.3d 454, 456 n.1 (5th Cir. 2019) (acknowledging that "'the tension' between state sovereign immunity and the right to just compensation . . . is [an issue] for the Supreme Court"); Add. 52–54 (noting that "the Supreme Court has not addressed whether Eleventh Amendment immunity applies to takings claims against states or territories" and that "the First Circuit has not dwelled on this thorny subject."). Yet a faithful application of text, history, purpose, and precedent all lead to the same conclusion: when the government takes property, it can't rely on sovereign immunity to evade its constitutional duty to compensate the property owner.

Text, history, and purpose specify that sovereign immunity doesn't obviate the need for government to provide just compensation when it takes an individual's property. The text of the Eleventh Amendment only prohibits a court from extending the "judicial power of the United States" to any suit "against one of the United States

by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has explained that the Eleventh Amendment does not limit "the sovereign immunity of the States." *Alden v. Maine*, 527 U.S. 706, 713 (1999). Instead, "as the Constitution's structure, and its history, and the authoritative interpretations" by the Supreme Court make clear, "the States' immunity from suit [in state and federal court] is a fundamental aspect of the sovereignty which the States enjoy[] . . . except as altered by the plan of the Convention or certain constitutional Amendments." *Id.*

The Fifth Amendment contains the only self-executing provision in the Bill of Rights. *See* U.S. Const. amend. V. ("[N]or shall private property be taken for public use, without just compensation."). That means that the Takings Clause is unique among the provisions in the Bill of Rights in that it not only acknowledges limitations on government power, but also sets forth the remedy if government fails to abide by them. *Davis v. Burke*, 179 U.S. 399, 403 (1900) ("A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced.") (citation and internal quotation marks omitted). The Fifth Amendment's text thus dictates that, when the government takes private property, it may not use sovereign immunity to escape its duty to provide just compensation.

It could hardly be otherwise.[3] The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstong v. United States*, 364 U.S. 40, 49 (1960). Yet a rule that allows the government to assert sovereign immunity in takings cases would make matters worse not only by depriving property owners of their property, but also by forcing them to shoulder all of the costs.

The Fourteenth Amendment incorporated the protections of the Takings Clause against the states. *See Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 239–41 (1897). A leading proponent of the Fourteenth Amendment explained that the Takings Clause must be applied against the states to protect "citizens of the United States, whose property, by State legislation, has been wrested from them, under confiscation." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 268 (1998). This history suggests that just as "the principle of state sovereignty" is "necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment," *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976), so too is that principle necessarily limited by the Fourteenth Amendment's application of the

---

[3] The remedy for a Takings Clause violation, unlike the remedy for violations of other provisions in the Bill of Rights, is generally "just compensation" rather than injunctive relief. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2176–77 (2019).

self-executing Takings Clause to the states. Because the states agreed to ratify the Fifth and Fourteenth Amendments, they necessarily consented to the just compensation mechanism that is "inherent in the constitutional plan." *PennEast Pipeline Co., v. New Jersey*, 141 S. Ct. 2244, 2262 (2021); *cf. Allen v. Cooper*, 140 S. Ct. 994, 1003 (2020) ("the Bankruptcy Clause itself abrogated sovereign immunity" because "the States had already 'agreed in the plan of the Convention not to assert any sovereign immunity defense' in bankruptcy proceedings") (quoting *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 377 (2006)).

A long line of Supreme Court precedent leads to the same conclusion. In *Monongahela Navi. Co. v. United States*, the Supreme Court rebuffed the Congress's efforts to determine the measure of compensation it wished to pay for the taking of private property. 148 U.S. 312, 327 (1893). The Court observed that "[t]he legislature may determine what private property is needed for public purposes," but that it "does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation." *Id.* On the contrary, the "Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry." *Id.*

The Supreme Court's decision in *First Eng. Evangelical Lutheran Church of Glendale v. County of Los Angeles* provides yet more support. 482 U.S. 304, 315–

16

16 (1987). There, the Supreme Court refuted the argument of the United States that the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government, and explained that its precedents "make clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking." *Id.* at 316 (citing *San Diego Gas & Elec. Co. v. San Diego*, 450 U.S. 621, 655, n. 21 (1981) (Brennan, J., dissenting).

More recently in *Knick v. Township of Scott*, the Supreme Court overruled a prior decision requiring property owners to seek just compensation in state court before bringing a federal takings claim. 139 S. Ct. 2162, 2169 (2019). Although the government entity in that case was not entitled to sovereign immunity, the Court's reasoning severely undermined the notion that any government may use sovereign immunity to avoid paying compensation. For one, the Court in *Knick* reasoned that "because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time." *Id.* at 2172. The Court also soundly rejected the notion that federal courts must play second fiddle to state courts in takings cases. *See id.* at 2173.

*Knick* thus undermines the logic of the court of appeals' decisions allowing state governments to mount sovereign immunity defenses to takings claims. Add. at 54–55 (citing cases). Those decisions pointed to the fact that the property owners

17

may seek just compensation in state court.[4] *See Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014). Yet *Knick* rejected a system that would "relegate[] the Takings Clause to the status of a poor relation among the provisions of the Bill of Rights." *Knick*, 139 S. Ct. at 2169 (internal quotation marks omitted). Plaintiffs "asserting any other constitutional claim are guaranteed a federal forum," but sovereign immunity effectively "hands authority over federal takings claims" against a state "to state courts." *Id.* at 2169–70 (internal quotation marks and brackets omitted).

The appellate court decisions cited by the district court also took a sharp misstep in relying on the Supreme Court's decision *Reich v. Collins*, 513 U.S. 106 (1994). *See, e.g.*, *Hutto*, 773 F.3d at 552 (noting that the court's conclusion followed by reasoning analogously from *Reich*). In *Reich*, the Supreme Court held that the Due Process Clause provides a refund remedy for unconstitutionally appropriated taxes in state court, but opined in dicta that sovereign immunity would "generally bar" a refund claim in federal court. *Reich*, 513 U.S. at 110. As the Supreme Court reiterated in *Knick*, "the analogy from the due process context to the takings context is strained." 139 S. Ct. at 2174. The Due Process Clause doesn't expressly provide for a self-executing remedy; the Takings Clause does. *See id.* at 2170-72.

---

[4] The district court in this case remarked that sovereign immunity would bar the Clemente family's takings claim even if there were "no local remedy to redress" that claim. Add. 55.

### b.    Puerto Rico is not entitled to sovereign immunity

The Clementes recognize that this Court has held that Puerto Rico is entitled to sovereign immunity, *see, e.g.*, *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 48 n.3 (1st Cir. 2003), but that holding has been cast into doubt by recent Supreme Court opinions. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 143 S. Ct. 1176, 1186–88 (2023) (Thomas, J., dissenting) (observing that Puerto Rico's argument that it has sovereign immunity "appears untenable"); *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 71 (2016) (the Supreme Court "concluded in the early decades of the last century that U.S. territories — including an earlier incarnation of Puerto Rico itself — are not sovereigns distinct from the United States."). The Clementes assert that Puerto Rico does not enjoy sovereign immunity to preserve that argument for further review. *Cf. United States v. Padilla*, 415 F.3d 211, 215 (1st Cir. 2005) (noting an instance in which the court, sua sponte, to rehear a question en banc).

Puerto Rico does not enjoy sovereign immunity. The Supreme Court has observed that the *states'* sovereign immunity emanates from their sovereignty, which they "enjoyed before the ratification of the Constitution, and which they retain today" *Alden*, 527 U.S. at 713.

But Puerto Rico is a federal territory, which unlike a state, does not enter the Union "with [its] sovereignty intact." *Blatchford v. Native Vill. of Noatak*, 501 U.S.

775, 779 (1991). Federal territories "are not sovereigns distinct from the United States" and instead derive their powers from the United States. *Sánchez Valle*, 579 U.S. at 71; *cf. id.* at 72 & n.5 ("The States (*all* of them) are separate sovereigns for double jeopardy purposes not (as the dissent claims) because they exercise authority over criminal law, but instead because that power derives from a source independent of the Federal Government.") (emphasis in original).

As a result, Congress may "legislate for the [territories] in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it under Art. I, § 8." *Palmore v. United States*, 411 U.S. 389, 398 (1973). The Constitution itself provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, Cl. 2. And this Court has recognized Congress's authority to "not only abrogate laws of the territorial legislatures," but "legislate directly for the local government." *Nat'l Bank v. County of Yankton*, 101 U.S. 129, 133 (1880).

Puerto Rico enjoys some immunity with respect to its own laws and courts. *See Porto Rico v. Rosaly*, 227 U.S. 270, 273 (1913) (Puerto Rico "is of such nature as to come within the general rule exempting a government sovereign in its attributes from being sued without its consent"). But this limited immunity, which rests on

Puerto Rico's *delegated* power to self-governance rather than the *inherent* immunity of a sovereign state, is not enforceable against the federal laws or federal courts, and may be abrogated by Congress as part of its plenary control over territories.

     *c.*     *The Lanham Act abrogates the immunity of Puerto Rico and its officials*

To the extent that a clear statement is needed to abrogate Puerto Rico's limited immunity, Congress has provided it in the Lanham Act. *See Fin. Oversight & Mgmt.*, 1143 S. Ct. at 1183 (Congress "must make its intent to abrogate sovereign immunity 'unmistakably clear in the language of the statute'").[5] The text of the Lanham Act makes it unmistakably clear that Congress intended to abrogate or waive immunity for *all* governmental entities, officials, and individuals in the United States, including Federal, State and Territorial government. 15 U.S.C. § 1122(a), entitled "Waiver of sovereign immunity by the United States," provides a waiver of sovereign immunity for the "United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States." For purposes of

---

[5] The facts in this case underscore that the United States manages Puerto Rico's affairs in ways that would be unimaginable if Puerto Rico were a state. Congress set up a system "for overseeing Puerto Rico's finances," and a board that "approves and enforces the Commonwealth's fiscal plans and budgets, and supervises the Commonwealth's borrowing." *Fin. Oversight & Mgmt. Bd.*, 143 S. Ct. at 1181. The Act requires Puerto Rico to send the Board the text of each new law and allows the Board to prevent the enforcement of laws significantly inconsistent with its fiscal plan. 48 U.S.C. § 2144(a).

21

the Lanham Act, the United States includes Puerto Rico because "United States includes and embraces all territory which is under its jurisdiction and control." *Id.* § 1127. All this reflects Congress's intent in enacting the Lanham Act "to protect registered marks used in such commerce from interference by State, or territorial legislation." 15 U.S.C. § 1127.

Even if Puerto Rico is viewed as more like a state, the Lanham Act provides a clear statement that Congress intended to waive Puerto Rico's Immunity. § 1125(b) provides that "Any State, instrumentality of a State or any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or *under any other doctrine of sovereign immunity*." *Id.* (emphasis added).

As stated above, the fact that Puerto Rico is a Territory subject to the plenary power of Congress makes the abrogation doctrine employed in *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Board*, 527 U.S. 666 (1999), inapplicable to this case. But even if Puerto Rico were entitled to sovereign immunity similar to the immunity that states enjoy, Congress has properly abrogated it here. In *College Savings Bank*, the Supreme Court concluded that Congress intended to abrogate sovereign immunity of States in the Lanham Act, but lacked the authority to do so under the Fourteenth Amendment regarding the false advertisement cause of action in 15 U.S.C. § 1125.

22

When considering if State immunity was validly abrogated under the Fourteenth Amendment, the Supreme Court explained that "[t]he Lanham Act may well contain provisions that protect constitutionally cognizable property interests— notably, its **provisions dealing with infringement of trademarks, which are the 'property' of the owner because he can exclude others from using them**." *College Savings Bank*, 527 U.S. at 673 (emphasis added). There was no deprivation of property in *College Savings Bank* that allowed an abrogation of State immunity.

According to the expressions in *College Savings Bank*, the abrogation of States' sovereign immunity regarding the provisions of the Lanham Act dealing with infringement of trademarks, as a protection of property rights under the Fourteenth Amendment, is valid. In this case, the Defendants' conduct constitutes trademark infringement, and some *also* constitutes false-advertising. Therefore, even if Puerto Rico were treated as having the sovereign immunity of a State, no dismissal is in order.

Likewise, the Court's other decision in *Florida Prepaid Postsecondary Educ. Expense Board v. College Sav. Bank*, 527 U.S. 627 (1999), does not preclude the claims here. In that case, the Supreme Court made a detailed and specific analysis of the Patent Remedy Act and concluded that its historical record and the scope of coverage made it clear that the Patent Remedy Act cannot be sustained under the Fourteenth Amendment. *Id.* at 646, 647. No similar analysis was made in *College*

23

*Savings Bank* regarding the Lanham Act, and the analysis cannot be extrapolated to trademark legislation because trademarks are a form of a property right that predates the Constitution. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015).[6]

In any case, the historical record analysis to determine the remedial or preventive nature of a statute under the Fourteenth Amendment is a doctrine to protect federalism and the sovereign immunity of the States that predated the Constitution, and it is inapplicable to Puerto Rico.

Finally, the Lanham Act abrogates *any* immunity, including qualified immunity, of government officials or governmental entities. The Lanham Act provides that remedies are available against the United States and state officers to the same extent that they are available against "any person," and that such remedies include injunctive relief, damages, profits, costs, attorneys' fees, and "any other remedies" provided in the Lanham Act. 15 U.S.C. § 1122(c). The Act also states that "any instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity." 15 U.S.C. § 1127.

---

[6] Likewise, *Allen v. Cooper*, 140 S. Ct. 994 (2020), is not controlling because it deals with copyrights and not trademarks, and because the State Defendant there presented the Court with federalism concerns that are inapplicable here.

It has long been established that Congress can abolish common law immunities, such as qualified immunity if specifically provided. *Pierson v. Ray*, 386 U.S. 547, 554–55 (1967) ("we presume that Congress would have specifically so provided had it wished to abolish the doctrine."); *Wyatt v. Cole*, 504 U.S. 158, 164 (1992). And the qualified immunity doctrine has been developed in connection with §1983, which does not contain a comprehensive scheme for liability of officials or individuals acting under color of law. On the contrary, the Lanham Act specifically regulates the liability of such individuals making it clear that Congress abrogated any immunity.

In addition, there is no important governmental function that requires *any* use, even legal or fair, of a private trademark, making the qualified immunity doctrine superfluous regarding trademark infringement. Therefore, the qualified immunity defense cannot be raised regarding violations of the Lanham Act.

## II.    The Clementes are entitled to prospective relief

The Clementes are entitled to prospective relief. First, the Clementes are entitled to prospective relief against all defendants to prevent the *continued* implementation of Law 67-2022. Second, prospective relief is appropriate to require Defendants to provide just compensation to the Clementes as that is the only way by

25

which Defendants can stop their unconstitutional taking of the Roberto Clemente trademark.

It is well-settled that the Court can issue injunctive relief to prevent defendants from continuing to violate a plaintiff's rights. For instance, the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), provides for injunctive relief against government officials to cease an ongoing violation of federal law, including the federal Constitution. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002). *Ex parte Young* also allows a plaintiff to seek prospective injunctive relief *before* government officials violate that plaintiff's federal constitutional or statutory rights. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 417 (6th Cir. 2019).

Although the district court's opinion barely mentioned Puerto Rico Law 67-2022, the Clementes are plainly entitled to an injunction preventing defendants from implementing that law. After all, the Clementes seek forward-facing relief enjoining Defendants from the unauthorized use of the Roberto Clemente trademark in connection with the Roberto Clemente Sports District—a project that the Clementes neither endorsed nor approved. The Roberto Clemente Sports District illegally uses the trademark in the name with which it is identified. The revenues to be made by the use of the Roberto Clemente trademark in the enormous project of the Roberto Clemente Sports District as described in Law 67-2022, are immeasurable. The

Clementes' request to enjoin the creation and development of the Roberto Clemente Sports District is proper.

Additionally, the Clementes are entitled to an injunction ordering the government defendants to prevent the continued violation of the Clementes' Fifth Amendment rights by paying just compensation. That's because the Takings Clause doesn't prohibit all takings, but prohibits takings "without just compensation." U.S. Const. amend. V. The government defendants here have already improperly used the Roberto Clemente trademark through their enforcement of Resolution Nos. 16 and 17. They cannot undo the taking of the trademark. Therefore, compensation is "required by the Constitution," *First Eng.*, 482 U.S. at 316, because it is the only way by which the Court can stop the constitutional violation.

Sovereign immunity does not bar injunctive relief just because it will include payment of some government funds. In *Milliken v. Bradley*, for instance, the Supreme Court required state officials to pay for a comprehensive education program for school children who had been subjected to past acts of de jure segregation. 433 U.S. 267, 269 (1977). Sovereign immunity did not block an *Ex Parte Young* action seeking "the payment of state funds" because it was a "a necessary consequence of compliance *in the future* with a substantive federal-question determination." *Id.* at 289 (quoting *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)).

Additionally, the government of Puerto Rico has no power to constitutionally take a property right that exists in the rest of the United States. Puerto Rico Const. Art. I, § 3, provides that "[t]he political authority of the Commonwealth of Puerto Rico shall extend to the Island of Puerto Rico and to the adjacent islands within its jurisdiction." Puerto Rico's Constitution and laws are intended to resolve internal situations. *Green Giant Co. v. Tribunal Superior*, 104 D.P.R. 489, 496 (1975). Therefore, a trademark registered in the United States Patent and Trademark Office, that is a property right enforceable nationally, cannot be validly taken by the government of Puerto Rico. And there's no public use justification that would allow the government to take a registered trademark, because no governmental function requires any use of a private trademark. In absence of a valid taking for public use and given that in this case the taking cannot be undone, just compensation must be paid.

### III. The Clementes stated a plausible claim for relief under the Lanham Act

a. *The District Court improperly dismissed the Clementes' claim under 15 U.S.C. § 1114, 1225(a)(1)(A), 1125(c) and in relation with Law 67-2022 sua sponte.*

The Court of Appeals reviews "the granting of a motion to dismiss for lack of subject matter jurisdiction *de novo*." *Román-Cancel v. United States*, 613 F.3d 37, 41 (1st Cir. 2010). But since the district court *sua sponte* dismissed several claims

against the government and the government officials, the standard of review is the harshest against the dismissal.

"*Sua sponte* dismissals are strong medicine, and … are erroneous unless the parties have been afforded notice and an opportunity to amend the complaint or otherwise respond." *Chute v. Walker*, 281 F.3d 314, 319 (1st Cir. 2002) (internal quotations and references omitted). A plaintiff who encounters an argument on a motion to dismiss has notice of the argument and the opportunity to amend. *See* Fed. R. Civ. Proc. 15(a). By contrast, a *sua sponte* dismissal of a plaintiff's claims deprives that plaintiff of the core protections to amend or respond. It will thus be "the rare case" in which a *sua sponte* dismissal without leave to amend will be upheld. *González-González v. United States*, 257 F.3d 31, 36–37 (1st Cir. 2001).

In this case, Defendants did not raise any argument for dismissal regarding violation of 15 U.S.C. § 1114, concerning the unauthorized use of a registered mark, which make them liable in a civil action by the registrant for damages under 15 U.S.C. § 1117. They made no argument on false association, § 1125(a)(1)(A) or dilution § 1125 (c). And their argument for dismissal revolved on the issue of the motor vehicle license plates and registration labels and omitted the Roberto Clemente Sports District.[7]

---

[7] Regarding the Roberto Clemente Sports District, the Secretary of the Department of Sports and Recreation in his official capacity, only alleged that he has not yet executed any functions, and consequently, no relief may be granted. Dkt. 42.

Therefore, the *sua sponte* dismissal of all those claims must be reversed. But even if the Court proceeds to the merits, the Clementes have stated a claim under several provisions of the Lanham Act.

       *b.     Violation of 15 U.S.C. § 1114*

Under the Lanham Act, any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, is liable. 15 U.S.C. § 1114.

The district court concluded that each Lanham Act claim, including trademark infringement claims under Section 1114, "requires proof of use in commerce and commercial use." Add. 37. But, although the term "use in commerce" is defined in 15 U.S.C. § 1127,[8] that restrictive definition does not apply to infringement. "When

---

Likewise, the District Authority only alleged that its involvement is tangential, that it will act according to Puerto Rico law and that PR Act 139-2011 governs. Dkt. 36.
[8] The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--

the Trademark Act was amended in 1988 to authorize federal registration based on 'intent to use,' as well as actual use in commerce, the legislative reports explicitly recognized that this statutory definition of 'use in commerce' applies to the use of a trademark for purposes of federal registration, and reaffirmed that an infringing use may be 'use of any type':

> [T]he revised definition [of use in commerce] is intended to apply to all aspects of the trademark registration process, from applications to register, whether they are based on use or on intent-to-use, and statements of use filed under Section 13 of the Act, to affidavits of use filed under Section 8, renewals and issues of abandonment. Clearly, however, use of any type will continue to be considered in an infringement action.

S. Rep. No. 100–515, at 45 (1988)." *VersaTop Support Sys., LLC v. Georgia Expo, Inc.*, 921 F.3d 1364, 1369 (Fed. Cir. 2019). But here, the trademark was illegally used even applying the standard most favorable to Defendants.

"[A] plaintiff must establish (1) that its mark is entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer

---

(1) on goods when--
(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
(B) the goods are sold or transported in commerce, and
(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services. 15 U.S.C. § 1127.

confusion. *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008); *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 605 (1st Cir. 1992).

There is no controversy that the Roberto Clemente trademark, as a registered trademark, is entitled to protection under the Lanham Act. Add. 42. That is because "[r]egistration of a mark on the principal register … shall be constructive notice of the registrant's claim of ownership thereof" 15 U.S.C. § 1072, and "[t]his system of federal registration helps to ensure that trademarks are fully protected." *Matal v. Tam*, 582 U.S. 218, 225 (2017).

Nor there is controversy that in this case there is a use of the trademark. Add. 42. This is the "[t]he typical situation in a trademark case involv[ing] the defendant's having passed off another's mark as its own." *Century 21 Real Est. Corp. v. LendingTree, Inc.*, 425 F.3d 211, 217 (3d Cir. 2005); *Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 49 (1st Cir. 2013). The use of the trademark is undeniable. "[W]hen … marks are 'legal equivalents' … they create the same, continuing commercial impression." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 420 (2015). The doctrine of legal equivalents recognizes that "a word mark can infringe a picture mark if the word mark evokes the picture mark, and a picture mark can infringe a word mark where the picture is a depiction of the word." *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F.Supp.2d 1067, 1077 (C.D. Cal. 2012). A pictorial depiction can be the legal equivalent of a word mark. Legal

equivalents are likely to impress the same mental image. A design mark may be found to be confusingly similar to a word mark consisting of the design's literal equivalent. *See Trademark Manual of Examining Procedure* (TMEP), United States Patent and Trademark Office, July 2022, section 1207.01(c)(i) Legal Equivalents – Comparison of Words and Their Equivalent Designs. Therefore, the use of a pictorial depiction of the Roberto Clemente trademark is a use of the trademark.

The only remaining issue is if the use of the trademark infringes the Lanham Act. It does. Defendants' actions establish liability under 15 U.S.C. § 1114 because a trademark like Roberto Clemente has such an intrinsic value separate from any product it endorses. The registered trademark itself was the good or service for which the infringer charged and made a profit through its unauthorized use.

As stated above, the government charged fees not for any typical license plate or vehicle registration label, but for *the Roberto Clemente trademark* imprinted on specialized license plate and vehicle registration labels—which trademark netted the government roughly 15 million dollars.

This Court need not analyze consumer confusion because the infringer is not making a profit from the sale of a good or service by misleading the consumer about its origins, it is making a profit using the trademark itself.

But in any case, the confusion naturally happened. Because it is common knowledge that the Clementes are the owners of the Roberto Clemente trademark,

the People of Puerto Rico inferred that the Clementes were recipients of monies from the sale of the trademark. The contempt of the People of Puerto Rico against the Clementes for apparently charging those monies flooded televised, written and on-line press, social networks, events, everyday social activities, and so on. The Roberto Clemente trademark and the Clementes were perceived as blameworthy actors for the growing impoverishment of the People of Puerto Rico. A23, A25.[9]

In general terms, Defendants and the district court rejected that the unauthorized use of the trademark infringed the Lanham Act, because of the nature of the goods and services in question. Again, the good or service for which the government charged was the trademark itself, not the vehicle license plates and labels.

Regardless, the district court conclusion that motor vehicle license plates and tags are not the classes of products that trademark law protects is plainly wrong. Vehicle registration goods and services are specifically listed as examples in classes 6, 20 and 35, all of which are included in the Roberto Clemente Trademark

---

[9] The district court deemed these facts as false when concluding that there is not likelihood of confusion, even though confusion actually happened. Add. 48–49. That is contrary to the legal standard that must be applied when resolving a motion to dismiss.

Registration.[10] Class 20 includes any kind of plastic label,[11] and labels, signs, prints are examples of infringement cited in 15 U.S.C. § 1114. To support its contrary conclusion, the lower court cited *Walker v. Texas Div., Sons of Confederate Veterans, Inc*., 576 U.S. 200 (2015), which is a First Amendment case involving government speech and does not even mention trademarks. Add. 43.

In any case, the Lanham Act's construction of the term commercial use for purposes of infringement must be very broad to secure the purposes of the act. *See VersaTop Support Sys.,* 921 F.3d at 1369. The Lanham Act has been applied to a wide variety of non-commercial public and civic benefits, for example, non-profit solicitations, political activities, and non-profits disseminating information. *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc*., 128 F.3d 86, 90 (2d Cir. 1997). Placing products in the stream of commerce is unnecessary for the Lanham Act to protect against the improper use of a trademark. *Id*, (citation omitted). In all, the Lanham Act is not restricted to profit-making activities or to commercial organizations. *See Trusted Integration v. United States*, 679 F.Supp.2d 70, 80–81 (D.D.C. 2010) (concluding that the Department of Justice can violate the statute).

---

[10] Some examples are: vehicle registration plates of metal are item 006-1797; state vehicular registration and title transfer are item 035-93; registration plates, not of metal are item 020-1787; registration of written communications and data in the field of state vehicular registrations is item 035-2891. https://tmidm.uspto.gov/id-master-list-public.html.

[11] Plastic labels are item 020-288. https://tmidm.uspto.gov/id-master-list-public.html.

Defendants also infringed the Roberto Clemente trademark thorough Law 67-2002, which created the Roberto Clemente Sports District and contemplates the use of the trademark in the name of the sports facility.[12]

Roberto Clemente Sports City ("Ciudad Deportiva Roberto Clemente") is one of the most iconic good and service endorsed by the trademark. It's a sports facility created by Roberto Clemente himself before his death. Now, under Law 67-2022, the government uses the Roberto Clemente trademark in the name of a sports facility (unaffiliated with Clemente) to be developed in the same lands of Roberto Clemente Sports City. Basically, the government uses the registered trademark to identify a good or service that is a knock-off of the most iconic good and service of the registered trademark. *Leathersmith of London, Ltd. v. Alleyn*, 695 F.2d 27, 30 (1st Cir. 1982) (noting that the use of the very words of a trademark is enough to show likelihood of confusion or mistake, "where the goods are identical and are marketed in the same channels of trade").

Additionally, the Roberto Clemente trademark registration includes class 41, which contains providing sports facilities as item 041-370.

---

[12] Surprisingly, the district court did not include any analysis of trademark infringement under the Lanham Act regarding the creation of the Roberto Clemente Sports District. Therefore, the *sua sponte* dismissal of that claim must be reversed. The Roberto Clemente Sports District is a fully commercial profit-making project. *See* Law 67-2022 (detailing all the commercial activity that will be taking place, such as sales contracts, leases, joint ventures, partnerships, developments, operations, constructions, etc.).

https://tmidm.uspto.gov/id-master-list-public.html; Nice Classification, Eleventh Edition, version 2022 (NCL 11-2022). That means there is no doubt that the Roberto Clemente trademark is protected from the unauthorized use in relation with sports facilities, among other sport related goods and services.[13]

In sum, Resolution 16-2022, Resolution 17-2022 and Law 67-2022 provide for trademark infringement under 15 U.S.C. § 1114.

c.    *Violation of 15 U.S.C. § 1125 (a)*

Any person who, on or in connection with any goods or services, uses in commerce any word, term, name, symbol, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or

---

[13] The Lanham Act protects registered and unregistered trademarks in registered and unregistered classes. The difference is the level of protection and the legal analysis of infringement. A registered trademark in specific classes like the Roberto Clemente trademark, is vested with the highest level of protection. *See Kotabs, Inc., v. Kotex Co.*, 50 F.2d 810, 812 (3d Cir. 1931) ("there is more in a trade-mark infringement case than class determination"); *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) ("a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask.").

approval of his or her goods, services, or commercial activities by another person, or in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, of his or her goods or services, is liable to any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125 (a).

This section of the Lanham Act protects trademarks regardless of registration. The main protection is from false advertisement and false association.

In *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 134 (2014), the Supreme Court rejected the argument that only direct competitors may sue for false advertisement. The Court also rejected other restrictive interpretations of the law and recognized a cause of action for false advertisement, even though the case did not involve a typical commercial advertisement. Therefore, the interpretation of commercial advertising or promotion for purposes of false advertisement claims is broad and guided by the purpose of the Lanham Act.

The intent of Lanham Act is to make actionable the deceptive and misleading use of marks in commerce; to protect registered marks used in commerce from interference by State, or territorial legislation; to protect persons engaged in commerce against unfair competition and to prevent fraud and deception in commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks, among others. 15 U.S.C. § 1127. Liability for commercial advertising within the meaning of 15 U.S.C. § 1125(a) could take many forms as

long as it relates to a commercial activity and clashes with the principles protected in the Lanham Act.[14]

"The fact that the injury is to a company's reputation or goodwill, rather than directly to its sales, does not render the confusion any less actionable." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 15 (1st Cir. 2004). And, "[i]f the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction." *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 33 (1st Cir. 2000).

Here, Defendants used the trademark and made misleading and false descriptions of facts and representations of facts, in relation to the charges for the imprint of the Roberto Clemente name, image, likeness and trademark in the license plates and registration labels, and in relation to the Roberto Clemente Sports District project that would generate significant revenue for the government. The unauthorized use of the trademark and the misleading and false descriptions of fact and representations of facts were made in the laws, in the license plates and registration labels, in the document of permit for motor vehicles, to the press, and so

---

[14] Commercial activity is an activity conducted to make a profit. Black's Dictionary, tenth edition, p. 41.

on. A19, A24 (¶¶ 3.39, 3.66). All methods that communicate information to the public.[15]

Those uses of the trademark and the misleading and false descriptions of facts and representations of facts constitute false advertisement and false association because they misled the public to believe that the Clementes endorsed the charges for the trademark in license plates and registration labels, and the new sports district. This cause commercial injury to the trademark because the initiatives were repudiated by the People.[16] Therefore, the claim under 15 U.S.C. § 1125 (a) must proceed.

15 U.S.C. § 1125 (a) is also the federal equivalent protection of the right of publicity, which protects image, name and likeness. *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 924 (6th Cir. 2003). The right of publicity had been described as a right emanating from state law, but the doctrine has evolved. The unauthorized use of the general components of the right of publicity, like name, photograph, portrait,

---

[15] In fact, "Class 035-Advertising and business," includes state vehicular registration and title transfer, item 035-93, and registration of written communications and data in the field of state vehicular registrations is item 035-2891. https://tmidm.uspto.gov/id-master-list-public.html. Naturally, the purpose of those goods is to communicate the information displayed because the goods themselves have no significant value without the information imprinted on them. Therefore, these are recognized methods of advertising, within the meaning and scope of protection of the Lanham Act.

[16] The "likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark." *Beacon Mut.*, 376 F.3d at 16.

voice, signature, attribute or any representation of a person that serves to identify that person, can violate the Lanham Act. *Álvarez Guedes v. Marcano Martínez*, 131 F.Supp.2d. 272 (D.P.R. 2001).

This section of the law can protect an individual's image or likeness from unauthorized use, even if there's no trademark registration, if the requirements of the federal statute are met. The analysis differs from the state's law of the right for publicity. *See Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 257(2d Cir. 2021); *see also Parks v. LaFace Recs.*, 329 F.3d 437, 445 (6th Cir. 2003) ("§ 43(a) … permits celebrities to vindicate property rights in their identities against allegedly misleading commercial use by others). Celebrities have standing to sue under this provision because they possess an economic interest in their identities akin to that of a traditional trademark holder. *See Waits v. Frito Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992) (abrogated on other grounds); *see also* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 28:15 (4th ed. 2002) (discussing cases).

According to Puerto Rico Law 139-2011, Art. 5, the Clementes (as the heirs of Roberto Clemente) were vested with the ownership of Roberto Clemente's image, name and likeness. That property right, once attained, is protected by the Lanham Act, and cannot be taken or violated under local statutes. *See* U.S. Const. art. VI, cl. 2. Therefore, Resolution 16-2022, Resolution 17-2022 and Law 67-2022, which

provide for the unauthorized use of Roberto Clemente's image, name and likeness, violate 15 U.S.C.A. § 1125 (a).

>    d.    *Violation of 15 U.S.C. § 1125 (c)*

Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, must be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. 15 U.S.C. § 1125 (c).

This section of the Lanham Act protects famous marks, like Roberto Clemente, from dilution by blurring or dilution by tarnishment, regardless of the presence of actual or likely confusion, of competition, or of actual economic injury. *Jack Daniel's Properties, Inc. v. VIP Prod. LLC*, 143 S. Ct. 1578, 1584 (2023). It contains an injunctive remedy, but is also a basis for civil liability. 15 U.S.C. § 1117.

In a dilution case, the question is whether the reputation of the famous trademark was harmed. *Jack Daniel's*, 143 S. Ct. at 1579. "The overriding purpose of anti-dilution statutes is to prohibit a merchant of noncompetitive goods from selling its products by trading on the goodwill and reputation of another's mark."

*L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 30 (1st Cir. 1987). Therefore, classes of goods or competitor status are not dispositive for these claims.

"A trademark owner may obtain relief under an anti-dilution statute if his mark is distinctive and there is a likelihood of dilution due to (1) injury to the value of the mark caused by actual or potential confusion, (2) diminution in the uniqueness and individuality of the mark, or (3) injury resulting from use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with plaintiff's mark." *Id.* "The threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark." *Id.* at 31. "The harm occurs when a trademark's identity and integrity—its capacity to command respect in the market—is undermined due to its inappropriate and unauthorized use by other market actors." *Id.* Where confusion "injured the trademark holder's goodwill and business reputation, no further showing of injury is necessary." *Beacon Mut.*, 376 F.3d at 20.

As explained, the contempt of the People of Puerto Rico against the Clementes for apparently charging for the impression of the trademark in license plates and registration labels flooded televised, written and on-line press, social networks, events and everyday social activities. the Roberto Clemente trademark was perceived as blameworthy for the growing impoverishment of the People of Puerto

Rico and as an unstable trademark rejected in Puerto Rico, the birthplace of Roberto Clemente. A23, A25, A32. Defendants' unauthorized use plainly tarnished the Roberto Clemente trademark.

In sum, Defendants violated the Clementes' rights under the Lanham Act. Therefore, The Clementes are entitled to the remedies provided for in 15 U.S.C. § 1117 and the injunctive remedies included in 15 U.S.C. § 1116 and 1125 (c).

## IV. The Clementes stated a plausible claim for relief under the Takings Clause of the Fifth Amendment

### a. The Roberto Clemente Trademark is a constitutionally protected property right under the Fifth Amendment's Takings Clause

Although the district court did not conclusively decide whether trademarks were cognizable under the Fifth Amendment's Takings Clause, Add. 55, trademarks merit protection under the Takings Clause. The Fifth Amendment's Takings Clause states that "nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. The Fifth Amendment protects "'private property' without any distinction between different types." *Horne v. Dep't of Agric.*, 576 U.S. 351, 358, (2015). This includes tangible and intangible property rights. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984). The Constitution itself does not create property rights. *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164, (1998). Rather, the existence of a property right derives from "existing rules or understandings that stem from an independent source such as state law." *Id*. While

44

state law is a common source of recognized property interests, it is not the only source. Courts also examine "traditional property law principles," historical practices, and Supreme Court precedent. *Tyler v. Hennepin Cnty*., 143 S. Ct. 1369, 1375 (2023).

Trademarks satisfy the requirements of what constitute constitutionally protected property under the Takings Clause. First, both state and common law recognize trademarks as protected property. Second, trademarks embody traditional property law principles found in real and personal property. Trademarks are thus cognizable under the Fifth Amendment's Takings Clause.

1.    Trademarks derive from state and common law

Trademarks have been protected as property rights since the founding and originally derive from common law. "Trademarks and their precursors have ancient origins, and trademarks were protected at common law and in equity at the time of the founding of our country." *Tam*, 582 U.S. at 224. State common law has long recognized the right of an individual or business to adopt or use a symbol to distinguish the use and sale of goods or property to the exclusion of all others. *Trade-Mark Cases*, 100 U.S. 82, 92 (1879). One of the functions of trademarks as a property interest is to protect the reputation and goodwill that flows from using the mark. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916); *Tam*, 582 U.S. at 224. Goodwill is also a protected property right. *Coll. Sav. Bank*, 527 U.S. at 675.

45

Trademarks under the common law are "classed among property rights." *Hanover Star Milling Co*., 240 U.S. at 413; *Trade-Mark Cases*, 100 U.S. at 92.

The territory of Puerto Rico also recognizes trademarks as property and protects both registered and unregistered marks. *Dorpan, S.L. v. Hotel Meliá, Inc*., 728 F.3d 55, 63 (1st Cir. 2013) (*citing* 10 L.P.R.A. § 223a). The right of likeness and the right to one's image is also a distinct property right in Puerto Rico. *Cortés Camacho v. Quizno's Sub, In*c. 173 D.P.R. 254, 266-67. Puerto Rico's recognition of trademarks as property rights also shows that the Clementes' property right in the Roberto Clemente trademark derives from an independent source similar to state law.

Trademarks can therefore be distinguished from copyrights and patents as trademarks are not created under federal law.[17] *B&B Hardware, Inc.*, 575 U.S. at 142; The Lanham Act did not create the property right of a trademark; rather, the owner of the mark already has the property right established by prior use. *Id.*; *In re Int'l Flavors & Fragrances, Inc*., 183 F.3d 1361, 1366 (Fed. Cir. 1999)[18];15 U.S.C.

---

[17] Unlike copyrights and patents which are created by the Constitution's Intellectual Property Clause, trademarks as property rights rest exclusively on the laws of the states, and federal legislation on trademarks is created under the Commerce Clause. *Trade-Mark Cases*, 100 U.S. at 93-94. Trademarks as a property interest derive from state and common law, not federal law. *Id*.

[18] The district court improperly cited *Int'l Flavors* to support the notion that a trademark may not be a property right "[t]he federal registration of a trademark does not create an exclusive property right in the mark." Add. 52 (quoting *In re Int'l*

§ 1501(a) (Owner acquires rights in the trademark through use of the mark.). The Lanham Act was designed to "to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park'n Fly v. Dollar Park & Fly*, 469 U.S. 189, 198 (1985). The Lanham Act further solidifies the protection of a trademark by providing a national registry and expanding the protections afforded to owners of trademarks. *See In re Int'l Flavors*, 183 F.3d at 1366–67. Although the Lanham Act does not create the property interest of a trademark, the Lanham Act's protection of trademarks bolsters the common law understanding that trademarks are distinct property rights.

Trademarks therefore meet the constitutional definition of property under the Fifth Amendment because their existence as a property right derives from independent sources such as state and common law.

> 2.    Trademarks bear the hallmark of constitutionally protected property and adhere to traditional property law principles

The Clementes' property interest in their trademark grants them the right to exclude others from using the Roberto Clemente mark. "The hallmark of a constitutionally protected property right is the right to exclude others." *Coll. Sav. Bank*, 527 U.S. at 673; *Kaiser Aetna v. United States*, 444 U.S. 164, at 176 (1979).

---

*Flavors*, 183 F.3d at 1366). Yet the quote merely states that registration of the trademark itself doesn't create the property interest. On the contrary, a property interest arises from the trademark holder's use of the trademark.

Under common law, the property right in a trademark grants the right of the owner to exclude all others from using the mark. *S.F. Arts & Ath., Inc. v. United States Olympic Comm*., 483 U.S. 522, 534, (1987) (*citing Trade-Mark Cases*, 100 U.S. at 92). "Trademark law, like contract law, confers private rights, which are themselves rights of exclusion." *K Mart Corp. v. Cartier*, 485 U.S. 176, 185, (1988); *Hanover Star Milling Co*., 240 U.S. at 413. The Lanham Act also grants the holder of a trademark the exclusive use of the mark. 15 U.S.C. §§ 1057(b), 1065, 1115(b); *see also Coll. Sav. Bank*, 527 U.S. at 673 (noting that the owner of trademark has the right to exclude others and that the Lanham Act's section on trademark infringement likely protects a cognizable property interest due to the owner's right to exclude). Trademarks thus contain one of the primary and most important attributes of a protected property interest: the right to exclude others.

The intangible nature of trademarks does not diminish the traditional property law principles inherent in a trademark. The Supreme Court has elaborated that when intangible forms of property, such as trade secrets, contain similar traits to tangible property, a protected property right exists. *See, e.g.*, *Ruckelshaus*, 467 U.S. at 1002. Trademarks, like trade secrets, also resemble tangible property. A trademark is assignable, 15 U.S.C. § 1060, and perpetual (provided renewal applications are timely filed). 15 U.S.C. § 1059. As discussed above, trademarks are established by an individual's or business's use of the mark—through labor—which is another

traditional principle of what constitutes property. *Ruckelshaus*, 467 U.S. at 1002 (citing 2 W. Blackstone, Commentaries 405; J. Locke, The Second Treatise of Civil Government, ch. 5 (J. Gough ed. 1947)). Trademarks thus bear the common characteristics found in tangible property and merit protection under the Taking Clause. *Id*, at 103.

In all, trademarks embody all the traditional characteristics of property rights and derive from independent sources such as state and common law. The Roberto Clemente trademark is therefore a cognizable property right under the Fifth Amendment's Takings Clause.

b.    *Puerto Rico's appropriation and unauthorized use of the Roberto Clemente trademark is a categorical taking requiring just compensation*

Puerto Rico by using the Roberto Clemente trademark under Resolution 16 and 17, and Act 67-2022 against the wishes of the Clementes, appropriated the Roberto Clemente trademark. The district court concluded that there was no taking because the Clementes could still use the Roberto Clemente mark, and that the mark retained economic value. Add. 55-56. But when governments directly appropriate private property for their own use, it is a classic taking and they have the categorical duty to compensate the owner. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan.*

*Agency*, 535 U.S. 302, 322 (2002); *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077–78 (2021) (defining "appropriation" as "taking as one's own.").

Puerto Rico has taken the Roberto Clemente trademark to use as its own. Under Resolutions 16 and 17, Puerto Rico charged drivers for the Roberto Clemente trademark embedded in license plates and vehicle registration labels, and obtained around 15 million dollars for its unauthorized use. A17–18 (¶¶ 3.27; 3.33). Also, under Act 67-2022, Puerto Rico intends to further use and rely on the Roberto Clemente mark, against the express wishes of the Clemente family, for the development of the Roberto Clemente Sports District. Puerto Rico's actions show that it used, and will continue to use, the Roberto Clemente trademark to obtain revenue from the people of Puerto Rico at the expense of the Clementes and Roberto Clemente's legacy.

The district court's analysis on whether the Clementes could still use the Roberto Clemente trademark focused on the wrong property right taken from the Clementes. The owner of a trademark has the right to exclude others from using the mark. *K Mart Corp*, 485 U.S. at 185. The Supreme Court has conclusively established that the right to exclude "falls within [the] category of interests that the Government cannot take without compensation." *Cedar Point*, 141 S. Ct. at 2073 (quotations omitted).

50

Puerto Rico's use of the Roberto Clemente mark deprived the Clementes of their right to exclude others from using the mark and destroyed the goodwill and image of Roberto Clemente. A20–21 (¶¶ 3.44–47). "If the law will not protect one's claim of right to exclude others from using an alleged trademark, then he does not own a 'trademark,' for that which all are free to use cannot be a trademark." *In re Deister Concentrator Co*., 48 C.C.P.A. 952, 963 n.6, 289 F.2d 496, 501 (C.C.P.A. 1961). In effect, Puerto Rico has taken the Roberto Clemente mark and has destroyed the essence of the trademark—the right to exclude others from using the mark to protect the goodwill and reputation of Roberto Clemente's legacy. The Clementes' right to exclude others from using the Roberto Clemente mark is so fundamental that it "cannot be balanced away" by claiming that the Clementes can still use the Roberto Clemente mark or that it retains economic value. *Cedar Point*, 141 S. Ct. at 2077.

That the Roberto Clemente mark still retains economic value after Puerto Rico's use of the mark is irrelevant when the government appropriates property for its own use. *See Horne*, 576 U.S. at 363. When the government takes away the right of a property owner to exclude others and appropriates the property for its use, the remaining economic value or benefit from the property does not relieve the government from the categorical duty to compensate the owner. *Id*. The Supreme Court in *Loretto* held that the government took a property right even when the

51

infringement arguably increased the market value of the property.[19] *Phillips*, 524 U.S. at 170 (*citing Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 437 n.15 (1982)). And even if the appropriation is not permanent there is still a taking of property. *See Cedar Point*, 141 S. Ct. at 2074 ("the duration of an appropriation—just like the size of an appropriation, bears only on the amount of compensation.") (citation omitted).

Nor does the fact that the Clementes can still use the Roberto Clemente mark defeat their categorical takings claim. That a property owner may retain the use of the property does not defeat the government's obligation to pay just compensation. *Loretto*, 458 U.S. at 430. The district court's logic that a categorical taking does not occur when the government appropriates property private if the property owner can still use their property, is contrary to Supreme Court precedent. For example, in *Cedar Point*, the access regulation at issue only allowed union organizers to enter the growers' land for 3 hours per day, 120 days per year. *Cedar Point*, 141 S. Ct. at 2072. The growers still had use of their land and retained an interest in their property, even if union organizers could access their land on limited occasions. But the Supreme Court held that since the access regulation took the right of the growers to exclude others from their property, it was still a categorical taking. *Id*. at 2077.

---

[19] The taking committed by Puerto Rico has tarnished and damaged the Roberto Clemente trademark and the goodwill associated with the mark. App. 32 (¶¶ 3.99–104).

Likewise, in *Loretto,* the fact that the government installed only a small cable box on Loretto's rooftop did not stop the Supreme Court from finding a taking. *Horne*, 576 U.S. at 363 (*citing Loretto*, 458 U.S. at 430); *see also United States v. Causby*, 328 U.S. 256, 262, (1946) (even though the property owner still retained some use and enjoyment of the property, the government's appropriation of the property constituted a taking). This is particularly true with trademarks, because the core value of a trademark is the exclusive right to use it. A trademark that can be used by everyone ceases to be a trademark. In sum, the Clementes' amended complaint properly pleaded a claim under the Takings Clause.

## V.    Defendants are not entitled to qualified immunity for their appropriation of the Roberto Clemente trademark

As discussed above (on pages 24–25), the Lanham Act abrogated any qualified immunity that territorial government officials could have had. Additionally, the qualified immunity defense was waived because the argument was not properly developed. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

Defendants only allege that a reasonable public official in their situation could have concluded that no trademark or proprietary rights were being violated, since requisites of commercial advertising or promotion and intention to influence potential customers are missing from the pleadings,[20] and there is no relief under the

---

[20] It is clear from the preceding discussion that there are no legal bases for the supposed requirements, and in any case, they would have been met.

Lanham Act because PR Law-139-2011 controls. Defendants didn't raise the qualified immunity defense in connection with the unauthorized use and misappropriation of the Roberto Clemente trademark in the creation of the Roberto Clemente Sports District, nor the false advertising claim regarding that issue. Hence, the qualified immunity defense was waived regarding all the other Lanham Act claims. *Gómez v. Toledo*, 100 S. Ct. 1920, 1924 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant); *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 37 (1st Cir. 2007) (qualified immunity issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived).

In any case, the territorial government officials are not entitled to qualified immunity. The qualified immunity defense in §1983 claims stems from the tenet that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). To evaluate whether a defendant deserves qualified immunity, the court must consider "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged

action violated the constitutional right at issue." *Mihos v. Swift,* 358 F.3d 91, 102 (1st

Cir. 2004) (*citing Suboh v. District Att'y's Off. of Suffolk Dist.,* 298 F.3d 81, 90 (1st

Cir. 2002). The analysis is no different when officials are acting according to an

invalid or unconstitutional law, if "a reasonable official in their position would have

known" that the law violated constitutional or federal rights. *Guillemard-Ginorio*,

490 F.3d at 40–41.

To resolve a qualified immunity issue raised in a motion to dismiss, the initial

inquiry or threshold question is: "Taken in the light most favorable to the party

asserting the injury, do the facts alleged show the officer's conduct violated a

constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). When the defense

is raised by way of a Rule 12(b)(6) motion, the level of specificity of the allegations

doesn't have to be too high.  *Riverdale Mills Corp. v. Pimpare,* 392 F.3d 55, 61 (1st

Cir. 2004).

Therefore, even if the court conducts the qualified immunity analysis—and it

should not—Defendants are not entitled to qualified immunity. The Clementes'

registration of the Roberto Clemente trademark constitutes "constructive notice of

the Clementes' claim of ownership thereof." 15 U.S.C. § 1072; s*ee also Tam*, 582

U.S. at 226–227. Federal registration "confers important legal rights and benefits on

trademark owners" and serves as "prima facie evidence of the validity of the

registered mark and of the registration of the mark, of the owner's ownership of the

mark, and of the owner's exclusive right to use the registered mark." *Tam*, 582 U.S. at 226–27. "Registration serves as constructive notice to the public of the registrant's ownership of the mark . . . and thus prevents another user of the mark from claiming innocent misappropriation as a trademark infringement defense." *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1367 (Fed. Cir. 1999); *see also Value House v. Phillips Mercantile Co.*, 523 F.2d 424, 429 (10th Cir. 1975); *Geoffrey, Inc. v. Toys 'R Us (Nosotros Somos Los Juguetes), Inc.*, 756 F. Supp. 661, 665 (D.P.R. 1991). The statute prohibits thus the defense of good faith in which qualified immunity is rooted. *See Harlow*, 457 U.S. at 807. ("Nonetheless, we held that a governor and his aides could receive the requisite protection from qualified or good-faith immunity."). In the end, Defendants are not entitled to qualified immunity because the registration of the Roberto Clemente trademark eliminated any possible good faith defense.

It is clearly established that a registered trademark cannot be used by another and that a reasonable officer would have understood that the use of the registered trademark violated the Clementes' constitutional and statutory rights. Defendants do not dispute actual knowledge of the registered trademark and that they violated the general prohibitions of the Lanham Act.[21] That should be the end of the analysis. Defendants' after-the-fact rationalization that one of the officers could have thought

---

[21] The Amended Complaint, A14, A23, explains that Defendants had constructive and actual knowledge of the registered trademark.

that its use was covered by an exception to trademark infringement does not suffice. *See* Dkt. 38 at 45–46. Qualified immunity shields from liability an officer that acts in good faith, not an officer that acts with knowledge of the violation and gambles to find an exception that will allow the conduct—particularly where the exception has no basis in the law. If to be entitled to qualified immunity, a defendant has only to invent some extremely far-fetched situation in which his conduct may have not violated a constitutional or statutory right, no cause of action would ever survive qualified immunity.

Additionally, the involvement of the individual Defendants in the violation of the Clementes' rights is unquestionable. This case presents a comprehensive governmental scheme, implemented by three laws, that violates Clementes' constitutional and statutory rights. Defendants are the leaders of the agencies invested by the laws to execute the governmental scheme. And the Governor, as the principal officer of the executive branch, implements the laws, and signed these laws giving them effectiveness and enforceability.

The complaint shows how most of the unlawful conduct were facilitated by the heads of the pertinent agencies. A17–20, 25–30 (listing the most relevant allegations).[22] The Clementes' other allegations against individual Defendants show

---

[22] Defendants failed to consider the entirety of the allegations in the *Amended Complaint* regarding the individual Defendants involvement, therefore the argument

57

that their involvement in the Lanham Acts violations surpasses a mere compliance with a law. *See id.*

For example,[23] before Governor Pierluisi signed into law Joint Resolutions No. 16 and No. 17, he was specifically informed by Luis Roberto Clemente that the name Roberto Clemente and its image was a registered trademark and its use required prior authorization and that they had not received communication or design of the proposal license plate or tag for approval. Therefore, Governor Pierluisi signed the laws knowing they constituted an unauthorized use of the trademark and were illegal. A21–23.

On her part, Secretary Vélez issued written comments to the legislature, before the approval of Joint Resolution No. 16, in which she favored the approval as long as it was amended to make the purchase of the commemorative license plate of Roberto Clemente mandatory for all license plates purchased during 2022. Therefore, she was directly responsible for the monies collected through the unauthorized use of the Roberto Clemente trademark, name and likeness in license plates. Additionally, Secretary Vélez made false statements in an interview televised on January 17, 2022, that the monies collected were destined to the Roberto

---

was not properly developed and it should be considered waived. *Zannino*, 895 F.2d at 17.

[23] The Clementes include only a few examples to sustain their position, but more can be found in their amended complaint. *See* A11.

Clemente Foundation (a foundation backed by the trademark) and the charge was for the restoration of Ciudad Deportiva Roberto Clemente (project backed by the trademark). A24–25.

Secretary Quiñones also endorsed H.R. 489, which was enacted as Law 67-2022, and indicated that he envisions its development as the most advanced sports training center, as well as a source of jobs and tourist attraction for those who enjoy sports tourism. He is in the particular position of being one of the members of the Board of Directors of Ciudad Deportiva Roberto Clemente and therefore, has firsthand knowledge of how Ciudad Deportiva Roberto Clemente is one of the most valuable and recognizable endeavors backed by the Roberto Clemente trademark. Therefore, Secretary Quiñones is directly responsible for the creation of the Roberto Clemente Sports District which is an unauthorized use of the Roberto Clemente trademark and name, and is an imitation of Ciudad Deportiva Roberto Clemente, making the infringement even more blatant. A31.

Finally, the District Authority endorsed H.R. 489, asked to be the entity that develops the administration of the projects carried out in the Roberto Clemente Sports District and recommended itself to be responsible for the planning and organization of the Roberto Clemente Sports District, which will perpetually infringe the Roberto Clemente trademark. All of the Authority's requests were granted and, as a part of the comprehensive scheme here, the Authority receives,

59

from Puerto Rico, an annual income of one hundred and fifty thousand dollars ($150,000.00) from the monies the Commonwealth collected through the unauthorized sale of the Roberto Clemente trademark in license plates and vehicle registration labels. A25–32. Defendants are not entitled to qualified immunity.

## CONCLUSION

This Court should reverse the district court's judgment and remand the case for further proceedings.

Dated: March 4, 2024.

Respectfully submitted,

s/ Wencong Fa
Wencong Fa
Beacon Center of Tennessee
1200 Clinton Street, #205
Nashville, TN 37203
Tel.: 615-383-6431
Fax: 615-383-6432
wen@beacontn.org
*Admitted to practice only in California*

/s/ Tanaira Padilla-Rodriguez
Tanaira Padilla-Rodriguez
Ave. Ponce de León 1225
VIG Tower, Suite 1500
San Juan, PR 00907
787-620-0527
tanairapadilla@yahoo.com

*Attorneys for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with this Court's order granting Appellants leave to file an oversized brief because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 14,289 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

Dated: March 4, 2024.

<u>s/ Wencong Fa</u>
Wencong Fa
Counsel for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2024, I submitted the foregoing motion to the Clerk of the Court via the CM/ECF system, which served those documents on all counsel of record.

s/ Wencong Fa
Wencong Fa
Counsel for Appellants

# ADDENDUM

# TABLE OF CONTENTS

| Description of Item | Record Entry No. | Addendum Page No. |
|---|---|---|
| Opinion and Order (09/22/2023) ................................. | R.67 | Add.1 |
| Judgment (09/22/2023) ................................................ | R.68 | Add.70 |
| U.S. Const. art. IV (Territorial Clause of Article IV) ........................................................ | | Add.71 |
| U.S. Const. amend. V. .................................................. | | Add.72 |
| U.S. Const. amend. XI................................................... | | Add.73 |
| Lanham Act, 15 U.S.C. § 1114 ................................. | | Add.74 |
| Lanham Act, 15 U.S.C. § 1122 ................................. | | Add.78 |
| Lanham Act, 15 U.S.C. § 1125 (a)-(c). ...................... | | Add.79 |
| Lanham Act, 15 U.S.C. § 1127. ................................. | | Add.82 |
| Joint Resolution No. 16 of 2021 [and English Translation]................................................ | | Add.86 |
| English Translation of Joint Resolution No. 16 of 2021 ........................................................ | | Add.89 |
| Joint Resolution No. 17 of 2021 [and English Translation]................................................ | | Add.93 |
| English Translation of Joint Resolution No. 17 of 2021 ........................................................ | | Add.98 |
| Act 67-2022 [and English Translation]. ...................... | | Add.104 |
| English Translation of Act 67-2022 ........................... | | Add.116 |

i

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Clemente Properties, Inc., et al., | **Civil No. 22-1373 (GMM)** |
| Plaintiffs, | |
| v. | |
| Hon. Pedro R. Pierluisi Urrutia, | |
| Governor of Puerto Rico, in his | |
| Official and Individual Capacity and as representative of the Commonwealth of Puerto Rico; et als., | |
| Defendants. | |

**OPINION AND ORDER**

Pending before the Court are three motions to dismiss: (1) *Amended and Restated Motion to Dismiss Complaint And Amended Complaint Under FRCP 12(B)(6)* ("Authority's Motion to Dismiss") filed by the Puerto Rico Convention Center District Authority's (the "Authority") (Docket No. 36); (2) *Motion to Dismiss Amended Complaint for Failure to State a Claim Under Federal Rule Of Civil Procedure 12(B)(6)* filed by the Commonwealth of Puerto Rico ("Commonwealth"), Hon. Pedro R. Pierluisi-Urrutia ("Governor Pierluisi"), in his official capacity as Governor of the Commonwealth and in his personal capacity; Eileen M. Vélez-Vega, in her official capacity as Secretary of the Department of Transportation and Public Works ("Department of Transportation") and in her personal capacity ("Secretary of Transportation");

**Add.1**

Civil No. 22-1373(GMM)
Page -2-

Francisco Parés-Alicea in his official capacity as Secretary of
the Department of the Treasury and in his personal capacity
("Secretary of Treasury"), and Ray J. Quiñones-Vázquez, in his
personal capacity as Secretary of the Department of Sports and
Recreation ("Secretary of Sports and Recreation") (collectively,
"Defendants")(Docket No. 38); and (3) *Motion to Dismiss* filed by
the Secretary of Sports and Recreation, in his official capacity
(Docket No. 42).

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On August 5, 2022, Clemente Properties, Inc.; 21 In Right,
Inc.; Roberto Clemente Jr.; Luis Roberto Clemente; and Roberto
Enrique Clemente ("Plaintiffs") filed a Complaint against the
Commonwealth, Governor Pierluisi, in his official and individual
capacity and as representative of the Commonwealth; the Secretary
of Transportation, in her official and individual capacity and as
representative of the conjugal partnership composed by her and
John Doe; the Secretary of Treasury, in his official and individual
capacity; the Secretary of Sports and Recreation, in his official
and individual capacity and as representative of the conjugal
partnership composed of him and Jane Doe; and the Authority.
(Docket No. 1) (the "Complaint").

Therein, Plaintiffs seek: (1) declaratory judgment
determining that the use of the Roberto Clemente mark, name, and
likeness pursuant to Puerto Rico Joint Resolutions No. 16 and 17

**Add.2**

Civil No. 22-1373(GMM)
Page -3-

of 2021 and Act 67-2022 is unlawful, violates due process,
constitutes trademark infringement, violates the right of
publicity, and constitutes a taking; (2) declaratory judgment
decreeing that Puerto Rico Joint Resolutions No. 16 and 17 of 2021
and Act 67-2022 are unconstitutional; (3) injunctive relief
proscribing Defendants' use of the Roberto Clemente mark and name
pursuant to Puerto Rico Joint Resolutions No. 16 and 17 of 2021,
without just compensation; (4) declaratory judgment "decreeing
that just compensation for the use of the mark pursuant to Joint
Resolutions No. 16 and 17 of 2021 is no less than $3,150,000.00
for the temporary taking of the trademark"; (5) "payment of just
compensation to Plaintiffs for the temporary use of the Roberto
Clemente mark, name and likeness"; (6) injunctive relief
proscribing Defendants' use of the Roberto Clemente mark pursuant
to Puerto Rico Act 67-2022 and enjoining the creation of the
Roberto Clemente Sports District; and (7) "judgment for three times
the profits or damages, whichever amount is greater, or for
damages, in a sum of not less than $45,000,000.00". Id. at 41-42.

Plaintiffs' claims are brought pursuant to 28 U.S.C.A. § 2201
and 2202; Rule 65 of the Federal Rules of Civil Procedure, 42
U.S.C.A. § 1983 ("Section 1983"); the Lanham Trade-Mark Act, 15
U.S.C. §§ 1051-1127 ("Lanham Act"); the Takings Clause of the
Constitution of the United States, U.S. Const. Amend. V., the Due
Process Clause, U.S. Const. U.S. Const. Amend. XIV, and

Civil No. 22-1373(GMM)
Page -4-

supplemental claims under Puerto Rico Act 139 of 2011 ("Act 139"),
P.R. Laws Ann. Tit. 32 §§ 3151 *et seq.*, and the Puerto Rico
Trademarks Act, Act 169 of 2009 ("Act 169"), P.R. Laws Ann. Tit.
10 §§ 223 *et seq.* Id. at 2.

Plaintiffs claim that pursuant to Puerto Rico Joint
Resolution No. 16 of 2021, at the beginning of calendar year 2022,
the Commonwealth —led by Governor Pierluisi through the Department
of Transportation— began to impose the mandatory purchase of a
commemorative license plate for the fiftieth anniversary of
Roberto Clemente's "Hit 3000." The Commonwealth charged twenty-
one dollars ($21.00) for the commemorative plate. Plaintiffs
allege that the license plate had an image of Roberto Clemente and
included the name "Clemente" with the number "21," the number "50,"
the word "anniversary," and the phrase "3000 hits." Also, that
pursuant to Joint Resolution No. 17 of 2021, there was a mandatory
charge of five dollars ($5.00) in addition to the regular costs
for duties, tariffs, and fines, for a commemorative vehicle
certificate tag. The vehicle certificate tag was yellow, had the
figure of Roberto Clemente with the name "Clemente," the number
"21," the number "50," and phrase "3000 hits." According to
Plaintiffs, the cost charged to the citizens of Puerto Rico was
transferred to the Roberto Clemente Sports District Fund,
administered by the Department of Treasury, for the exclusive use
of the Department of Sports and Recreation. Id. at 8-10.

Civil No. 22-1373(GMM)
Page -5-

In addition, Plaintiffs argue that Defendants acted willfully, intentionally, and with full awareness about the mark's misappropriation, because it is allegedly common knowledge that the Plaintiffs are the owners of the Roberto Clemente mark, his right of publicity, his likeness, and the legacy it represents. Plaintiffs claim that the Roberto Clemente mark has been in use since 1955 and Clemente Properties, Inc. registered the mark with the United States Patent and Trademark Office ("USPTO") under Registration No. 5,176,650, Serial number 86048262. Id. at 5. Therefore, they argue that the unauthorized use by the Commonwealth constitutes an infringement of a registered trademark and a violation of the Takings and Due Process Clauses of the United States Constitution.

On November 23, 2022, Plaintiffs filed an Amended Complaint[1], which maintained the same allegations, but included additional assertions regarding the adoption of the Joint Resolution No. 16. They posit that before its adoption, they had already authorized Ciudad Deportiva Roberto Clemente to use the trademark, name, and likeness of Roberto Clemente for vehicles' license plates. (Docket No. 27). Plaintiffs add that Ciudad Deportiva Roberto Clemente

---

[1] On September 28, 2022, the Authority filed a motion to dismiss for failure to state a claim. (Docket No. 14). On November 2, 2022, Governor Pierluisi and Defendants filed a motion to dismiss for failure to state a claim. (Docket No. 19). The Secretary of Sports and Recreation also filed a *Motion for Joinder* to the motion to dismiss at Docket No. 19. (Docket No. 22). On December 2, 2023, these motions to dismiss were denied without prejudice as moot due to the filing of the Amended Complaint. *See* Docket No. 32.

planned to raise funds by the issuing of commemorative license plates to be available to the public in exchange for a voluntary donation of $2.10. Id. at 12.

On December 26, 2023, the Authority filed its Motion to Dismiss. (Docket No. 36). The Authority argues dismissal is warranted under Rule 12 (b)(6) since: (1) it is not acting under color of state law to illegally, culpably, negligently, intentionally, knowingly, or willfully, use and pretend to continue using the Roberto Clemente mark, name, and likeness in contravention of the aforementioned legal provisions; (2) the Authority's only involvement is incidental and only regards its participation in the legislative process before the adoption of Act 67-2022; (3) there is no relief sought from the Authority as there is no claim that it has caused any breach, violation, damage, and/or unlawful use of Plaintiffs' property, and the allegations regarding the Authority relate to obligations which the Authority will legally perform under state law. According to the Authority, Act 67-2022 imposes obligations to be carried out once the property is transferred to the Commonwealth, obligations which the Authority cannot even perform to date; and (4) that the Authority, as a government entity created under Puerto Rico Act 351-2000, has a legal obligation to be bound by the laws duly enacted by the Puerto Rico legislature, in which case, the Authority has no

Civil No. 22-1373(GMM)
Page -7-

influence on which laws are enacted, and thus, no bearing on the
passing of Act 67-2022. Id. at 6-11.

On January 9, 2023, the Defendants filed a *Motion to Dismiss
Amended Complaint for Failure to State a Claim under Federal Rule
of Civil Procedure 12 (b)(6)*. (Docket No. 38). First, Defendants
argue that Plaintiffs' claims against the Commonwealth and the
official capacity Defendants are barred by sovereign immunity as
provided by the Eleventh Amendment of the United States
Constitution. Specifically, they claim that this Court does not
have jurisdiction to entertain suits under the Lanham Act, because
suits against states and its officers, in their official capacity,
are barred by the Eleventh Amendment immunity, as determined by
the Supreme Court in College Savings Bank v. Florida Prepaid
Postsecondary Education Expense Board, 527 U.S. 666 (1999). In
addition, Defendants posit that the monetary claim pursuant to the
Fifth Amendment Takings Clause against the Commonwealth is also
barred by the Eleventh Amendment immunity.

Second, Defendants argue that, under the Lanham Act,
Plaintiffs lack standing to claim damages suffered by the
corporations Clemente Properties, Inc., and 21 In Right, Inc.

Third, Defendants assert that Plaintiffs lack standing to
claim damages suffered by Ciudad Deportiva Roberto Clemente, Inc.,
an independent corporate entity which is not a party to this case.
Defendants contend that Plaintiffs also lack standing to assert

the land transfer claims mandated by Act 67-2022 and that the Court lacks jurisdiction over such matters since the requested relief would entail the Court enjoining the land transfer mandated by this statute, from Ciudad Deportiva Roberto Clemente, Inc., back to the Commonwealth, through the Sports and Recreation Department.

Fourth, Defendants argue that Plaintiffs fail to state a claim for violations of their right to Substantive Due Process under the Fourteenth Amendment and that having asserted a Fifth Amendment Takings Clause claim, the alleged infringement of their property rights are to be ruled upon under the standards of that constitutional clause, and not the due process clause.

Fifth, Defendants posit that Plaintiffs fail to state a claim under the Lanham Act for individual liability against Defendants in their personal capacity.

Sixth, Defendants contend that Plaintiffs fail to establish a false advertising claim and that there is no "commercial advertising or promotion" nor "intention to influence potential customers" in this case which would activate liability under the Lanham Act.

Seventh, Defendants allege that image rights and rights of publicity are determined not by federal law but by state law, and that under Puerto Rico Act 139, such right extends up to twenty-five years after the person's death. They posit that in Roberto Clemente's case, this period expired in 1998.

Civil No. 22-1373(GMM)
Page -9-

Eighth, Defendants argue that Plaintiffs' request for injunctive relief for the alleged trademark violations has become moot since the sale of license plates and license labels mandated by Joint Resolutions 16-2021 and 17-2021 expired by its own terms on December 31, 2022.

Ninth, Defendants contend that Plaintiffs failed to state a claim against personal capacity Defendants under Section 1983, since their personal involvement, as described in the Amended Complaint, does not support a liability finding against them under that statute.

Tenth, that Defendants who were sued in their personal capacity are entitled to qualified immunity, to the extent that they were carrying out their legal duties by enforcing statutes validly enacted by the Commonwealth's Legislative Assembly, against which no constitutional challenge has been raised by Plaintiffs.

Eleventh, Defendants argue that after dismissing all of Plaintiffs' federal claims the Court should decline to exercise supplemental jurisdiction over claims brought under the Puerto Rico's Constitution and laws.

On January 17, 2023, the Secretary of Sports and Recreation filed a Motion to Dismiss. (Docket No. 42). He argues that Eleventh Amendment immunity bars any claim for monetary relief against him in his official capacity as Secretary of Sports and Recreation. In

Civil No. 22-1373(GMM)
Page -10-

addition, for the same reasons, he contends that claims under Section 1983 brought against him in his official capacity must be dismissed. Moreover, he states that as Secretary of Sports and Recreation he is immune from suit under the Takings Clause and the Lanham Act. Furthermore, he maintains that Plaintiffs have not raised a claim upon which a relief may be granted since he has not yet executed his rights, duties and function pursuant to Act 67-2022.

On February 24, 2023, Plaintiffs filed a *Response in Opposition to Puerto Rico Convention Center District Authority's Motion to Dismiss Amended Complaint*. (Docket No. 44). Plaintiffs argue that the Authority's Motion to Dismiss must be disregarded, because there was a straightforward trademark infringement claim. Specifically, they contend that the Roberto Clemente mark is registered in International Class 41 which includes entertainment services. Furthermore, they posit that that the image and likeness of Roberto Clemente are an integral part of the registered trademark and that Section 43 (a) of the Lanham Act, provides the federal equivalent protection of the right for publicity and can thus protect an individual's image or likeness from unauthorized use. Additionally, they argue that the Authority has actively pursued and contributed to the creation of the Roberto Clemente Sports District and had a leading role in its development. For that reason, injunctive relief is warranted.

**Add.10**

Civil No. 22-1373(GMM)
Page -11-


Also on February 24, 2023, the Plaintiffs filed a *Response in Opposition to Secretary of the Department of Sports and Recreation's Motion to Dismiss Amended Complaint*. (Docket No. 45). Therein, they argue that the Amended Complaint should not be dismissed based on Eleventh Amendment immunity, since no legal or judicial doctrine in place justifies applying the principles of Eleventh Amendment immunity in Puerto Rico. Moreover, they maintain that claims pursuant to the Lanham Act may not be dismissed on Eleventh Amendment grounds, because the Supreme Court of the United States has only determined that States' sovereign immunity cannot be validly abrogated in relation to a false-advertising claim under the Lanham Act. Id. at 10-17. Regarding the Takings Clause, they also allege that Eleventh Amendment immunity does not apply. Lastly, Plaintiffs allege that they are entitled to monetary and equitable remedies against the Department of Sports and Recreation "for the creation and further development of the Roberto Clemente Sports District using and taking the Plaintiffs' trademark, and for the unauthorized use and taking of the Roberto Clemente trademark in license plates and vehicle certificate labels, which generated earnings for [them]." Id. at 19. They claim that they are entitled to prospective injunctive relief against state officials in their official capacity and that these claims cannot be dismissed based on the Secretary of Sports and Recreation's allegation that they are not yet the owner of the

**Add.11**

**Civil No. 22-1373 (GMM)**
**Page -12-**

property or lands of the Roberto Clemente Sports District and that they have not executed any duties as owners.

On March 17, 2023, Plaintiffs filed a *Response in Opposition to Government and Individual Defendants' Motion to Dismiss Amended Complaint.* (Docket No. 53). Plaintiffs reiterate that "Puerto Rico possesses no sovereign immunity or Eleventh Amendment immunity from federal law or federal-court suits." Id. at 9. Additionally, they assert that there is no immunity from the application of the Lanham Act. Furthermore, Plaintiffs contend that the reference to Act 139 asserts an additional or alternative source of ownership of the Roberto Clemente image, name, and likeness in violation of that property right under the statute. They also argue that they have standing as to these claims since they are the heirs of Roberto Clemente, to whom the law, without any other legal contract or act, invests with the property and transference rights to Roberto Clemente's image. Regarding the alleged due process violation, Plaintiffs contend that their claim is valid, since even if commemorating Roberto Clemente could be a legitimate government interest -which they allege it is not- there is no need for the misappropriation of the trademark to pursue that goal.

Plaintiffs also specifically respond to arguments regarding liability pursuant to the Lanham Act. Regarding the individual liability of Defendants, Plaintiffs allege that Defendants' argument for lack of involvement or participation in the Lanham

Civil No. 22-1373(GMM)
Page -13-

Act violations is meritless. As to the claims of commercial
advertising or promotion and intention to influence potential
customers, Plaintiffs argue that the false advertising claim must
stand, since Defendants made misleading and false descriptions of
facts, in relation to the sales of Roberto Clemente name, image,
likeness, and trademark in the license plates and license labels,
and in relation to the Roberto Clemente Sports District project -
that would generate significant revenue for the government, and
have therefore caused damages. On the other hand, regarding the
mootness of the request for injunctive relief, Plaintiffs contend
that the temporary taking of the trademark persists until just
compensation is awarded and that equitable relief for trademark
violations for the sale of license plates and license labels is
still in order.

Regarding the Section 1983 claims, Plaintiffs respond that
Defendants are not entitled to qualified immunity regarding the
constitutional violations because they all originate from the
unauthorized use or appropriation of the registered trademark.

On May 22, 2023, the Commonwealth, Governor Pierluisi, the
Secretary of Transportation, the Secretary of Treasury, and the
Secretary of Sports and Recreation filed *Reply to Opposition to
Motion to Dismiss Amended Complaint*. (Docket No. 64). Regarding
Eleventh Amendment immunity, Defendants argue that the doctrine
still stands and is applicable to this case. Furthermore, they

Civil No. 22-1373(GMM)
Page -14-

cite <u>Allen v. Cooper</u>, 140 S. Ct. 994 (2020) to sustain that
Congress has not abrogated the State's sovereign immunity under
the Eleventh Amendment regarding intellectual property claims. As
to the claims under the Lanham Act, Defendants respond that
"Plaintiffs do not sell license plates nor yearly license labels
and no amount of artful pleading can establish the pleading
requisite of consumers withholding trade from them." <u>Id.</u> at 11.
Also, in addressing the arguments relating to the substantive due
process claims, Defendants assert that Plaintiffs' claims fall
outside the very limited scope defined by applicable law and find
no support in current substantive due process standards. In
addition, Defendants posit there are no legal grounds for
injunctive relief for official capacity Defendants to stop acting
when the statutory authorization, provided by Act 67-2022, for
them to carry those actions has already expired. They argue that
this is strictly a legal question that arises from Act 67-2022 and
requires no evidence to adjudicate it. Lastly, Defendants allege
that Plaintiffs provided no basis to establish any congressional
intention to abolish qualified immunity as a possible defense in
Lanham Act claims.

## II. LEGAL STANDARD

A. <u>Motion to Dismiss</u>

To survive a motion to dismiss, a complaint must contain a
"short and plain statement of the claim showing that the pleader

**Civil No. 22-1373(GMM)**
**Page -15-**

is entitled to relief." Fed. R. Civ. P. 8(a). The complaint "must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009) (*quoting* Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007)). This pleading standard does not require
"detailed factual allegations," but does require "more than labels
and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Twombly, 550 U.S. at 555. "A claim
has facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Iqbal, 556 U.S.
at 678. "Where a complaint pleads facts that are 'merely consistent
with' a defendant's liability, it 'stops short of the line between
possibility and plausibility of "entitlement to relief." ' " Id.
(*quoting* Twombly, 550 U.S. at 557). *See also* Álvarez-Maurás v.
Banco Pop. of Puerto Rico, 919 F.3d 617, 622 (1st Cir. 2019).

    1.   Federal Rule of Civil Procedure 12(b)(1)

    It is settled that the standard followed by the Court when
considering a dismissal request under Rule 12(b)(1), is that the
court "must accept as true all well-pleaded factual claims and
indulge all reasonable inferences in plaintiff's favor." *See*
Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998), as
restated in Rolon v. Rafael Rosario & Associates, Inc., et al.,
450 F.Supp.2d 153, 156 (D.P.R. 2006). Moreover, [m]otions brought

under Rule 12(b)(1) are subject to the same standard of review as Rule 12(b)(6). *See* <u>Negron-Gaztambide v. Hernandez-Torres</u>, 35 F.3d 25, 27 (1st Cir. 1994); <u>De Leon v. Vornado Montehiedra Acquisition L.P.,</u> 166 F. Supp. 3d 171, 173 (D.P.R. 2016). As such, "[d]etermining whether a complaint states a plausible claim for relief will. . .be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Iqbal</u>, 556 U.S. at 679.

A motion to dismiss based on state sovereign immunity is appropriate under both Rule 12(b)(1) and Rule 12(b)(6). The defense of sovereign immunity is a claim that a court lacks the subject-matter jurisdiction to hear a case and thus can be brought under Rule 12(b)(1). *See* <u>Valentin v. Hosp. Bella Vista</u>, 254 F.3d 358, 362-63 (1st Cir. 2001) (*citing* <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir. 1995)). In <u>Valentin v. Hospital Bella Vista</u>, the Court held that Fed. R. Civ. P. 12(b)(1) is a "large umbrella, overspreading a variety of different types of challenges to subject matter jurisdiction" including "considerations of ripeness, mootness, sovereign immunity, and the existence of federal question jurisdiction". <u>Id.</u> at 363.

Where subject matter jurisdiction is challenged under 12(b)(1), the party asserting jurisdiction bears the burden of demonstrating the existence of federal subject matter jurisdiction. *See* <u>Skwira v. United States</u>, 344 F.3d 64, 71 (1st

Cir. 2003); <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir. 1995); <u>McCulloch v. Velez</u>, 364 F.3d 1, 5 (1st Cir.2004).

    2.   Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the factual allegations in a complaint must "possess enough heft" to set forth "a plausible entitlement to relief." <u>Twombly</u>, 550 U.S. at 544. Stated differently, "[a] plaintiff must allege sufficient facts to show that he has a plausible entitlement to relief." <u>Sanchez v. Pereira-Castillo</u>, 590 F.3d 31, 41 (1st Cir. 2009). In analyzing the sufficiency of the complaint, the Court accepts the complaint's allegations as true and draws all reasonable inferences in the plaintiff's favor. *See* <u>Langadinos v. American Airlines, Inc.</u>, 199 F.3d 68, 69 (1st Cir. 2000)).

Under Rule 12(b)(6), dismissal is proper when "it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." <u>Gonzalez-Morales v. Hernandez-Arencibia</u>, 221 F.3d 45, 48 (1st Cir. 2000) (*citing* <u>Correa-Martinez v. Arrillaga-Belendez</u>, 903 F.2d 49, 52 (1st Cir. 1990)).

Furthermore, dismissal for failure to state a claim is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." <u>Centro Medico del Turabo, Inc. v.</u>

Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005) (*quoting* Berner
v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997)); Gagliardi v.
Sullivan, 513 F.3d 301, 305 (1st Cir. 2008).

### III. APPLICABLE LAW AND DISCUSSION

Courts presented with motions to dismiss under both Rules
12(b)(1) and 12(b)(6) should ordinarily decide jurisdictional
questions before addressing the merits. *See* Deniz v. Municipality
of Guaynabo, 285 F.3d 142, 149 (1st Cir. 2002). Thus, the Court
begins its analysis with Defendants' arguments regarding Eleventh
Amendment immunity. Plaintiffs argue that Puerto Rico is a
territory of the United States and, as such, the Eleventh Amendment
immunity does not apply. To this end, Plaintiffs essentially allege
that the Eleventh Amendment exists for States, not territories
like the Commonwealth. Plaintiffs base their arguments mainly on
Puerto Rico v. Sánchez Valle, 579 U.S. 59 (2016). Furthermore,
Plaintiffs argue that Congress validly abrogated immunity for of
all the governmental entities and individuals within the United
States, including territories, under the Lanham Act through the
Trademark Amendments Act of 1999.

The Commonwealth and official capacity Defendants, on the
other hand, posit that the case against them should be dismissed
pursuant to the Eleventh Amendment. According to them, and in line
with Supreme Court precedent established in College Savings Bank
and reiterated most recently in Allen v. Cooper, Congress did not

abrogate state sovereign immunity in the amendments to the Lanham Act.

A.    The Doctrine of Stare Decisis Controls this Case

Since the Plaintiffs contend that this Court should disregard First Circuit precedent based on their interpretation of the United States Supreme Court's case law on the applicability of the state sovereign immunity doctrine to the Commonwealth, we must first discuss the doctrine of stare decisis.

This doctrine comes from the Latin maxim "stare decisis et non quieta movere," meaning "to stand by the thing decided and not disturb the calm." Ramos v. Louisiana, --- U.S. ----, 140 S. Ct. 1390, 1411, 206 L.Ed.2d 583 (2020). "The doctrine of stare decisis renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision." Gately v. Massachusetts, 2 F.3d 1221, 1226 (1st Cir. 1993). It is "a foundation stone of the rule of law." Allen v. Cooper, 140 S. Ct. at 1003(quoting Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 798, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014)).

Commonly, the doctrine of stare decisis is divided into horizontal and vertical precedent. See Bryan A. Garner et al., The Law of Judicial Precedent 27 (2016). Pertinent here, vertical precedents are decisions in "the path of appellate review," meaning Supreme Court decisions control all lower federal courts, and circuit court decisions control the dispositions of the federal

district courts in their circuits. Id. at 28. The Supreme Court has repeatedly stressed the importance of both circuit and district courts faithfully following vertical precedent. *See* Eberhart v. United States, 546 U.S. 12, 19-20 (2005). Hence, we are obliged to follow circuit precedent unless undermined by intervening Supreme Court precedent or some other compelling authority. *See* Reisman v. Associated Facs. of Univ. of Maine, 939 F.3d 409, 414 (1st Cir. 2019) (*citing* United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018)).

Absent guidance of the Supreme Court regarding the Commonwealth's Eleventh Amendment immunity, this Court is bound by First Circuit rulings until any doctrinal developments are established by Supreme Court precedent.

B.   Eleventh Amendment Immunity

1. Generally

The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

Grounded in the principles of federalism, the Eleventh Amendment provides that each state is a sovereign entity and therefore "not amenable to suit without its consent." Seminole

Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996). Essentially, the Eleventh Amendment decrees that states cannot be sued in federal court. The amendment "acts as a gatekeeper to the enforcement of federal law against state actors." *See* LAURA E. LITTLE, EXAMPLES & EXPLANATIONS: FEDERAL COURTS 371 (3rd ed. 2013). In fact, "[t]he very object and purpose of the [Eleventh] Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (*quoting* In re Ayers, 123 U.S. 443, 505 (1887)). That is the essence of Eleventh Amendment immunity, also known as sovereign immunity.

    2. Eleventh Amendment Immunity and Puerto Rico

    Regarding the Commonwealth, "[t]he First Circuit has consistently held that Puerto Rico, though obviously not a state, is entitled to Eleventh Amendment immunity." *See* What Constitutes the State for Eleventh Amendment Purposes, 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3524.2 (3d ed.) The First Circuit first embraced this holding in 1981, in an opinion by then Judge Stephen Breyer. *See* Ezratty v. Puerto Rico, 648 F.2d 770(1st Cir. 1981). Since 1981 —for over four decades— the First Circuit has reiterated the holding "at least twenty-eight times —about once a year— and described it as 'settled,' a 'verity,' 'consistently held,' and 'beyond dispute.'" Adam D.

**Civil No. 22-1373(GMM)**
**Page -22-**

Chandler, <u>Puerto Rico's Eleventh Amendment Status Anxiety</u>, 120
Yale L.J. 2183, 2189 (2011). The Court has even referred to these
precedents as a "phalanx of cases." <u>Id.</u> (*quoting* <u>Jusino Mercado v.</u>
<u>Commonwealth of Puerto Rico</u>, 214 F.3d 34, 39 (1st Cir. 2000)). *See*
*for example*, the following cases where the First Circuit has held
that Puerto Rico enjoys Eleventh Amendment protection: <u>Borrás-</u>
<u>Borrero v. Corporación del Fondo del Seguro del Estado</u>, 958 F.3d
26, 33 (1st Cir. 2020) (noting that "Puerto Rico is treated as a
state for Eleventh Amendment purposes" but avoiding consideration
of the constitutional immunity question because the state entity
clearly prevailed on the merits) (*quoting* <u>Fresenius Med. Care</u>
<u>Cardiovascular Res., Inc. v. P.R. and Caribbean Cardiovascular</u>
<u>Ctr. Corp.</u>, 322 F.3d 56, 61 (1st Cir. 2003)); <u>Grajales v. P.R.</u>
<u>Ports Auth.</u>, 831 F.3d 11, 15 (1st Cir. 2016) (acknowledging that
Puerto Rico "enjoys" sovereign immunity in the same way as the
states) (*citing* <u>Jusino Mercado v. Puerto Rico</u>, 214 F.3d 34, 39
(1st Cir. 2000)); <u>Guillemard-Ginorio v. Contreras-Gomez</u>, 585 F.3d
508, 530 n.23 (1st Cir. 2009) ("We further note that '[t]he
Commonwealth of Puerto Rico is treated as a state for purposes of
Eleventh Amendment immunity analysis.'") (*quoting* <u>Díaz-Fonseca v.</u>
<u>Puerto Rico</u>, 451 F.3d 13, 33 (1st Cir.2006)); <u>Maysonet-Robles v.</u>
<u>Cabrero</u>, 323 F.3d 43, 48 n.3 (1st Cir. 2003) ("This circuit has
consistently held that Puerto Rico enjoys immunity from suit
equivalent to that afforded to the States under the Eleventh

Amendment."); <u>Arecibo Community Health Care, Inc. v. Cmmw. of Puerto Rico</u>, 270 F.3d 17, 21 n.3 (1st Cir. 2001)("It is well settled in this circuit that the Commonwealth of Puerto Rico 'is protected by the Eleventh Amendment to the same extent as any state...'"); <u>Ortiz-Feliciano v. Toledo-Dávila</u>, 175 F.3d 37, 39 (1st Cir. 1999)("This circuit has already decided that the Commonwealth is protected by the Eleventh Amendment to the same extent as any state..."); <u>Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.</u>, 991 F.2d 935, 939 n.3 (1st Cir. 1993)("We have consistently treated Puerto Rico as if it were a state for Eleventh Amendment purposes.").

In addition, and pertinent to this case, this District has previously ruled in intellectual property cases that the Eleventh Amendment applies to the Commonwealth. In <u>Berio-Ramos v. Flores-Garcia</u>, 2016 WL 270385 (D.P.R. 2016), this Court addressed arguments that the Senate of Puerto Rico is not immune from copyright infringement suits. On that occasion —citing <u>Maysonet-Robles v. Cabrero</u>, 323 F.3d at 53 and <u>Porto Rico v. Castillo</u>, 227 U.S. 270, 273 (1913)— the Court ruled that the Copyright Remedy Clarification Act did not abrogate the Eleventh Amendment's sovereign immunity for Puerto Rico; that Puerto Rico is considered a state for purposes of federal immunity; and that the application of Eleventh Amendment immunity is not limited to states and applies

Civil No. 22-1373(GMM)
Page -24-

to territories like Puerto Rico. Specifically, the Court rebutted

the same arguments that Plaintiffs bring here by concluding:

> The argument overlooks the fact that in 1913, when Puerto
> Rico was subject to the Jones Act, the Supreme Court
> held that as an unincorporated territory of the United
> States its government is entitled to Eleventh Amendment
> immunity. _Porto Rico v. Castillo_, 227 U.S. 270, 273
> (1913). And that situation has not changed after 1952
> under the Federal Relations Act. See, Maysonet-Robles,
> 323 F.3d at 53 (1st Cir. 2003) ("Even though Puerto Rico
> is an unincorporated territory of the United States, its
> government has always been considered a sovereign entity
> entitled to immunity from suit without its consent").

_Berio-Ramos v. Flores-Garcia_, supra. _See also_, _Rodriguez v. Casa_

_Salsa Restaurant_, 260 F. Supp. 2d 413 (D.P.R. 2003) (In an opinion

dismissing Lanham Act trade dress infringement claims under Fed.

R. Civ. P. 12(b)(6), the court noted that it had previously

dismissed the claims against co-defendant Commonwealth based on

Eleventh Amendment immunity).

Moreover, quite recently the United States Supreme Court in

_Financial Oversight & Management. Board. for P.R. v. Centro de_

_Periodismo Investigativo, Inc._, 598 U.S. 339 (2023), "assum[ed]

without deciding that Puerto Rico is immune from suit in federal

district court. . ." Although it did not decide if the Commonwealth

is entitled to sovereign immunity, the Court acknowledged that

"Circuit precedent ha[s] settled Puerto Rico's own immunity. . ."

_Id._ at 345.

It is certainly clear that (1) the First Circuit has long

treated Puerto Rico like a state for Eleventh Amendment purposes

Civil No. 22-1373(GMM)
Page -25-

and (2) the Supreme Court has expressly reserved the question of whether Eleventh Amendment immunity principles apply to the Commonwealth. Hence, as discussed above, this Court is required to follow the First Circuit, and rules that Eleventh Amendment sovereign immunity applies to the Commonwealth.

   3. Exceptions to Eleventh Amendment immunity

   The United States Supreme Court has recognized "only two circumstances in which an individual may sue a State: First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment. . .Second, a State may waive its sovereign immunity by consenting to suit." College Savings Bank, 527 U.S. at 670.

      a. Abrogation

   The Supreme Court has held that to abrogate the states' immunity under the Eleventh Amendment, Congress "must make its intent to abrogate sovereign immunity 'unmistakably clear in the language of the statute.'" Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc., 598 U.S. at 346 (quoting Kimel v. Florida Bd. of Regents 528 U.S. 62, 73 (2000)). Supreme Court precedent has recently reiterated this point stating, "[i]f a defendant enjoys sovereign immunity, abrogation requires an 'unequivocal declaration' from Congress." Id. at 347 (quoting Dellmuth v. Muth, 491 U.S. 223, 232 (1989)); see also Seminole Tribe of Fla., 517 U.S. at 55.

> i.   Congress has not abrogated sovereign immunity
> under the Lanham Act

Regarding intellectual property, Congress has enacted statutes barring state entities from asserting sovereign immunity in infringement matters. Yet, the Supreme Court has invalidated these statutes.  In Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627 (1999), the Court found that the Patent and Plant Variety Protection Remedy Clarification Act, which abrogated state immunity from patent infringement suits, was unconstitutional. Likewise, in College Savings Bank, 527 U.S. at 670, a decision issued on the same day as Florida Prepaid, the Court found that the Trademark Remedy Clarification Act, which abrogated state sovereign immunity for claims under the Lanham Act, was unconstitutional. More recently, in Allen v. Cooper, the Court ruled that the Copyright Remedy Clarification Act of 1990, which abrogated state immunity for liability for copyright infringement, was also unconstitutional.

Hence, "Congress has not abrogated immunity for intellectual property claims, including trademark claims, brought under the Lanham Act and subsequent amendments." Kentucky Mist Moonshine, Inc. v. University of Kentucky, 192 F.Supp.3d 772 (2016) (*citing* Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. at 631 n.1; College Savings Bank, 527 U.S. at 691). To date, all federal courts that have addressed this issue have concluded the same. *See*

*also* Board of Regents of the Univ. of Wisconsin Sys. v. Phoenix
Int'l Software, Inc., 653 F.3d 448, 458 (7th Cir. 2011) (Observing
that "these [Supreme Court] decisions appear to foreclose any
argument that Congress has properly abrogated" state sovereign
immunity to liability in trademark actions); Jackson v. State of
Connecticut Dep't of Pub. Health, No. 3:15-CV-750 (CSH), 2016 WL
3460304, at *12 (D. Conn. June 20, 2016) ("Just as the Eleventh
Amendment precludes suits against the State in § 1983 actions,
such immunity also exists with respect to the Lanham Act[.]");
Utah Republican Party v. Herbert, 141 F. Supp. 3d 1195, 1200 (D.
Utah 2015) ("*College Savings Bank* made clear that "the Trademark
Remedy Clarification Act did not abrogate sovereign immunity for
actions brought under the Lanham Act.").

Moreover, Plaintiffs misread the purpose of the Trademark
Amendments Act of August 5, 1999, PL 106-43 (S 1259), which they
argue was enacted by Congress after the Florida Prepaid cases to
reinstate their intention to abrogate state sovereign immunity. A
review of the Congressional record suggests otherwise: "our bill
will amend the Lanham Act to subject the federal government to
suit for trademark infringement and dilution." 145 Cong. Rec.
S7452-04, 145 Cong. Rec. S7452-04, S7454, 1999 WL 412237. The
congressional record clearly reflects the legislature's intention
was not to reinstate the dispositions regarding state sovereign
immunity, which had just been declared unconstitutional:

Civil No. 22-1373(GMM)
Page -28-

    The Hatch-Leahy Trademark Amendments Act is significant legislation to enhance protection for trademark owners and consumers by making it possible to prevent trademark dilution before it occurs, by clarifying the remedies available under the Federal trademark dilution statute when it does occur, <u>by providing recourse against the Federal Government for its infringement of others' trademarks</u>, and by creating greater certainty and uniformity in the area of trade dress protection.

. . .

    <u>Third, the bill amends the Lanham Act to allow for private citizens and corporate entities to sue the Federal Government for trademark infringement and dilution. Currently, the Federal Government may not be sued for trademark infringement, even though the Federal Government competes in some areas with private business and may sue others for infringement. This bill would level the playing field, and make the Federal Government subject to suit for trademark infringement and dilution. I note that the Lanham Act also subjects the States to suit, but that provision has now been held unconstitutional. Last week, the Supreme Court held in College Savings Bank versus Florida Prepaid Postsecondary Education Expense Board that federal courts were without authority to entertain these suits for false and misleading advertising, absent the State's waiver of sovereign immunity.</u> This case (as well as the other two Supreme Court cases decided the same day), raise a number of important copyright, federalism and other issues, but do not effect the provision in the bill that waives Federal government immunity from suit.

*See* 145 Cong. Rec. S8252-01, 145 Cong. Rec. S8252-01, S8253-54, 1999 WL 484889 (emphasis added).

    In other words, the congressional intention when adopting the Trademark Amendments Act was to establish sovereign immunity abrogation as to the federal government, not for states or territories.

**Add.28**

Civil No. 22-1373(GMM)
Page -29-

In addition, recent congressional work confirms that — contrary to Plaintiffs' arguments— Congress did not validly abrogate state sovereign immunity as to trademark claims under the Lanham Act and its amendments. The United States Senate recently requested a study from the United States Patent and Trademark Office, in light of the ruling in Allen v. Cooper, which to their understanding "created a situation in which copyright owners are without remedy if a State infringes their copyright and claims State sovereign immunity under the Eleventh Amendment of the U.S. Constitution", which "was already the case in patent law and some aspects of federal trademark law following two Supreme Court decisions in 1999." *See* U.S. PATENT AND TRADEMARK OFFICE, REPORT TO CONGRESS: INFRINGEMENT DISPUTES BETWEEN PATENT AND TRADEMARK RIGHTS HOLDERS AND STATES AND STATE ENTITIES (Aug. 31, 2021) 20. As per letter from Senators Patrick Leahy and Thom Tillis, dated April 28, 2020, "Allen v. Cooper provided Congress a blueprint for how to validly abrogate State sovereign immunity from certain patent and trademark infringement claims." To that extent, they requested guidance on whether legislative action was necessary to address this matter.

Plaintiffs argue that their trademark claims are not barred because Congress has abrogated the Commonwealth's immunity under the Eleventh Amendment. Yet, as discussed, the Supreme Court made clear in College Savings that Congress did not abrogate sovereign immunity for actions brought under the Lanham Act. This means that,

to date, the Commonwealth enjoys sovereign immunity with respect
to Lanham Act claims, unless it has waived its sovereign immunity.

       b. <u>Waiver</u>

Sovereign immunity is "a personal privilege which [a State or
entity of the State] may waive at pleasure." <u>College Saving Bank</u>,
527 U.S. at 675 (*quoting* <u>Clark v. Barnard</u>, 108 U.S. 436, 447
(1883)). However, the decision to waive such immunity "is
altogether voluntary on the part of the sovereignty." <u>Id.</u> (*quoting*
<u>Beers v. Arkansas</u>, 20 How. 527, 529, 15 L.Ed. 991 (1858)). A waiver
may be found where (1) a State "voluntarily invokes jurisdiction"
by filing suit in federal court, or (2) a State "makes a 'clear
declaration' that it intends to submit itself to. . . [the court's]
jurisdiction[.]" <u>Id.</u> (*quoting* <u>Great Northern Life Ins. Co. v. Read</u>,
322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944)). When
reviewing a state's words, courts should infer waiver only "by the
most express language or by such overwhelming implications from
the text as (will) leave no room for any other reasonable
construction."   <u>Edelman v. Jordan</u>, 415 U.S. 651, 673 (1974)
(*quoting* <u>Murray v. Wilson Distilling Co.</u>, 213 U.S. 151, 171, 29
S.Ct. 458, 464, 53 L.Ed. 742 (1909)).

In other words, after <u>College Savings</u>, any waiver of sovereign
immunity by a state, or in this case by the Commonwealth, must be
express and voluntary, and cannot be implied or constructive. Under
this "stringent" standard, Plaintiffs must show express or

**Add.30**

Civil No. 22-1373(GMM)
Page -31-

unequivocal waiver of immunity by the Commonwealth with respect to
Lanham Act claims. They fail to do so. There is no suggestion in
Plaintiffs' Amended Complaint that the Commonwealth has expressly
consented to being sued in federal court, nor is there any
suggestion that it has, in some other way, waived its right to
sovereign immunity and thus exposed itself to a suit in the federal
jurisdiction. In fact, the Amended Complaint is completely devoid
of any allegation or explanation of how Plaintiffs contend that
they can bypass the Commonwealth's sovereign immunity in order to
bring these claims for damages and injunctive relief against it.

      c. Ex Parte Young: Defendants in their Official Capacity

There is one remaining exception to the sovereign immunity
doctrine. The Eleventh Amendment generally bars suits against
states and state officers in their official capacity. "However,
the exception to Eleventh Amendment immunity laid out in Ex parte
Young, 209 U.S. 123 (1908), allows federal courts to "'grant [ ]
prospective injunctive relief to prevent a continuing violation of
federal law,' in part because 'a suit challenging the
constitutionality of a state official's action in enforcing state
law is not one against the State.'" Doe v. Shibinette, 16 F.4th
894, 903 (1st Cir. 2021) (quoting Negrón-Almeda v. Santiago, 528
F.3d at 24); see also Green v. Mansour, 474 U.S. 64, 68, (1985).

While it is true that claims for prospective injunctive relief
may be advanced against state officials under the Ex parte Young

**Add.31**

exception, claims for "retroactive monetary relief" are barred.
"It has remained abundantly clear. . .that the Eleventh Amendment
protects a state official, acting in his official capacity, from
any claim for retrospective monetary relief, just as if it were a
suit against the state itself." Mills v. Maine, 118 F.3d 37, 54
(1st Cir. 1997). "The *Ex parte Young* doctrine does not apply in
cases where plaintiffs seek monetary relief for past violations of
federal law, regardless of whether the party the plaintiffs seek
to designate as a defendant is nominally a state officer sued in
his official capacity." Vega Castro v. Puerto Rico, 43 F.Supp.2d
186, 191 (D.P.R. 1999).

"In determining whether the doctrine of *Ex parte Young* avoids
an Eleventh Amendment bar to suit, a court need only conduct a
'straightforward inquiry into whether [the] complaint alleges an
ongoing violation of federal law and seeks relief properly
characterized as prospective.'" Verizon Md., Inc. v. Pub. Serv.
Comm'n, 535 U.S. 635, 645 (2002) (*quoting* Idaho v. Coeur d'Alene
Tribe of Idaho, 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438
(1997) (O'Connor, J., concurring in part and concurring in the
judgment)) (emphasis added). "[T]he pivotal question to be decided
when a defendant brings a motion to dismiss is whether the
requested relief would directly bring an end to an ongoing
violation of federal law." Hootstein v. Collins, 670 F. Supp. 2d
110, 114 (D. Mass. 2009) (*citing* Papasan v. Allain, 478 U.S. 265,

278 (1986)). In addition, to pursue the claims for prospective injunctive relief, the state officer named in the suit "must have some connection with the enforcement of the act, or else [the plaintiff] is merely making him a party as a representative of the state, and thereby attempting to make the state a party. Ex parte Young, 209 U.S. at 157.

We must also review if the requested equitable relief has become moot. "The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" ACLU of Mass. v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 52 (1st Cir. 2013) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003)). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968). One "reason for mootness is that a court cannot provide meaningful relief to the allegedly aggrieved party," especially when "the only relief requested is an injunction," and "there is no ongoing conduct left for the court to enjoin." U.S. Conf. of Cath. Bishops, 705 F.3d at 53.

Declaratory judgements deeming past conduct illegal are similarly disfavored because "[t]he Supreme Court has admonished that federal courts 'are not in the business of pronouncing that past actions [that] have no demonstrable continuing effect were

right or wrong.'" Id. (quoting Spencer v. Kemna, 523 U.S. 1, 18, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998)). For declaratory relief to survive a mootness challenge, the facts alleged must "show that there is a substantial controversy. . .of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Preiser v. Newkirk, 422 U.S. 395, 402 (1975) (quoting Md. Cas. Co. v. Pac. Co., 312 U.S. 270, 273 (1941)).

This court now employs the inquiry to determine if the Plaintiffs' Ex parte Young claims proceed. In the instant case, Plaintiffs are seeking monetary relief for the damages allegedly caused by the Commonwealth and official capacity Defendants. Plaintiffs also seek declaratory and injunctive relief regarding the Puerto Rico Joint Resolutions No. 16 and 17 of 2021 and Law 67-2022 which they allege provide for the use of the Roberto Clemente trademark and thus violate their due process rights and constitute trademark infringement. To determine whether Ex parte Young applies, the Court must evaluate whether the complaint: (1) alleges an ongoing violation of federal law; and (2) seeks relief properly characterized as prospective monetary relief which is barred by the Eleventh Amendment.

As to the first part of the Ex parte Young inquiry, Plaintiffs only seek declaratory judgment that Defendants past conduct was unlawful. On this matter, there is no real question of conflicting

legal interests for the Court to consider. Accordingly, Plaintiffs' request for declaratory judgment must be denied.

Plaintiffs also seek injunctive relief barring Defendants from the "use [of] the Roberto Clemente mark, name and likeness, pursuant to Puerto Rico Joint Resolutions No. 16 and 17 of 2021 without just compensation." While Plaintiffs seek prospective relief, they have provided the Court with no basis from which it can infer any possibility of an ongoing violation of federal law. Moreover, the Plaintiffs' request for injunctive relief on the trademark violations has turned moot since the sale of license plates and license labels mandated by Joint Resolutions 16-2021 and 17-2021 expired by its own terms on December 31, 2022. The Plaintiffs have not made any allegations that the Commonwealth or individual Defendants continued the sales and alleged trademark infringement beyond the date of expiration, and that such specific conduct is capable of repetition. Therefore, the Court cannot provide meaningful relief, as there is no ongoing conduct left for the Court to enjoin. *See* U.S. Conf. of Cath. Bishops, 705 F.3d at 53. Accordingly, the Plaintiffs request for injunctive relief must also be denied.

Furthermore, as explained in more detail in the sections that follow, even if Plaintiffs were not barred from pursuing claims against the Commonwealth in federal court —which they are— and even if the claims where to survive prospective, injunctive relief

for alleged ongoing violations of federal law, specifically trademark infringement, those claims fail because Plaintiffs have not stated a viable trademark infringement claim pursuant to the Lanham Act.

C.   Failure to State a Claim for Trademark Infringement pursuant to the Lanham Act

Plaintiffs allege that Defendants infringed on their trademark under various provisions of the Lanham Act, 15 U.S.C. §§ 1114 ("Section 32"), 1125(a) ("Section 43(a)") and 1125(c) ("Section 43(c)"). Specifically, Plaintiffs posit that "[t]hrough the enactment and implementation of Joint Resolution No. 16, Defendants incurred in an unauthorized use of the trademark, name and likeness of Roberto Clemente in an identical product that the one that was going to be sponsored by the trademark owners." (Docket No. 27 at 12-13). They further allege that "[t]he Roberto Clemente trademark, his right to publicity and likeness, the legacy it represents and the trademarks, names and likeness of his sons as individual businessmen and representatives of the mark are severally damaged by the actions of the Defendants" and that "[t]he actions of the Defendants have caused Plaintiffs losses of business opportunities and revenues". Id. at 23. Also, that the "actions of the Defendants constitute a gross misappropriation, discredit dilution by blurring and by tarnishment and use in multiple ways of the mark of Roberto Clemente, his right to publicity and

likeness in an illegal, negligent, culpable, willful and unauthorized manner. They also tarnished the Plaintiffs' trademarks, persons, names and their own likeness." Id. at 23-24.

As to the false advertising claim, Plaintiffs allege that the use of the Roberto Clemente mark in license plates and labels "constitutes false advertising because it implies that the funds would go to the Plaintiffs, owners of the Roberto Clemente mark. It is also a use of the mark." Id. at 11. They further posit that Defendants are "using the Roberto Clemente trademark as a subterfuge to collect money from the People." Id. In addition, they state that the use of the mark has encouraged contempt which has led to "innumerable attacks and disdains in the televised, written and on-line press, in social networks, in events, and during every day activities." Id.

1. Each Lanham Act Claim Requires Proof of Use in Commerce and Commercial Use

"Trademark law seeks to prevent one seller from using the same 'mark' as —or one similar to— that used by another in such a way that. . .confuses the public about who really produced the goods (or service)." DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605 (1st Cir. 1992). Liability under each Lanham Act claim expressly requires that a plaintiff establishes "use in commerce." Section 32 prohibits the unauthorized reproduction or use in commerce of registered trademarks, while Section 43(a) proscribes

the use in commerce of words or symbols that misidentify the source or affiliation of a product or service. As to the dilution claim, the Lanham Act expressly excludes dilution liability based on any noncommercial use of a mark. *See* 15 U.S.C. § 1125(c)(3(C). Furthermore —separate and independent of the "use in commerce" element— each Lanham Act claim also requires, expressly or implicitly, that the allegedly infringing use be a "commercial use" of the plaintiff's mark.

More specifically, Section 32 prohibits, in relevant part, the unauthorized

> use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive...

15 U.S.C. § 1114.

Likewise, Section 43(a) makes liable

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -- is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

15 U.S.C. § 1125(a)(1)(A).

In addition, the Lanham Act prohibits "commercial advertising or promotion" that "misrepresents the nature, characteristics, [or] qualities" of a product. 15 U.S.C. § 1125(a)(1)(B). Also, Section 43(c) provides, in pertinent part: "(3) Exclusions. The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:. . .(C) Any noncommercial use of a mark." 15 U.S.C. § 1125(c)(3)(C).

Federal trademark rights are created by actual "use" of the mark in commerce. Kusek v. Family Circle, Inc., 894 F.Supp. 522, 531 (D. Mass. 1995) (*citing* 15 U.S.C. § 1051). Concurrently,

> infringement of a federal trademark right is defined as the unauthorized 'use in commerce' of any reproduction, counterfeit, copy or colorable imitation of a registered mark on goods or services ... and/or 'use in commerce' of any word, term, or false designation of origin, false or misleading description of fact or false or misleading representation of fact, which is likely to cause confusion.

Id. (*citing* 15 U.S.C. §§ 1114(1)(a) and (b), 1125(a)). Hence, it is not just any use of a trademark that will subject a defendant to liability. Instead, these sections of the statute, which rely on the Commerce Clause as their constitutional basis, prohibit infringement only if a trademark is "use[d] in commerce" "in connection with" "goods or services." 15 U.S.C. §§ 1114(1)(a), 1125(a).

"The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade." Id. § 1127. This can occur when

**Add.39**

the trademark is used on goods for sale, or "in the sale or advertising of services." Id. Furthermore, Sections 32 and 43(a) "do not even reach an unauthorized use unless it is 'in connection with any goods or services.'" Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 914 F. Supp. 651, 654 (D. Me. 1996), aff'd, 103 F.3d 196 (1st Cir. 1996) (discussing 15 U.S.C. §§ 1114(1)(a), (b), and 1125(a)).

Thus, a trademark infringement injury under the Lanham Act is limited to redressing acts that create consumer confusion:

> [A] trademark is not property in the ordinary sense but only a word or symbol indicating the origin of a commercial product. The owner of the mark acquires the right to prevent the goods to which the mark is applied from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks. There are no rights in a trademark beyond these.

Natl. Licensing Assn. v. Inland Joseph Fruit Co., 361 F. Supp.2d 1244, 1255 (E.D. Wash. 2004) (citing Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., 395 F.2d 457, 464 (3rd Cir. 1968) (emphasis added).

"[T]he Lanham Act was enacted to protect trademarks and service marks from use 'in commerce' by competitors in order to avoid confusion among consumers." Utah Republican Party v. Herbert, 141 F.Supp.3d 1195, 1204 (D. Utah 2015). "To invoke the protections of the Lanham Act, a plaintiff must show that the alleged infringer used the plaintiff's mark 'in connection with

Civil No. 22-1373(GMM)
Page -41-

any goods or services.'" <u>Id.</u> at 1205. "The Lanham Act is intended to protect the ability of consumers to distinguish among competing producers, not to prevent all unauthorized uses." <u>Id.</u> "Unless there is a competing good or service labeled or associated with the plaintiff's trademark, the concerns of the Lanham Act are not invoked." <u>Id.</u> at 1204–1205. "[A] trademark, unlike a copyright or patent, is not a 'right in gross' that enables a holder to enjoin all reproductions." <u>Boston Athletic Ass'n v. Sullivan</u>, 867 F.2d 22, 35 (1st Cir.1989) (<i>citing</i> <u>Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co.</u>, 703 F.2d 1372, 1374 (Fed. Cir. 1983)).

   2. <u>Trademark Infringement under Section 32</u>

      "[T]o succeed on a claim of trademark infringement, a plaintiff must establish (1) that its mark is entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer confusion." <u>Boston Duck Tours, LP v. Super Duck Tours, LLC</u>, 531 F.3d 1, 12 (1st Cir. 2008); <i>see also</i> <u>Star Financial Services, Inc. v. AASTAR Mortg. Corp.</u>, 89 F.3d 5, 9 (1st Cir. 1996) (<i>quoting</i> <u>DeCosta v. Viacom Int'l, Inc.</u>, 981 F.2d 602, 605 (1st Cir. 1992)). <u>Nationwide Payment Sols., LLC v. Plunkett</u>, Civil No. 2:09-600 (GZS), 2011 WL 446077, at *10 (D. Me. Feb. 3, 2011), report and recommendation adopted, 2011 WL 1045137 (D. Me. Mar. 16, 2011); <u>Venture Tape Corp. v. McGills Glass Warehouse</u>, 540 F.3d 56, 61 n.6 (1st Cir. 2008) (holding that claims under both 15 U.S.C. §§ 1114 and 1125(a) require plaintiff to allege use in

Civil No. 22-1373(GMM)
Page -42-

commerce of a trademark or marks that misidentify the affiliation
or source of a service, and likelihood of consumer confusion).

The Court finds the first prong has been satisfied by the
federal trademark registration that entitles Plaintiffs to the
trademark rights. Yet, the Court does not need to review the second
prong which focuses on the possibility that the allegedly
infringing use is likely to cause consumer confusion. Plaintiffs
have failed to allege how the Defendants have used their mark in
commerce "in connection with" "goods or services."

Mere, alleged, unauthorized use of a trademark is not enough
to establish standing for trademark infringement. Although
Plaintiffs allege Defendants engaged in unauthorized use of a
trademark of "an identical product that the one that was going to
be sponsored by the trademark owners," they have not alleged that
they actually provide the same "goods or services." Moreover, "just
as copyright law does not protect ideas but only their concrete
expression, neither does trade dress law protect an idea, a
concept, or a generalized type of appearance." Bonazoli v. R.S.V.P.
Int'l, Inc., 353 F. Supp. 2d 218, 229 (D.R.I. 2005) (citing Jeffrey
Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32 (2d
Cir. 1995)). Also, the eight-factor confusion test generally
applied in the First Circuit is not applied to assess confusion in
the abstract; it is focused on the likelihood that commercially

**Add.42**

Civil No. 22-1373(GMM)
Page -43-

relevant persons or entities will be confused. <u>Astra</u>
<u>Pharmaceutical Prods., Inc. v. Beckman Instruments</u>, 718 F.2d 1201,
1204-09 (1st Cir. 1983); <u>Pignons S.A. de Mecanique v. Polaroid</u>
<u>Corp.</u>, 657 F.2d 482, 487-92 (1st Cir. 1981). Moreover, cases
analyzing the Lanham Act speak of confusion in terms of
"customers," "consumers," and "products" or "goods."

Here, the alleged "goods or services" in controversy are
license plates and vehicle certificate tags issued by the
Department of Transportation. Like many states, the Commonwealth
uses the vehicle license plate program not only to identify
vehicles but as a revenue source. "Automobile license plates are
governmental property intended primarily to serve a governmental
purpose, and inevitably they will be associated with the state
that issues them." <u>Perry v. McDonald</u>, 280 F.3d 159, 169 (2d Cir.
2001). Consequently, not only are these not the classes of products
or services that trademark law protects, but issuing motor vehicle
license plates and tags cannot be considered commercial use, as it
is a clear government activity. *See* <u>Walker v. Texas Div., Sons of</u>
<u>Confederate Veterans, Inc.</u>, 576 U.S. 200 (2015).

Moreover, as described in the Amended Complaint, the license
plate and tags in controversy depict the figure of Roberto Clemente
in the context of the fiftieth anniversary of his 3,000th hit. This
was an event of historical significance for both, Puerto Rico and
Major League Baseball, and thus the significance of its

**Add.43**

Civil No. 22-1373(GMM)
Page -44-

memorialization cannot be understated. Courts have recognized the public value of information about the game of baseball and its players, referring to baseball as "the national pastime." *See* Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 972 (10th Cir.1996). To that extent it must be noted that:

> Major league baseball is followed by millions of people across this country on a daily basis. . .The public has an enduring fascination in the records set by former players and in memorable moments from previous games. . .The records and statistics remain of interest to the public because they provide context that allows fans to better appreciate (or deprecate) today's performances.

C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P., 505 F.3d 818, 823 (8th Cir. 2007) (*quoting* Gionfriddo v. Major League Baseball, 94 Cal.App.4th 400, 411, 114 Cal.Rptr.2d 307 (2001)).

In the end, the issue is whether the Commonwealth, through Joint Resolutions No. 16 and 17 of 2021 and Act 67-2022, provides a "good or service" in commerce that infringes on the Plaintiffs trademark. The Plaintiffs have not made a plausible allegation that the Commonwealth or Defendants did so, and their claim is thus unsuccessful because Plaintiffs failed to state an essential element of their trademark infringement cause of action. Accordingly, Plaintiffs lack standing and have failed to state a redressable claim under Section 32.

### 3. False Advertising Under the Lanham Act

Plaintiffs allege that Defendants are liable for false advertising in violation of Section 43 of the Lanham Act.

Section 43(a) creates two distinct bases of liability: false association and false advertising. *See* Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 122 (2014). The Lanham Act prohibits "commercial advertising or promotion" that "misrepresents the nature, characteristics, [or] qualities" of a product. 15 U.S.C. § 1125(a)(1)(B).

False advertising claims focus on whether a defendant has made some false statement in advertising about the product that fundamentally misrepresents its qualities. A false association claim under subsection A, on the other hand, serves as the functional equivalent of a traditional trademark infringement claim for unregistered marks and trade dress. *See* 1-800 Contacts, Inc. v. Lens.Com, Inc., 722 F.3d 1229, 1238 (10th Cir. 2013). That is, the focus of the claim is on whether the mark causes confusion by leading consumers to think that two products from different sources are from the same source. "Claims brought under this section are traditionally referred to as 'false sponsorship' or 'false endorsement' claims and are traditionally limited to celebrity plaintiffs." Ji v. Bose Corp., 538 F. Supp. 2d 349, 351 (D. Mass. 2008) (*citing* Parks v. LaFace Records, 329 F.3d 437 (6th Cir. 2003)).

To state a claim for false advertising, a plaintiff must prove that "(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002). Moreover, to qualify as a "commercial advertisement," for purposes of a Lanham Act false advertising claim, a representation must (1) constitute commercial speech; (2) made with the intent of influencing potential customers to purchase the speaker's goods or services; (3) made by a speaker who is a competitor of the plaintiff in some line of trade or commerce; and (4) disseminated to the consuming public in such a way as to constitute "advertising" or "promotion." See Genzyme Corp. v. Shire Human Genetic Therapies, Inc., 906 F.Supp.2d 9 (D. Mass. 2012).

Based on the foregoing, Plaintiffs' claims under Section 43(a) equally fail as a matter of law.

**Add.46**

First, Plaintiffs lack standing to sue the Commonwealth and Defendants under this section of the Lanham Act. In Lexmark, the Supreme Court provided the framework for determining whether a plaintiff has standing to raise a claim under Section 43(a). The Supreme Court held that that a plaintiff invoking Section 43(a) must show that his claim falls within the "zone of interests" protected by that statute and that his injury was proximately caused by the alleged violation. In this case, the Amended Complaint fails to plead, much less meet, the proximate cause requirement established in Lexmark.

The Court in Lexmark held "that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flows directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." Lexmark Int'l, Inc., 572 U.S. at 133. Here, however, not only is there is no allegation, or even a suggestion, by Plaintiffs in their Amended Complaint, that the Commonwealth or Defendants' use of the Roberto Clemente trademark caused "consumers" to withhold trade from them, but as with their Section 32 claim, they again fail to allege "use in commerce" and "in connection with goods or services."

Moreover, as a false advertising claim, Plaintiffs' cause is plainly insufficient. They fail to plead the elements of "commercial advertisement" and "commercial speech" as required to

state claim for false advertising under Lanham Act. Not only are the license plates and tags not considered "goods or services" under the statute, but they also cannot be considered advertisements, and Plaintiffs have not even alleged as much. Furthermore —and pertinent to this case— we must point out what other courts have held in similar false advertising claims. In Pirone v. MacMillan, Inc., 894 F.2d 579 (2nd Cir. 1990), the Second Circuit rejected a trademark claim asserted by the daughters of baseball legend Babe Ruth. There, plaintiffs objected to the use of Ruth's likeness in three photographs which appeared in a calendar published by the defendant. The court rejected their claim, holding that "a photograph of a human being, unlike a portrait of a fanciful cartoon character, is not inherently 'distinctive' in the trademark sense of tending to indicate origin." Id. at 583. The court noted that Ruth "was one of the most photographed men of his generation, a larger than life hero to millions and an historical figure in whom interest still runs high." Id.; ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 922 (6th Cir. 2003) ("[A]s a general rule, a person's image or likeness cannot function as a trademark.") The Second Circuit Court concluded that a consumer could not reasonably believe that Ruth sponsored the calendar:

> [A]n ordinarily prudent purchaser would have no difficulty discerning that these photos are merely the subject matter of the calendar and do not in any way

**Add.48**

Civil No. 22-1373(GMM)
Page -49-

> indicate sponsorship. No reasonable jury could find a
> likelihood of confusion.

Id. at 923. Certainly, the same can be applied here to the alleged
facts regarding the use of the image of Roberto Clemente.

In addition, Plaintiffs have not pled that Defendants made
any false or misleading statement beyond the use of the mark. The
only allegations related to any sort of false or misleading
statement are the bold conclusory assertions that Defendants' use
of the Roberto Clemente mark in the license plates and labels
"constitutes false advertising because it implies that the funds
would go to the Plaintiffs, owners of the Roberto Clemente mark"
and that they are "using the Roberto Clemente trademark as a
subterfuge to collect money from the People." Furthermore,
Plaintiffs allegations of harm from the alleged violation of the
statute are conclusory statements of unspecified injury and of the
type that was not intended to be protected by the Lanham Act.

Second, Plaintiffs' Lanham Act claim falls short of the
factual detail needed to plead plausibility as required by Iqbal
and Twombly. A review of the Amended Complaint reflects a
conclusory and formulaic recitation of certain elements of a
trademark infringement cause of action that is insufficient to
survive a motion to dismiss. Far from pleading facts showing a
plausible cause of action, Plaintiffs simply parrot certain
statutory language tied with facts that do not amount to a valid

**Add.49**

statutory claim. Likewise, as explained above with respect to Plaintiffs' failure to plead damages meeting the proximate cause requirement for actions under Section 43(a) set forth in <u>Lexmark</u>, Plaintiffs' damages allegations —stating no more than that they have been harmed from the alleged violation of the statute— come nowhere close to meeting the <u>Iqbal</u> and <u>Twombly</u> plausibility requirement. Plaintiffs' failure to sufficiently plead damages is thus an independent basis on which to dismiss Plaintiffs' Lanham Act claims.

There is no need for the Court to further analyze Plaintiffs' dilution claim, as it also fails on the same grounds as the other two Lanham Act claims.

D.    <u>Takings Clause of the Fifth Amendment in the United States Constitution</u>

Additionally, the Plaintiffs allege that Defendants' actions constituted a taking under the Constitution.

The Takings Clause of the Fifth Amendment to the United States Constitution states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. "[A] government violates the Takings Clause when it takes property without compensation, and. . .a property owner may bring a Fifth Amendment claim under § 1983 at that time." <u>Knick v. Twp. of Scott, Pennsylvania</u>, 139 S. Ct. 2162, 2177, 204 L.Ed.2d 558 (2019).

The classic taking which requires just compensation is the physical appropriation of real or personal private property by the government.  For much of the Nation's history, the Takings Clause was thought only to embrace such physical takings and not to apply to the regulation of property.  *See* <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528, 537 (2005). However, in <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393, 415 (1922) the United States Supreme Court recognized that the regulation of private property may be considered a taking if the regulation "goes too far." *See also* <u>Lingle</u>, 544 U.S. at 538. The Supreme Court has identified three factors which are helpful in analyzing a regulatory taking: (1) the economic impact of the regulation on the property owner; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government regulation.  *See* <u>Lingle</u>, 544 U.S. at 539.

A question raised by the motions before the Court is whether a trademark is the type of private property protected by the Takings Clause. The question is debatable and far from settled. *See* Dustin Marlan, <u>Trademark Takings: Trademarks As Constitutional Property Under the Fifth Amendment Takings Clause</u>, 15 U. Pa. J. Const. L. 1581, 1583 (2013). The Supreme Court has recognized other intangible property as protected by the Takings Clause. *See* <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1004 (1984) (holding an intangible property interest in trade secrets is a right protected

by the Taking Clause of the Fifth Amendment); College Savings Bank, 527 U.S. at 673 (noting that "the Lanham Act may well contain provisions that protect constitutionally cognizable property interests. . ."); *but see* In re Int'l Flavors & Fragrances, Inc., 183 F.3d 1361, 1366 (Fed. Cir. 1999) (noting that "[t]he federal registration of a trademark does not create an exclusive property right in the mark.").

Plaintiffs claim damages, injunctive relief, and just compensation pursuant to Section 1983, alleging that Defendants "knowingly, intentionally and in bad faith misappropriated and used a trademark and likeness belonging to Plaintiffs for the purpose of obtaining the monies of the People of Puerto Rico." (Docket No. 27 at 33). The Commonwealth and Defendants claim that Eleventh Amendment immunity also bars the Plaintiffs' takings claim.

The Supreme Court has not addressed whether Eleventh Amendment immunity applies to takings claims against states or territories. Yet, some parties have argued that the recent decision in Knick created an exception to the sovereign immunity doctrine for Takings Clause claims. However, "[t]he takings claim in Knick was brought against a municipality, not the state, and for that reason the Supreme Court did not address sovereign immunity." Soscia Holdings, LLC v. Rhode Island, No. 22-CV-266-LM, 2023 WL 4230720, at *7 (D.R.I. June 15, 2023); *See also* Pharm. Research &

Mfrs. of Am. v. Williams, 64 F.4th 932, 949 n.13 (8th Cir. 2023)
("Knick did not address sovereign immunity, as it involved a suit
against a town."); Skatemore, Inc. v. Whitmer, 40 F.4th 727, 734
(6th Cir. 2022)("[n]othing in Knick alters. . .bedrock principles
of sovereign immunity law."); Zito v. N.C. Coastal Resources
Comm'n, 8 F.4th 281, 286 (4th Cir. 2021)("Thus, every circuit to
address Knick's effect on sovereign immunity has concluded that
Knick did not abrogate State sovereign immunity in federal
court."); Ladd v. Marchbanks, 971 F.3d 574, 579-80 (6th Cir. 2020);
Bay Point Props. v. Miss. Transp. Comm'n, 937 F.3d 454, 456-57
(5th Cir. 2019) ("Nor does anything in Knick even suggest, let
alone require, reconsideration of longstanding sovereign immunity
principles protecting states from suit in federal court.");
William v. Utah Dep't of Corr., 928 F.3d 1209, 1214 (10th Cir.
2019) ("But Knick did not involve Eleventh Amendment immunity,
which is the basis of our holding in this case. Therefore, we hold
that the takings claim against the [Utah Department of Corrections]
must be dismissed based on Eleventh Amendment immunity. . .").

This District has followed the same reasoning in Puma Energy
Caribe LLC v. Puerto Rico, Civil No. 20-1591 (DRD), 2021 WL
4314234, at *1 (D.P.R. Sept. 22, 2021):

> The Court fails to see how Knick-which involves a
> Municipality, instead of a state or a state official,
> and essentially addresses the state forum exhaustion of
> just compensation claims for government takings under
> state law- would aid them in their quest as it does not

**Add.53**

discuss Eleventh Amendment immunity nor its interplay
with the self-executing just compensation clause of the
Fifth Amendment. Therefore, this Court must apply the
law as it stands.

Furthermore, the Court in <u>Puma Energy</u> —founded on settled
Section 1983 caselaw— concluded that plaintiffs could not pursue
their Fifth Amendment claim under Section 1983 since it did not
apply when suing the Commonwealth or its officers in their official
capacities for monetary relief and the Eleventh Amendment equally
barred their request for monetary relief. *See* <u>Id.</u> at *1 n.3 (*citing*
<u>Fredyma v. Com. of Mass.</u>, 961 F.2d 1565 (1st Cir. 1992)) ("Neither
states, nor state officials acting in their official capacity, or
government entities that are 'arms of the State' are 'persons'
under § 1983 for Eleventh Amendment purposes; they cannot be sued
for monetary damages."); <u>Toledo v. Sanchez</u>, 454 F.3d 24, 31 (1st
Cir. 2006); <u>O'Neill v. Baker</u>, 210 F.3d 41, 47 (1st Cir. 2000);
<u>Caraballo v. Commonwealth of P.R.</u>, 990 F.Supp.2d 165, 172-174
(D.P.R. 2014) (Dominguez, J.)).

Though the First Circuit has not dwelled on this thorny
subject, the consensus among most federal courts of appeals is to
allow state governments to mount sovereign immunity defenses as to
takings claims. *See* <u>Hutto v. S.C. Ret. Sys.</u>, 773 F.3d 536, 551-52
(4th Cir. 2014); <u>DLX, Inc. v. Kentucky</u>, 381 F.3d 511, 528 (6th
Cir. 2004); <u>Garrett v. Illinois</u>, 612 F.2d 1038, 1040 n.1 (7th Cir.
1980); <u>Jachetta v. United States</u>, 653 F.3d 898, 912 (9th Cir.

2011); <u>Robinson v. Georgia Department of Transportation</u>, 966 F.2d 637, 640 (11th Cir. 1992).

Therefore, even though Plaintiffs argue that the Eleventh Amendment Immunity does not apply and that there is no local remedy to redress their takings claim, the Court must conclude that their claim under the Takings Clause is equally barred by the sovereign immunity doctrine, for the same reasons discussed in section B of this Opinion. Also, as discussed before, <u>Ex Parte Young</u> bars recovery of monetary damages. Plaintiffs' request for injunctive relief equally fails as to their takings claim.

Even if this Court assumes —for the sake of argument— that trademarks are constitutionally protected property and that the sovereign immunity doctrine does not apply, Plaintiffs' Takings Clause claims are still unsupported. Plaintiffs contend that the alleged trademark infringement promoted by Puerto Rico Joint Resolutions No. 16 and 17 of 2021 and Act 67-2022 constitute a taking of their trademark.

The latter contention is easily dismissed. A regulation may be a categorical or per se regulatory taking when government causes a property owner to "suffer a permanent physical invasion of [t]he[i]r property" or a regulation completely deprives a property owner of "all economically beneficial use of her property." <u>Lingle</u>, 544 U.S. at 538. However, as per the allegations in the Amended Complaint, neither Puerto Rico Joint Resolutions No. 16

Civil No. 22-1373(GMM)
Page -56-

and 17 of 2021 nor Act 67-2022 seem to deprive Plaintiffs of any use of their trademarks, much less "all economically beneficial use" of the property. Plaintiffs remain free to use their trademarks as they wish.

E.   Due Process Clause of the Fifth and Fourteenth Amendment

Plaintiffs also allege that the Defendants are "using and pretend to continue using Plaintiffs property, the Roberto Clemente mark, without due process of law." (Docket No. 27 at 34). They add that those actions "constitute a substantive due process violation" because it is "a governmental scheme designed to misappropriate a trademark and also the products, goods and services of the mark [and that it] shocks the conscience and must stop." (Docket No. 27 at 35).

The Fourteenth Amendment to the United States Constitution prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The touchstone of this due process guarantee is the protection of the individual against arbitrary action of government." DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (internal quotation marks omitted). The substantive due process guarantee "safeguards individuals against certain offensive government action, notwithstanding that facially fair procedures are used to implement them." Id. The Due Process Clause applies to Puerto Rico.

**Add.56**

*See* Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478 U.S. 328 (1986).

To set out a substantive due process claim, a plaintiff challenging specific acts of government officials must sufficiently allege that: (1) the officials' "acts were so egregious as to shock the [contemporary] conscience"; and (2) that the acts "deprived [them] of a protected interest in life, liberty, or property." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006); Abdisamad v. City of Lewiston, 960 F.3d 56, 59-60 (1st Cir. 2020) (holding that a substantive due process claim must allege facts "so extreme and egregious as to shock the contemporary conscience."); *see also* DePoutot, 424 F.3d at 118. The question whether "the challenged conduct shocks the contemporary conscience is a threshold matter that must be resolved before a constitutional right to be free from such conduct can be recognized." DePoutot, 424 F.3d at 118. To meet that standard, the officers' conduct must be "truly outrageous, uncivilized, and intolerable." Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011).

The First Circuit has depicted certain guidelines to direct the analysis of conduct's egregiousness. *See* Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880-81 (1st Cir. 2010). On one hand, "negligence, without more, is simply insufficient to meet the conscience-shocking standard." Id. at 881 (internal quotation marks omitted). On the other, allegations that state officials had

"an intent to injure in some way unjustifiable by any government interest is likely sufficient" to meet the conscience-shocking threshold. Id. (internal quotation marks and brackets omitted). Between these two lines are cases that present "closer calls." Id. Ultimately, though, the shocks-the-conscience threshold is necessarily a "high one," to prevent the Constitution from being demoted to a "font of tort law." Drake v. Town of New Bos., No. 16-CV-470-SM, 2017 WL 2455045, at *13 (D.N.H. June 6, 2017) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

The First Circuit has collected representative cases in which plaintiffs established a viable substantive due process claim. See Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 623 (1st Cir. 2000); Harrington v. Almy, 977 F.2d 37, 44 (1st Cir. 1992); see also Ortolano v. City of Nashua, No. 22-CV-326-LM, 2023 WL 4237366, at *5 (D.N.H. June 28, 2023); Spencer v. Doran, No. 18-CV-1191-LM, 2020 WL 4904826, at *5 (D.N.H. Aug. 20, 2020) (quoting Cummings v. McIntire, 271 F.3d 341, 346 (1st Cir. 2001)). Yet, here, none of the allegations against the Defendants come remotely close to establishing a claim for a violation of Plaintiffs' substantive due process rights. Their allegations not only fall short of complying with the Iqbal and Twombly pleading standards, but they pay scant notice to the guidelines outlined by the First Circuit. Therefore, the allegations in Plaintiffs' Amended Complaint are

insufficient to state a claim for relief under a theory of substantive due process.

F.   Defendants in their individual capacity

> The individual liability standard [under the Lanham Act]
> does not ask whether the individual participated or
> engaged in some infringing act; instead, it asks whether
> he actively participated as a moving force in the
> decision to engage in the infringing acts, or otherwise
> caused the infringement as a whole to occur.

Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1478 n.8 (11th Cir. 1991). Under this standard, a "corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity" is personally liable. *See* Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1184 (11th Cir. 1994).

It is not clear from current caselaw that the Lanham Act's individual liability disposition also applies to state officers in their individual capacity. Regardless, "[a]s a general rule, suits seeking damages from state officials in their individual capacities are not barred by the Eleventh Amendment." Hafer v. Melo, 502 U.S. 21, 25 (1991); *see also* Papasan v. Allain, 478 U.S. 265, 277 n.11 (1986). Thus, a suit for monetary damages may be prosecuted against a state officer in his or her individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself or herself, so long as the

relief is sought not from the state treasury but from the officer personally. Hafer, 502 U.S. at 31.

Yet, as previously discussed in section C, Plaintiffs have failed to adequately plead a claim pursuant to the Lanham Act. On motion to dismiss, the Court "need not credit a complaint's bald assertions or legal conclusions." Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996). Moreover, the Amended Complaint must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988) This reasoning is equally applicable to determining individual liability against Governor Pierluisi or the other individual Defendants. Plaintiffs' Lanham Act claims should thus also be dismissed against Defendants in their personal capacity because they have failed to allege the essential elements of such a claim.

Likewise, the Court has determined that Plaintiffs' Amended Complaint contains insufficient allegations to establish plausible entitlement to relief for any constitutional violations. These allegations are equally lacking to hold Defendants liable in their individual capacities. Here, Plaintiffs fail to allege any facts which demonstrate wrongdoing by the individual Defendants. The mere fact that they have enforced the resolution and statute in controversy is irrelevant in the absence of allegations that their

Civil No. 22-1373(GMM)
Page -61-

actions were motivated by some improper purpose or acting outside the scope of their official duties. In other words, Plaintiffs' averments fall woefully short of the "special showing" requirement. Plaintiffs' conclusory statements, standing alone, run afoul of their obligation to outline a claim with sufficient supporting facts.

    1. <u>Qualified Immunity</u>

To protect officials from unnecessary litigation burdens, the Supreme Court and First Circuit have often emphasized the importance of addressing issues of qualified immunity "at the earliest possible stage in litigation." <u>Haley v. City of Boston</u>, 657 F.3d 39, 47 (1st Cir. 2011) (*quoting* <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)); *See, e.g.*, <u>Est. of Rahim by Rahim v. Doe</u>, 51 F.4th 402, 411 (1st Cir. 2022) (concluding it was an error for the district court to find "that consideration of the 'clearly established' prong of the qualified immunity defense was premature before discovery."). Thus, although additional factual development may be beneficial to this Court's analysis, the Court addresses Defendants' qualified immunity claims at this stage.

"When government officials are sued in their individual capacities for money damages, the doctrine of qualified immunity shields them from pecuniary liability unless their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Lawless v. Town</u>

of Freetown, 63 F.4th 61, 67 (1st Cir. 2023) (*quoting* Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Officials are shielded by qualified immunity to permit them to fulfill their professional responsibilities without hesitation born of the fear of liability. Anderson v. Creighton, 483 U.S. 635, 638 (1987).

Qualified immunity applies where: (1) a federal right was violated, and (2) "the unlawfulness of the conduct was clearly established at the time." Lawless, 63 F.4th at 67. Courts may begin the qualified immunity analysis by considering the clearly established prong. *See* Id.

To determine whether the allegedly violated rights were clearly established, the Court must decide the following: "(1) the relative clarity of the governing law to a reasonable official on the date of the alleged wrong and (2) whether the specific characteristics of the situation confronted by the official would have made it clear to a reasonable official how the governing law applied in the given situation." Id. The governing law must be so clear as to put "the statutory or constitutional question beyond debate" because officials may "make reasonable but mistaken judgments." City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 611 (2015). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Id. (*quoting* Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d

1149 (2011)). The plaintiff bears the burden to demonstrate that the law was clearly established. <u>Est. of Rahim by Rahim</u>, 51 F.4th at 410.

To avoid qualified immunity in the context of their constitutional claims, Plaintiffs must identify controlling authority or a consensus of persuasive cases that provide a clear signal that the challenged conduct violates a constitutional right. *See* <u>Alfano v. Lynch</u>, 847 F.3d 71, 75 (1st Cir. 2017).

Here, Plaintiffs have failed to provide clearly established law that enforcing the Puerto Rico Joint Resolutions No. 16 and 17 of 2021 and Act 67-2022, in the circumstances of this case, would violate their federal constitutional rights. On the contrary, as discussed before, it is clear that Plaintiffs' allegations do not plausibly establish a claim under the Lanham Act, the Takings Clause, the Due Process Clause, or any other statute cited in their Amended Complaint. Moreover, here, Governor Pierluisi as well as the other individual Defendants were merely complying with their official duties to enforce a law as adopted by the legislature. As per the caselaw and other applicable law to date, any reasonable public official in their situation could have concluded that no trademark or proprietary rights were being violated by the imposition of the license fees that Plaintiffs have challenged in this case.

Civil No. 22-1373(GMM)
Page -64-

G.   Failure to State a Claim Against the Authority

Pending before the Court is also the Authority's Motion to
Dismiss. The Authority contends that Plaintiffs' Amended Complaint
must be dismissed against them since it fails to state a plausible
claim for relief.

"Dismissal for failure to state a claim is appropriate if the
complaint fails to set forth factual allegations, either direct or
inferential, respecting each material element necessary to sustain
recovery under some actionable legal theory." Gagliardi v.
Sullivan, 513 F.3d at 305 (quoting Centro Médico del Turabo, Inc.,
406 F.3d at 6) (internal quotations omitted).  At the start, "an
inquiring court first must separate wheat from chaff; that is, the
court must separate the complaint's factual allegations (which
must be accepted as true) from its conclusory legal allegations
(which need not be credited)." Morales-Cruz v. Univ. of P.R., 676
F.3d 220, 224 (1st Cir. 2012). The Court must only accept those
facts that are "well pleaded," limiting its inquiry into the
allegations of the complaint. See Litton Indus., Inc. v. Colon,
587 F.2d 70, 74 (1st Cir. 1978). Then, the court must determine
whether the well-pleaded facts, taken in their entirety, permit
"the reasonable inference that the defendant is liable for the
misconduct alleged." Morales-Cruz, 676 F.3d at 224. The Court is
not obligated to accept a plaintiff's "bald assertions,

**Add.64**

unsupportable conclusions, periphrastic circumlocutions, and the like." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

In addition, an action is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). Under 28 U.S.C. § 1915(e)(2)(B)(i), a court may dismiss a complaint as frivolous if it is "based on an indisputably meritless legal theory" or a "clearly baseless" or "fantastic or delusional" factual scenario. See Neitzke, 490 U.S. at 327-28.

It is with this progression in mind that we turn to Plaintiffs' declaratory array against the Authority.

Plaintiffs intend to bring a claim for damages and injunctive relief against the Authority pursuant to the Lanham Act and the Takings Clause. Yet, the allegations as to the Authority are limited to a recital of the dispositions included in Act 67-2022 which refer to the public corporation as the entity designated by that statute as "responsible for the planning and organization of the Roberto Clemente Sports District, which includes the development, reconstruction and construction of facilities for its proper functioning" and as the recipient of public funds to execute those responsibilities. (Docket No. 27 at 8, 16, 18, 20 and 22).

As to the trademark infringement claim, Plaintiffs allege that the Authority has illegally used the Roberto Clemente mark, by its mere inclusion or mention in the dispositions of Act 67-2022. Yet, the Amended Complaint is void of allegations as to how

Civil No. 22-1373(GMM)
Page -66-

the Authority has used the trademark in violation to the Lanham

Act. The only allegations that refer to the alleged trademark

infringement generally read as follows:

> Therefore, Puerto Rico Convention District Authority is
> directly responsible for the creation and the further
> development and administration of the Roberto Clemente
> Sports District which is an unauthorized use of the
> Roberto Clemente trademark and name, and is an imitation
> of Ciudad Deportiva Roberto Clemente which is one of the
> most valuable and recognizable endeavors backed by the
> Roberto Clemente trademark, making the infringement even
> more blatant.

> Defendants in their individual capacities and the Puerto
> Rico Convention District Authority acting under color of
> state law, illegally, culpably, negligently,
> intentionally, knowingly and willfully, used, are using
> and pretend to continue using the Roberto Clemente mark,
> name and likeness in contravention to the aforementioned
> legal provisions.

Moreover, Plaintiffs failed to allege how the Authority has

used their mark in commerce "in connection with" "goods or

services." As stated before, mere, alleged, unauthorized use of a

trademark is not enough to establish standing for a trademark

infringement claim. Plaintiffs simply fail to plead any of the

necessary elements of a Lanham Act violation. The plausibility

standard requires more than a possibility that the Authority has

acted unlawfully. Their Amended complaint falls short of the

factual detail needed to plead plausibility as to the Lanham Act

claim as required by Iqbal and Twombly.

Regarding the Takings Clause claim, Plaintiffs merely allege

that "Defendants in their individual capacity and the Puerto Rico

Convention District Authority, are compelled to redress the damages for the violation of the Plaintiffs' right to not be deprived of property without just compensation." (Docket No. 27 at 34). This allegation is only backed by the series of assertions that just parrot the dispositions of Act 67-2022, which again mention the Authority only to designate it as the entity responsible for implementing part of the public policy established in said statute.

Furthermore, Plaintiffs make the following blank assertion that is far from establishing a valid claim under the Takings Clause:

> The Puerto Rico Convention District Authority also endorsed H.R. 489 and indicated that it was in a unique position for the development of the Sports District, which goes hand in hand with the Convention District, as it is an opportunity to allow them to be the entity that develops the administration of the projects carried out in the Sports District. Recommended that the Authority be responsible for the planning and organization of the Sports District, maximizing its potential.

As the Authority posits, its involvement with Act 67-2022 is imposed by the statute and its participation in the legislative process cannot amount to liability under the Takings Clause. Also, there is no plausible allegation that the Authority has caused any breach, violation, damage, or unlawful use of Plaintiffs' property. The combined allegations, taken as true, simply do not state a plausible case for relief.

It is true that the pleadings need not contain detailed factual allegations. But, they must provide more than labels and conclusions. Naked assertions and mere conclusory statements are insufficient to survive dismissal. The claims against the Authority lack an arguable basis in fact and law and the Amended Complaint fails to state a claim on which relief can be granted.

H.    Claims regarding the Puerto Rico Laws

This Court has supplemental jurisdiction to hear state law claims when it has original jurisdiction over the action and the claims "form part of the same case or controversy." 28 U.S.C. § 1367(a). However, where "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—point toward declining to exercise jurisdiction over the remaining state-law claims." _Carnegie-Mellon Univ. v. Cohill_, 484 U.S. 343, 350 n.7 (1988); _see also_ _Jesus v. Town of Pembroke, NH_, 977 F.3d 93, 114 (1st Cir. 2020) ("We have held that a district court may decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction, and absent certain circumstances inapplicable here, doing so is not an abuse of discretion."). Moreover, "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state

**Civil No. 22-1373(GMM)**
**Page -69-**

claims may be dismissed without prejudice and left for resolution to state tribunals." <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726-27 (1966). Here, the balance of factors favors declining the exercise of supplemental jurisdiction and, therefore, the Court hereby **DISMISSES WITHOUT PREJUDICE** Plaintiffs' state law claims.

### IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** the motions to dismiss at Docket Nos. 36, 38 and 42 and Plaintiffs' claims are hereby **DISMISSED WITH PREJUDICE**. In addition, Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE**. Judgment will be entered accordingly.


IT IS SO ORDERED.

In San Juan, Puerto Rico, September 22, 2023.

<u>s/Gina R. Méndez-Miró</u>
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Clemente Properties, Inc., et al., | **Civil No. 22-1373 (GMM)** |
| Plaintiffs, | |
| v. | |
| Hon. Pedro R. Pierluisi Urrutia, | |
| Governor of Puerto Rico, in his | |
| Official and Individual Capacity and as representative of the Commonwealth of Puerto Rico; et als., | |
| Defendants. | |

**JUDGMENT**

Pursuant to this Court's Opinion and Order at Docket No. 67, Judgment is hereby entered DISMISSING WITH PREJUDICE Plaintiffs' claims against all Defendants. In addition, Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE. The case is now closed for statistical purposes.

IT IS SO ORDERED.

In San Juan, Puerto Rico, September 22, 2023.

s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE

**Add.70**

# U.S. Const. Article IV

Section 1.

Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. And the Congress may by general laws prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof.

Section 2.

The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.

A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime.

No person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due.

Section 3.

New states may be admitted by the Congress into this union; but no new states shall be formed or erected within the jurisdiction of any other state; nor any state be formed by the junction of two or more states, or parts of states, without the consent of the legislatures of the states concerned as well as of the Congress.

The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state.

Section 4.

The United States shall guarantee to every state in this union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence.

## U.S. Const. Amendment V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### U.S. Const. Amendment XI

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

### 15 U.S.C. § 1114 - Remedies; infringement; innocent infringement by printers and publishers

**(1)**Any person who shall, without the consent of the registrant—

**(a)** use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

**(b)** reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the United States and with the authorization and consent of the United States, and any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, and any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

**(2)**Notwithstanding any other provision of this chapter, the remedies given to the owner of a right infringed under this chapter or to a person bringing an action under section 1125(a) or (d) of this title shall be limited as follows:

**(A)** Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

**(B)** Where the infringement or violation complained of is contained in or is part of paid advertising matter in a newspaper, magazine, or other similar periodical or in an electronic communication as defined in section 2510(12) of title 18, the remedies of the owner of the right infringed or person bringing the action under section 1125(a) of this title as against the publisher or distributor of such newspaper, magazine, or other similar periodical or electronic communication shall be limited to an injunction against the presentation of such advertising matter in future issues of such newspapers, magazines, or other similar periodicals or in future transmissions of such electronic communications. The limitations of this subparagraph shall apply only to innocent infringers and innocent violators.

**(C)** Injunctive relief shall not be available to the owner of the right infringed or person bringing the action under section 1125(a) of this title with respect to an issue of a newspaper, magazine, or other similar periodical or an electronic communication containing infringing matter or violating matter where restraining the dissemination of such infringing matter or violating matter in any particular issue of such periodical or in an electronic communication would delay the delivery of such issue or transmission of such electronic communication after the regular time for such delivery or transmission, and such delay would be due to the method by which publication and distribution of such periodical or transmission of such electronic communication is customarily conducted in accordance with sound business practice, and not due to any method or device adopted to evade this section or to prevent or delay the issuance of an injunction or restraining order with respect to such infringing matter or violating matter.

**(D)**

**(i)**

**(I)** A domain name registrar, a domain name registry, or other domain name registration authority that takes any action described under clause (ii) affecting a domain name shall not be liable for monetary relief or, except as provided in subclause (II), for injunctive relief, to any person for such action, regardless of whether the domain name is finally determined to infringe or dilute the mark.

**(II)** A domain name registrar, domain name registry, or other domain name registration authority described in subclause (I) may be subject to injunctive relief only if such registrar, registry, or other registration authority has—

**(aa)**

not expeditiously deposited with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name;

**(bb)** transferred, suspended, or otherwise modified the domain name during the pendency of the action, except upon order of the court; or
**(cc)** willfully failed to comply with any such court order.
**(ii)**An action referred to under clause (i)(I) is any action of refusing to register, removing from registration, transferring, temporarily disabling, or permanently canceling a domain name—
**(I)** in compliance with a court order under section 1125(d) of this title; or
**(II)** in the implementation of a reasonable policy by such registrar, registry, or authority prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of another's mark.
**(iii)** A domain name registrar, a domain name registry, or other domain name registration authority shall not be liable for damages under this section for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name.
**(iv)** If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant.
**(v)** A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.
**(E)**As used in this paragraph—
**(i)** the term "violator" means a person who violates section 1125(a) of this title; and
**(ii)** the term "violating matter" means matter that is the subject of a violation under section 1125(a) of this title.
**(3)**
**(A)** Any person who engages in the conduct described in paragraph (11) of section 110 of title 17 and who complies with the requirements set forth in that paragraph is not liable on account of such conduct for a violation of any right under this chapter. This subparagraph does not preclude liability, nor shall it be construed to

restrict the defenses or limitations on rights granted under this chapter, of a person for conduct not described in paragraph (11) of section 110 of title 17, even if that person also engages in conduct described in paragraph (11) of section 110 of such title.

**(B)** A manufacturer, licensee, or licensor of technology that enables the making of limited portions of audio or video content of a motion picture imperceptible as described in subparagraph (A) is not liable on account of such manufacture or license for a violation of any right under this chapter, if such manufacturer, licensee, or licensor ensures that the technology provides a clear and conspicuous notice at the beginning of each performance that the performance of the motion picture is altered from the performance intended by the director or copyright holder of the motion picture. The limitations on liability in subparagraph (A) and this subparagraph shall not apply to a manufacturer, licensee, or licensor of technology that fails to comply with this paragraph.

**(C)** The requirement under subparagraph (B) to provide notice shall apply only with respect to technology manufactured after the end of the 180-day period beginning on April 27, 2005.

**(D)** Any failure by a manufacturer, licensee, or licensor of technology to qualify for the exemption under subparagraphs (A) and (B) shall not be construed to create an inference that any such party that engages in conduct described in paragraph (11) of section 110 of title 17 is liable for trademark infringement by reason of such conduct.

### 15 U.S.C. § 1122 - Liability of United States and States, and instrumentalities and officials thereof

**(a)**WAIVER OF SOVEREIGN IMMUNITY BY THE UNITED STATES

The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, shall not be immune from suit in Federal or State court by any person, including any governmental or nongovernmental entity, for any violation under this chapter.

**(b)**WAIVER OF SOVEREIGN IMMUNITY BY STATES

Any State, instrumentality of a State or any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or nongovernmental entity for any violation under this chapter.

**(c)**REMEDIES

In a suit described in subsection (a) or (b) for a violation described therein, remedies (including remedies both at law and in equity) are available for the violation to the same extent as such remedies are available for such a violation in a suit against any person other than the United States or any agency or instrumentality thereof, or any individual, firm, corporation, or other person acting for the United States and with authorization and consent of the United States, or a State, instrumentality of a State, or officer or employee of a State or instrumentality of a State acting in his or her official capacity. Such remedies include injunctive relief under section 1116 of this title, actual damages, profits, costs and attorney's fees under section 1117 of this title, destruction of infringing articles under section 1118 of this title, the remedies provided for under sections 1114, 1119, 1120, 1124 and 1125 of this title, and for any other remedies provided under this chapter.

### 15 U.S.C. § 1125 - False designations of origin, false descriptions, and dilution forbidden

**(a)** CIVIL ACTION

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**(2)** As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

**(3)** In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

**(b)** IMPORTATION

Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any customhouse under this section may have any recourse by protest or appeal that is given under the customs revenue laws or may have the remedy given by this chapter in cases involving goods refused entry or seized.

**(c)** DILUTION BY BLURRING; DILUTION BY TARNISHMENT

**(1)** INJUNCTIVE RELIEF

Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become

famous, commences use of a mark or trade name in commerce that is likely to
cause dilution by blurring or dilution by tarnishment of the
famous mark, regardless of the presence or absence of actual or likely confusion,
of competition, or of actual economic injury.

**(2) DEFINITIONS**
**(A)** For purposes of paragraph (1), a mark is famous if it is widely recognized by
the general consuming public of the United States as a designation of source of the
goods or services of the mark's owner. In determining whether a mark possesses
the requisite degree of recognition, the court may consider all relevant factors,
including the following:
**(i)** The duration, extent, and geographic reach of advertising and publicity of
the mark, whether advertised or publicized by the owner or third parties.
**(ii)** The amount, volume, and geographic extent of sales of goods or services
offered under the mark.
**(iii)** The extent of actual recognition of the mark.
**(iv)** Whether the mark was registered under the Act of March 3, 1881, or the Act
of February 20, 1905, or on the principal register.
**(B)** For purposes of paragraph (1), "dilution by blurring" is association arising
from the similarity between a mark or trade name and a famous mark that impairs
the distinctiveness of the famous mark. In determining whether a mark or trade
name is likely to cause dilution by blurring, the court may consider all relevant
factors, including the following:
**(i)** The degree of similarity between the mark or trade name and the famous mark.
**(ii)** The degree of inherent or acquired distinctiveness of the famous mark.
**(iii)** The extent to which the owner of the famous mark is engaging in substantially
exclusive use of the mark.
**(iv)** The degree of recognition of the famous mark.
**(v)** Whether the user of the mark or trade name intended to create an association
with the famous mark.
**(vi)** Any actual association between the mark or trade name and the famous mark.
**(C)** For purposes of paragraph (1), "dilution by tarnishment" is association arising
from the similarity between a mark or trade name and a famous mark that harms
the reputation of the famous mark.
**(3) EXCLUSIONS** The following shall not be actionable as dilution by blurring or
dilution by tarnishment under this subsection:
**(A)** Any fair use, including a nominative or descriptive fair use, or facilitation of
such fair use, of a famous mark by another person other than as a designation of
source for the person's own goods or services, including use in connection with—

**(i)** advertising or promotion that permits consumers to compare goods or services; or

**(ii)** identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

**(B)** All forms of news reporting and news commentary.

**(C)** Any noncommercial use of a mark.

**(4)** BURDEN OF PROOF In a civil action for trade dress dilution under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that—

**(A)** the claimed trade dress, taken as a whole, is not functional and is famous; and

**(B)** if the claimed trade dress includes any mark or marks registered on the principal register, the unregistered matter, taken as a whole, is famous separate and apart from any fame of such registered marks.

**(5)** ADDITIONAL REMEDIES In an action brought under this subsection, the owner of the famous mark shall be entitled to injunctive relief as set forth in section 1116 of this title. The owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118 of this title, subject to the discretion of the court and the principles of equity if—

**(A)** the mark or trade name that is likely to cause dilution by blurring or dilution by tarnishment was first used in commerce by the person against whom the injunction is sought after October 6, 2006; and

**(B)** in a claim arising under this subsection—

**(i)** by reason of dilution by blurring, the person against whom the injunction is sought willfully intended to trade on the recognition of the famous mark; or

**(ii)** by reason of dilution by tarnishment, the person against whom the injunction is sought willfully intended to harm the reputation of the famous mark.

**(6)** OWNERSHIP OF VALID REGISTRATION A COMPLETE BAR TO ACTION The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register under this chapter shall be a complete bar to an action against that person, with respect to that mark, that—

**(A)** is brought by another person under the common law or a statute of a State; and

**(B)**

**(i)** seeks to prevent dilution by blurring or dilution by tarnishment; or

**(ii)** asserts any claim of actual or likely damage or harm to the distinctiveness or reputation of a mark, label, or form of advertisement.

**(7)** SAVINGS CLAUSE

Nothing in this subsection shall be construed to impair, modify, or supersede the applicability of the patent laws of the United States.

* * *

### 15 U.S.C. § 1127 - Construction and definitions; intent of chapter

In the construction of this chapter, unless the contrary is plainly apparent from the context—

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

The term "principal register" refers to the register provided for by sections 1051 to 1072 of this title, and the term "supplemental register" refers to the register provided for by sections 1091 to 1096 of this title.

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this chapter includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes the United States, any agency or instrumentality thereof, or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

The terms "trade name" and "commercial name" mean any name used by a person to identify his or her business or vocation.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term "service mark" means any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof—

(1) used by a person other than its owner, or

(2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

The term "collective mark" means a trademark or service mark—

(1) used by the members of a cooperative, an association, or other collective group or organization, or

(2) which such cooperative, association, or other collective group or organization has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

and includes marks indicating membership in a union, an association, or other organization.

The term "mark" includes any trademark, service mark, collective mark, or certification mark.

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

A mark shall be deemed to be "abandoned" if either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its

significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.

The term "registered mark" means a mark registered in the United States Patent and Trademark Office under this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, or the Act of March 19, 1920. The phrase "marks registered in the Patent and Trademark Office" means registered marks.

The term "Act of March 3, 1881", "Act of February 20, 1905", or "Act of March 19, 1920", means the respective Act as amended.

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

The term "Internet" has the meaning given that term in section 230(f)(1) of title 47.

Words used in the singular include the plural and vice versa.

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

(R. C. de la C. 83)

# RESOLUCIÓN CONJUNTA NUM. 16
## 5 DE AGOSTO DE 2021

Para ordenar a la Secretaria del Departamento de Transportación y Obras Públicas confeccionar y expedir una tablilla conmemorativa de los cincuenta (50) años del "Hit 3,000" de Roberto Clemente Walker, a partir del 1 de enero de 2022 hasta el 31 de diciembre de 2022; disponer sobre el diseño y los requisitos para adquirirla; ordenar al Secretario del Departamento de Hacienda y a la Secretaria del Departamento de Transportación y Obras Públicas aprobar o enmendar las normas, reglas y reglamentos necesarios y convenientes; y para otros fines relacionados.

EXPOSICIÓN DE MOTIVOS

Roberto Clemente Walker es uno de los más grandes deportistas que ha dado Puerto Rico. Su grandeza y humildad subyace de su calidad humana, que tanto dentro como fuera del terreno lo distinguía de entre otros peloteros talentosos. A pesar de su trágico fallecimiento el 31 de diciembre de 1972, mientras llevaba ayuda como parte de un viaje humanitario hacia Nicaragua, su legado ha permanecido a través de generaciones de puertorriqueños.

En 1973, Roberto Clemente, se convirtió en el primer puertorriqueño e hispano en ser exaltado al Salón de la Fama del Béisbol de las Grandes Ligas. Tres meses antes del fatídico accidente aéreo que cobró su vida, Clemente alcanzó un "hit" que hasta el día de hoy solo han logrado treinta y dos (32) peloteros privilegiados en 144 años de historia de las Grandes Ligas. Fue un 30 de septiembre de 1972, cuando el astro boricua logro unirse al club de los 3,000 *hits*.

El partido entre los *Piratas* de *Pittsburgh* y los *Mets* de *Nueva York* se encontraba en el inicio de la parte baja de la cuarta entrada cuando el pitcher abridor de los *Mets*, Jon Matlack, se enfrentaría a Clemente, Willie Stargell y Richie Zisk, el tercer, cuarto y quinto bate de los Piratas. Nuestro orgullo puertorriqueño y Jugador Más Valioso de la Serie Mundial de 1971, abrió la tanda por los Piratas ante los vítores de 13,117 fanáticos que se dieron cita al estadio *Three Rivers* de la Ciudad de Pittsburgh. Este fue el momento de gloria, cuando en el segundo lanzamiento rompiente fuera del plato el pelotero boricua conectó un imparable que terminó picando por el jardín izquierdo. Cuando llegó a segunda base se quitó la gorra en un humilde gesto de agradecimiento y el árbitro Doug Harvey detuvo brevemente el juego para darle la icónica pelota que acreditó su entrada al exclusivo grupo de grandes peloteros que han conseguido 3,000 o más hits en su carrera.

Clemente llegó a los 3,000 *hits* en su decimoctava temporada en las Grandes Ligas, todas con los Piratas de Pittsburgh. Reconociendo los más altos valores y la inspiración que representa la figura de nuestro Roberto Clemente para los jóvenes y para las futuras generaciones de puertorriqueños, y con el propósito de honrar su memoria, esta Asamblea Legislativa entiende meritorio confeccionar y expedir una tablilla conmemorativa a este ilustre deportista puertorriqueño en ocasión a los cincuenta años del hit 3,000.

De otra parte, uno de los sueños de Clemente consistía en crear un espacio para que los jóvenes puertorriqueños pudieran practicar sus actividades deportivas y a su vez desarrollar destrezas humanitarias, así como brindar clínicas deportivas a nuestra juventud. Para aportar a este sueño, esta medida legislativa transfiere veintiún dólares ($21) al Distrito Deportivo Roberto Clemente por cada tablilla vendida, para el desarrollo de obras y mejoras de estas facilidades deportivas.

Por todo lo cual, esta Asamblea Legislativa del Estado Libre Asociado de Puerto Rico, honrando uno de los más importantes acontecimientos en la historia del deporte puertorriqueño, presenta esta Resolución Conjunta. Asimismo, mediante esta legislación le allegamos nuevos fondos al Distrito Deportivo, con el fin de asegurar que los mismos se desarrollen cabalmente y le puedan servir plenamente al pueblo de Puerto Rico, cumpliendo así con el sueño de nuestro Roberto Clemente Walker.

*RESUÉLVESE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

Sección 1.-Se ordena a la Secretaria del Departamento de Transportación y Obras Públicas, confeccionar y expedir una tablilla conmemorativa de los cincuenta (50) años del "Hit 3,000" de Roberto Clemente Walker, a partir del 1 de enero de 2022 hasta el 31 de diciembre de 2022.

Sección 2.-La Secretaria del Departamento Transportación y Obras Públicas será la encargada de elegir y confeccionar el diseño, tamaño, colores, composición y otros detalles físicos de la tablilla, conforme a lo establecido en los Artículos 2.19 y 2.20 de la Ley 22-2000, según enmendada, conocida como la "Ley de Vehículos y Tránsito de Puerto Rico".

Sección 3.-La compra de esta tablilla será obligatoria para todo conductor que adquiera una tablilla durante el año natural 2022. El cargo por la tablilla será de veintiún dólares ($21), los cuales serán transferidos al Fondo del Distrito Deportivo Roberto Clemente, administrado por el Departamento de Hacienda, para uso exclusivo del Departamento de Recreación y Deportes.

Sección 4.-Se autoriza al Departamento de Transportación y Obras Públicas y a las agencias pertinentes del Gobierno del Estado Libre Asociado de Puerto Rico, realizar una campaña informativa que le permita a los ciudadanos conocer sobre la disponibilidad de la tablilla conmemorativa de Roberto Clemente, su costo y el uso para el cual estarán destinados los fondos generados. Disponiéndose, que se deberá colocar un anuncio en las páginas cibernéticas del Gobierno a tal fin durante toda la duración de la emisión de las tablillas conmemorativas entre el 1 de enero de 2022 y el 31 de diciembre de 2022. Finalizado el periodo conmemorativo, la tablilla se mantendrá como opción de uso o colección para todo ciudadano que interese adquirirla conforme a las disposiciones de esta Resolución Conjunta.

Sección 5.-Toda persona que desee cambiar la tablilla de su vehículo por la tablilla conmemorativa a Roberto Clemente deberá completar una solicitud a esos efectos, entregar la tablilla anterior y comprar los correspondientes Comprobantes de Rentas Internas por valor de veintiún dólares ($21) para el pago de la nueva tablilla, en adición de los costos ordinarios de dicha transacción. Esta Resolución Conjunta no será de aplicación a los dueños de tablillas que al amparo de la Ley 2-2016, deseen migrar su tablilla de un vehículo a otro.

Sección 6.-Las corporaciones públicas, agencias, instrumentalidades y municipios del Gobierno del Estado Libre Asociado de Puerto Rico estarán obligados a adquirir la tablilla conmemorativa de Roberto Clemente para todo vehículo que estos adquieran a partir del 1 de enero de 2022 hasta el 31 de diciembre de 2022, en adición a todos los vehículos nuevos vendidos en el 2022.

Sección 7.-El Secretario del Departamento de Hacienda y la Secretaria del Departamento de Transportación y Obras Públicas aprobarán y/o enmendarán las normas, reglas y reglamentos que sean necesarios y convenientes para garantizar el cumplimiento de lo dispuesto en esta Resolución Conjunta en un periodo de treinta (30) días.

Sección 8.-Esta Resolución Conjunta comenzará a regir inmediatamente después de su aprobación.


+1 206-672-5052 I support@rushtranslate.com


MEMBER #263976

# Certification of Translation Accuracy

Translation of **Res0016C0083** from **Spanish** to **English**

As an authorized representative of RushTranslate, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified and competent professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, RushTranslate assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Mike Bortscheller
Authorized Representative
Order Date: February 9, 2024

RushTranslate
640 South Fourth Street
Suite 300
Louisville, KY 40202
United States

 

(R. C. of the C. 83)

## JOINT RESOLUTION NUM. 16
## AUGUST 5 OF 2021

To order the Secretary of the Department of Transportation and Public Works to prepare and issue a commemorative license plate of the fifty (50) years of Roberto Clemente Walker's "3,000 Hit", starting on January 1, 2022 to December 31, 2022 ; to provide the design and requirements in order to acquire it; to order the Secretary of the Department of Treasury and the Secretary of the Department of Transportation and Public Works to approve or amend the necessary and convenient guidelines, rules and regulations; and for other related purposes.

PREAMBLE

Roberto Clemente Walker is one of the greatest athletes that Puerto Rico has ever given. His greatness and humility underlie of his human quality, which both on and off the field set him apart from other talented players. Despite his tragic death on December 31, 1972, while traveling with aid as part of a humanitarian trip to Nicaragua, his legacy has endured through generations of Puerto Ricans.

In 1973, Roberto Clemente became the first Puerto Rican and Hispanic to be inducted into the Major League Baseball Hall of Fame. Three months before the fateful plane crash that took his life, Clemente achieved a "hit" that to this day only thirty-two (32) privileged players have achieved in 144 years of Major League history. It was on September 30, 1972, when the Puerto Rican star managed to join the 3,000 *hits* club.

The game between the *Pittsburgh Pirates* and the *New York M*ets was at the beginning of the bottom part of the fourth entry when the *Mets'* starting pitcher, Jon Matlack, would face Clemente, Willie Stargell and Richie Zisk, the third, fourth and fifth hitters of the Pirates. Our Puerto Rican pride and Most Valuable Player of the 1971 World Series opened the round for the Pirates on front of the cheers of 13,117 fans who were gathered at *Three Rivers* Stadium in the City of Pittsburgh. This was the moment of glory, when on the second breaking pitch off the home plate the Puerto Rican player connected an unstoppable hit that ended up landing in left field. When he reached second base, he took off his cap in a humble gesture of gratitude and the referee Doug Harvey briefly stopped the game to give him the iconic ball that accredited his entry into the exclusive group of great baseball players who have had 3,000 or more hits in their career.

**Add.90**

 

2

Clemente reached 3,000 *hits* in his eighteenth season in the Major Leagues, all with the Pittsburgh Pirates. Recognizing the highest values and inspiration that the figure of our Roberto Clemente represents for young people and for future generations of Puerto Ricans, and with the purpose of honoring his memory, this Legislative Assembly considers it worthwhile to prepare and issue a commemorative license plate to this illustrious Puerto Rican athlete on the occasion of the fifty years of the 3,000 hits.

On the other hand, one of Clemente's dreams was to create a space for young Puerto Ricans to practice their sports and, at the same time develop humanitarian skills and, provide sports clinics to our youth. To contribute to this dream, this legislative measure transfers twenty-one dollars ($21) to the Roberto Clemente Sports District for each license plate sold, for the development of works and improvements to these sports facilities.

Therefore, this Legislative Assembly of the Commonwealth of Puerto Rico, honoring one of the most important events in the history of Puerto Rican sports, presents this Joint Resolution. Likewise, by way of this legislation we provide new funds to the Sports District, in order to ensure that the funds are precisely developed and can fully serve the people of Puerto Rico, thus fulfilling the dream of our Roberto Clemente Walker.

*SO ORDERED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:*

Section 1.- The Secretary of the Department of Transportation and Public Works is ordered to prepare and issue a commemorative license plate for the fifty (50) years of the "3,000 Hit" by Roberto Clemente Walker, from January 1, 2022 to December 31, 2022.

Section 2.- The Secretary of the Department of Transportation and Public Works will be the one in charge of choosing and preparing the design, size, colors, composition and other physical details of the license plate, in accordance with the provisions of Articles 2.19 and 2.20 of Law 22-2000, as amended, known as the "Puerto Rico Vehicle and Traffic Law".

Section 3.- The purchase of this license plate will be mandatory for every driver that acquires a license plate during the 2022 calendar year. The charge for the license plate will be twenty-one dollars ($21), which will be transferred to the Roberto Clemente Sports District Fund, managed by the Department of Treasury, for exclusive use of the Department of Sports and Recreation.

**Add.91**





3

Section 4.- The Department of Transportation and Public Works and the relevant agencies of the Government of the Commonwealth of Puerto Rico are authorized to carry out an information campaign that allows the citizens to learn about the availability of the Roberto Clemente commemorative license plate, its cost and the use to which the generated funds will be allocated on. Provided, that an announcement must be placed on the Government's websites during the entire duration of the issuance of the commemorative license plates between January 1, 2022, and December 31, 2022. Once the commemorative period has ended, the license plate will be maintained as an option for use or collection for any citizen who is interested in acquiring it in accordance with the provisions of this Joint Resolution.

Section 5.- Any person who wishes to change the license plate of their vehicle for the Roberto Clemente commemorative license plate must complete an application for this purpose, and deliver the previous license plate and purchase the corresponding Internal Revenue Stamps for the value of twenty-one dollars ($21) for the payment of the new license plate, in addition to the ordinary costs of said transaction. This Joint Resolution will not apply to license plate owners who, under Law 2-2016, wish to migrate their license plate from one vehicle to another..

Section 6.- Public corporations, agencies, instrumentalities and municipalities of the Government of the Commonwealth of Puerto Rico will be mandated to acquire the Roberto Clemente commemorative license plate for every vehicle they acquire from January 1, 2022 until December 31, 2022. in addition to all new vehicles sold in 2022.

Section 7.- The Secretary of the Department of the Treasury and the Secretary of the Department of Transportation and Public Works will approve and/or amend the guidelines, rules and regulations that are necessary and convenient to guarantee the compliance of the provisions of this Joint Resolution in a period of thirty (30 ) days.

Section 8.- This Joint Resolution will start taking effect immediately after its approval.

**Add.92**

(R. C. de la C. 84)
(Conferencia)

## RESOLUCIÓN CONJUNTA NUM. 17
## 5 DE AGOSTO DE 2021

Para ordenar a la Secretaria del Departamento de Transportación y Obras Públicas a confeccionar y expedir un marbete conmemorativo a los cincuenta (50) años del "Hit 3,000" de Roberto Clemente Walker para el año 2022; requerirle al Secretario de Hacienda que, en coordinación con la Secretaria de Transportación y Obras Públicas y los proveedores de servicios de cobro de pagos de marbete, establezca un procedimiento sobre los requisitos para el pago del marbete y donativos; enmendar las Secciones 1 y 3 de la Resolución Conjunta 8-2017; y para otros fines relacionados.

EXPOSICIÓN DE MOTIVOS

Roberto Clemente Walker es uno de los más grandes deportistas que ha dado Puerto Rico. Su grandeza y humildad subyace de su calidad humana, que tanto dentro como fuera del terreno lo distinguía de entre otros peloteros talentosos. A pesar de su trágico fallecimiento el 31 de diciembre de 1972 mientras llevaba ayuda como parte de un viaje humanitario hacia Nicaragua, su legado ha permanecido a través de generaciones de puertorriqueños.

En 1973, Roberto Clemente, se convirtió en el primer puertorriqueño e hispano en ser exaltado al Salón de la Fama del Béisbol de las Grandes Ligas. Tres meses antes del fatídico accidente aéreo que cobró su vida, Clemente alcanzó un "hit" que hasta el día de hoy solo han logrado 32 peloteros privilegiados en 144 años de historia de las Grandes Ligas. Fue un 30 de septiembre de 1972 cuando el astro boricua logro unirse al club de los 3,000 *hits*.

El partido entre los Piratas de Pittsburgh y los *Mets* de Nueva York se encontraba en el inicio de la parte baja de la cuarta entrada cuando el pitcher abridor de los *Mets*, Jon Matlack, se enfrentaría a Clemente, Willie Stargell y Richie Zisk, el tercer, cuarto y quinto bate de los Piratas. Nuestro orgullo puertorriqueño y Jugador Más Valioso de la Serie Mundial de 1971, abrió la tanda por los Piratas ante los vítores de 13,117 fanáticos que se dieron cita al estadio *Three Rivers* de la Ciudad de Pittsburgh. Este fue el momento de gloria, cuando en el segundo lanzamiento rompiente fuera del plato el pelotero boricua conectó un imparable que terminó picando por el jardín izquierdo. Cuando llegó a segunda base se quitó la gorra en un humilde gesto de agradecimiento y el árbitro Doug Harvey detuvo brevemente el juego para darle la icónica pelota que acreditó su entrada al exclusivo grupo de grandes peloteros que han conseguido 3,000 o más *hits* en su carrera.

**Add.93**

Clemente llegó a los 3,000 *hits* en su temporada número 18 en las Grandes Ligas, todas con los Piratas de Pittsburgh. Reconociendo los más altos valores y la inspiración que representa la figura de nuestro Roberto Clemente para los jóvenes y para las futuras generaciones de puertorriqueños, y con el propósito de honrar su memoria, esta Asamblea Legislativa entiende meritorio confeccionar y expedir un marbete conmemorativo a este ilustre deportista puertorriqueño en ocasión a los cincuenta años del *hit* 3,000.

De otra parte, uno de los sueños de Clemente consistía en crear un espacio para que los jóvenes puertorriqueños pudieran practicar sus actividades deportivas y a su vez desarrollar destrezas humanitarias, así como brindar clínicas deportivas a nuestra juventud. Para aportar a este sueño, esta medida legislativa transfiere las aportaciones ciudadanas al Fondo del Distrito Deportivo Roberto Clemente para el desarrollo de obras y mejoras de estas facilidades deportivas.

Por todo lo cual, esta Asamblea Legislativa del Estado Libre Asociado de Puerto Rico, honrando uno de los más importantes acontecimientos en la historia del deporte puertorriqueño, presenta esta Resolución Conjunta. Asimismo, mediante esta legislación le allegamos nuevos fondos al Distrito Deportivo, con el fin de asegurar que los mismos se desarrollen cabalmente y le puedan servir plenamente al pueblo de Puerto Rico, cumpliendo así con el sueño de nuestro Roberto Clemente Walker.

*RESUÉLVESE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

Sección 1.-Se ordena a la Secretaria del Departamento de Transportación y Obras Públicas, a honrar el legado deportivo y social que representa el astro boricua Roberto Clemente Walker confeccionando y expidiendo un marbete conmemorativo a los cincuenta (50) años del "Hit 3,000", a ser expedido y utilizado en el año 2022, según se dispone en la Sección 4 de esta Resolución Conjunta.

Sección 2.-La Secretaria del Departamento de Transportación y Obras Públicas será la encargada de confeccionar el diseño, tamaño, composición y otros detalles físicos del marbete, según se disponga en las leyes, reglamentos aplicables, la Sección 4 de la presente Resolución Conjunta.

Sección 3.-Para el año 2022 exclusivamente, el marbete conmemorativo tendrá un costo de cinco dólares ($5.00) en adición a los costos regulares por concepto de derechos, aranceles y multas.

Sección 4.-El marbete conmemorativo será circulado durante el proceso de expedición y renovación de licencias para vehículos de motor correspondientes al año natural 2022. El marbete conmemorativo será en color amarillo, contendrá la figura de

Roberto Clemente con su número veintiuno (21) y llevará una frase alusiva a los cincuenta (50) años del hit 3,000.

Sección 5.-Durante el año natural 2022, el Departamento de Recreación y Deportes consignará al Fondo General de la Universidad de Puerto Rico la cantidad de dos mil (2,000) dólares mensuales provenientes de los recaudos establecidos en las Secciones 3 y 5 de esta Resolución Conjunta, venciendo su término de pago el 31 de diciembre de 2022.

Sección 6.-Se ordena al Secretario de Hacienda a que, en coordinación con la Secretaria de Transportación y Obras Públicas y los proveedores de servicio de cobro de pagos de marbetes, establezca un procedimiento que permita a los ciudadanos realizar junto al pago correspondiente a la renovación del marbete, un donativo por la cantidad de cinco dólares ($5.00), diez dólares ($10.00), veinte dólares ($20.00) o cualquier otra cantidad deseada. El costo del marbete conmemorativo y los donativos realizados por los ciudadanos descritos anteriormente serán destinados en su totalidad al Fondo del Distrito Deportivo Roberto Clemente, administrado por el Departamento de Hacienda para uso exclusivo del Departamento de Recreación y Deportes.  Todos los proveedores de servicio de cobro de pagos de marbetes estarán obligados a notificarle al ciudadano que podrá efectuar la donación en una de las cantidades antes mencionadas al momento de realizar su pago, pero que dicha donación será voluntaria y podrá negarse a efectuar la misma sin que esto afecte de forma alguna la obtención del marbete. Disponiéndose que, el procedimiento para realizar las donaciones aquí descrito deberá establecerse e implementarse en o antes del 1 de enero de 2022, de manera que, para en o antes de esta fecha, los ciudadanos puedan comenzar a realizar su donativo al momento de realizar su pago por concepto de marbete. Este procedimiento estará vigente hasta que culmine la emisión de marbetes conmemorativos que por esta Resolución Conjunta se establece.

Sección 7.-El Secretario de Hacienda adoptará, en coordinación con la Secretaria de Transportación y Obras Públicas y los proveedores de servicio de cobro de pagos de marbetes, las normas, reglas y reglamentos que sean necesarios para garantizar el cumplimiento de lo dispuesto en esta Resolución Conjunta.

Sección 8.-Se ordena al Secretario de Hacienda a rendir un informe anual a la Asamblea Legislativa donde detalle los recaudos mensuales y depósitos allegados al Fondo del Distrito Deportivo Roberto Clemente que se logren tras la implementación de la presente Resolución Conjunta. Dicho informe comprenderá el año natural 2022 hasta que culmine la emisión de los marbetes conmemorativos aquí detallados. Este será remitido a la Asamblea Legislativa en o antes del 31 de enero de 2023. Disponiéndose que el primer informe comprenderá los recaudos realizados a partir del 1 de enero de 2022 y será remitido a la Asamblea Legislativa en o antes del 31 de enero de 2023.

Sección 9.-Se faculta a la Secretaria del Departamento de Transportación y Obras Públicas, de ser necesario para cumplir los fines de esta Resolución Conjunta, a enmendar la reglamentación aprobada en virtud de la Ley Núm. 46 del 13 de julio de 1978, según enmendada, y la Ley 22-2000, según enmendada, conocida como "Ley de Vehículos y Tránsito de Puerto Rico".

Sección 10.-Se enmienda la Sección 1 de la Resolución Conjunta 8-2017, para que lea como sigue:

"Sección 1.-Se ordena al Secretario del Departamento de Transportación y Obras Públicas, a honrar el baluarte educativo, cultural y social que representa la Universidad de Puerto Rico y confeccionar y expedir un marbete conmemorativo de esta y sus once (11) unidades institucionales, a ser expedidos y utilizados según se dispone en la Sección 3 de esta Resolución Conjunta."

Sección 11.-Se enmienda la Sección 3 de la Resolución Conjunta 8-2017, para que lea como sigue:

"Sección 3.-Los marbetes conmemorativos serán circulados durante el proceso de expedición y renovación de licencias para vehículos de motor correspondientes a los años naturales 2020 al 2032 y contendrán los emblemas oficiales de la Universidad de Puerto Rico y sus unidades institucionales según se dispone a continuación:

a) Para el año 2020, el marbete deberá mostrar el emblema oficial institucional de la Universidad de Puerto Rico.

b) Para el año 2021, el marbete deberá mostrar el emblema oficial del Recinto Universitario de Río Piedras de la Universidad de Puerto Rico.

c) Para el año 2022, el marbete deberá mostrar el emblema oficial del Recinto Universitario de Mayagüez de la Universidad de Puerto Rico.

d) Para el año 2024, el marbete deberá mostrar el emblema oficial del Recinto de Ciencias Médicas de la Universidad de Puerto Rico.

e) Para el año 2025, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Humacao.

f) Para el año 2026, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Arecibo.

g)    Para el año 2027, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Cayey.

h)    Para el año 2028, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Ponce.

i)    Para el año 2029, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Bayamón.

j)    Para el año 2030, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Aguadilla.

k)    Para el año 2031, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Carolina.

l)    Para el año 2032, el marbete deberá mostrar el emblema oficial de la Universidad de Puerto Rico en Utuado."

Sección 11.-Esta Resolución Conjunta comenzará a regir inmediatamente después de su aprobación.

 

+1 206-672-5052 l support@rushtranslate.com

# Certification of Translation Accuracy

Translation of **Res0017C0084** from **Spanish** to **English**

As an authorized representative of RushTranslate, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified and competent professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, RushTranslate assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Mike Bortscheller
Authorized Representative
Order Date: February 9, 2024

RushTranslate
640 South Fourth Street
Suite 300
Louisville, KY 40202
United States

**Add.98**




+1 206-672-5052 | support@rushtranslate.com

**(R. C. of the C. 84)**

**(Conference)**

## JOINT RESOLUTION NO. 17
## AUGUST 5, 2021

To order the Secretary of the Department of Transportation and Public Works to prepare and issue a commemorative annual vehicle registration label for the fifty (50) years of Roberto Clemente Walker's "3,000 Hit" for the year 2022; require the Secretary of the Treasury to, in coordination with the Secretary of Transportation and Public Works and the service providers for collecting vehicle registration label payments, establish a procedure on the requirements for the payment of the label and donations; amend Sections 1 and 3 of Joint Resolution 8-2017; and for other related.

PREAMBLE

Roberto Clemente Walker is one of the greatest athletes that Puerto Rico has ever produced. His greatness and humility underlie his human quality, which both on and off the field set him apart from among other talented players. Despite his tragic death on December 31, 1972, while traveling with aid on a humanitarian trip to Nicaragua, his legacy has endured through generations of Puerto Ricans.

In 1973, Roberto Clemente became the first Puerto Rican and Hispanic to be inducted into the Major League Baseball Hall of Fame. Three months before the fateful plane crash that claimed his life, Clemente achieved a "hit" that to this day only 32 privileged players have achieved in 144 years of Major League history. It was September 30, 1972 when the Puerto Rican star managed to join the 3,000 *hits* club.

The game between the Pittsburgh Pirates and the New York *Mets* was at the beginning of the bottom of the fourth inning when Mets starting pitcher Jon Matlack would face Clemente, Willie Stargell and Richie Zisk, the third, fourth and fifth hitter for the Pirates. Our Puerto Rican pride and Most Valuable Player of the 1971 World Series opened the round for the Pirates on the sound of the cheers of 13,117 fans who gathered at Three Rivers Stadium in the City of Pittsburgh. This was the moment of glory, when on the second breaking pitch off the plate the Puerto Rican player swung hit a hit that ended up going straight up left field. When he reached second base, he took off his cap in a humble gesture of gratitude and umpire Doug Harvey briefly stopped the game to give him the iconic ball that accredited his entry into the exclusive group of great players who have had 3,000 or more *hits* in their career.

**Add.99**

 

2

Clemente reached 3,000 hits in his 18th season in the Major Leagues, all with the Pittsburgh Pirates. Recognizing the highest values and inspiration that the figure of our Roberto Clemente represents for young people and for future generations of Puerto Ricans, and with the purpose of honoring his memory, this Legislative Assembly considers it worthwhile to make and issue a commemorative vehicle registration label to this illustrious Puerto Rican athlete on the occasion of the fifty years of 3,000 hit.

On the other hand, one of Clemente's dreams was to create a space for young Puerto Ricans to practice their sports activities and at the same time develop humanitarian skills and, provide sports clinics to our youth. To contribute to this dream, this legislative measure transfers citizen contributions to the Roberto Clemente Sports District Fund for the development of works and improvements to these sports facilities.

Therefore, this Legislative Assembly of the Commonwealth of Puerto Rico, honoring one of the most important events in the history of Puerto Rican sports, presents this Joint Resolution. Likewise, by way of this legislation we provide new funds to the Sports District, in order to ensure that they are precisely developed and can fully serve the people of Puerto Rico, thus fulfilling the dream of our Roberto Clemente Walker.

*SO ORDERED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:*

Section 1.-The Secretary of the Department of Transportation and Public Works is ordered to honor the sporting and social legacy that the Puerto Rican star Roberto Clemente Walker represents by making and issuing a commemorative vehicle registration label for the fifty (50) years of the "3,000 Hit", to be issued and used in the year 2022, as provided in Section 4 of this Joint Resolution.

Section 2.-The Secretary of the Department of Transportation and Public Works will be in charge of preparing the design, size, composition, and other physical details of the vehicle registration label, as provided in the applicable laws, regulations, Section 4 of this Joint Resolution.

Section 3.-For the year 2022 only, the commemorative registration label will have a cost of five dollars ($5.00) in addition to the regular costs for duties, tariffs and fines.

Section 4.-The commemorative registration label will be circulated during the process of issuing and renewing licenses for motor vehicles corresponding to the calendar year 2022. The commemorative label will be yellow, will contain the figure of

**Add.100**





3

Roberto Clemente with his number twenty-one (21) and It will have a phrase alluding to the fifty (50) years of hit 3,000.

Section 5.-During the calendar year 2022, the Department of Sports and Recreation will consign to the General Fund of the University of Puerto Rico the amount of two thousand (2,000) dollars per month from the collections established in Sections 3 and 5 of this Joint Resolution, its payment term expiring on December 31, 2022.

Section 6.-The Secretary of the Treasury is ordered to, in coordination with the Secretary of Transportation and Public Works and the service providers for collecting payment of vehicle registration labels, establish a procedure that allows citizens to make, together with the payment corresponding to the registration label, a donation in the amount of five dollars ($5.00), ten dollars ($10.00), twenty dollars ($20.00) or any other desired amount. The cost of the commemorative registration label and the donations made by the citizens described above will be allocated in their entirety to the Roberto Clemente Sports District Fund, administered by the Department of the Treasury for the exclusive use of the Department of Sports and Recreation. All registration label payment collection service providers will be obliged to notify the citizen that they may make the donation in one of the amounts herein at the time of making their payment, but that said donation will be voluntary and they may refuse to make it without that this affects in any way the obtaining of the registration label. Provided that, the procedure for making donations described here must be established and implemented on or before January 1, 2022, so that, on or before this date, citizens can begin to make their donation at the time of making their payment for the registration label. This procedure will be valid until the issuance of commemorative registration labels established by this Joint Resolution is completed.

Section 7.-The Secretary of the Treasury will adopt, in coordination with the Secretary of Transportation and Public Works and the service providers for collecting payment of registration labels, the guidelines, rules and regulations that are necessary to guarantee compliance with the provisions of this Joint Resolution.

Section 8.-The Secretary of the Treasury is ordered to submit an annual report to the Legislative Assembly detailing the monthly collections and deposits related to the Roberto Clemente Sports District Fund that are achieved after the implementation of this Joint Resolution. This report will cover the calendar year 2022 until the issuance of the commemorative labels detailed here is completed. This will be sent to the Legislative Assembly on or before January 31, 2023. Provided that the first report will

**Add.101**




include the collections made as of January 1, 2022 and will be sent to the Legislative Assembly on or before January 31, 2023.

4

Section 9.-The Secretary of the Department of Transportation and Public Works is empowered, if necessary to fulfill the purposes of this Joint Resolution, to amend the regulations approved by virtue of Law No. 46 of July 13, 1978, as amended, and Law 22-2000, as amended, known as the "Puerto Rico Vehicle and Traffic Law."

Section 10.-Section 1 of Joint Resolution 8-2017 is hereby amended to read as follows:

"Section 1.-The Secretary of the Department of Transportation and Public Works is ordered to honor the educational, cultural and social bastion that the University of Puerto Rico represents and make and issue a commemorative registration label of this and its eleven (11) institutional campuses., to be issued and used as provided in Section 3 of this Joint Resolution."

Section 11.-Section 3 of Joint Resolution 8-2017 is hereby amended to read as follows:

"Section 3.-The commemorative registration labels will be circulated during the process of issuing and renewing licenses for motor vehicles corresponding to the calendar years 2020 to 2032 and will contain the official emblems of the University of Puerto Rico and its institutional units as provided below:

a)    By the year 2020, the label must show the official institutional emblem of the University of Puerto Rico.

b)    By the year 2021, the label must show the official emblem of the Río Piedras Campus of the University of Puerto Rico.

c)    By the year 2022, the label must show the official emblem of the Mayagüez Campus of the University of Puerto Rico.

d)    By the year 2024, the label must show the official emblem of the Medical Sciences Campus of the University of Puerto Rico.

e)    By the year 2025, the label must show the official emblem of the University of Puerto Rico in Humacao.

f)    By the year 2026, the label must show the official emblem of the University of Puerto Rico in Arecibo.

**Add.102**

 

5

a)   By year 2027, the label must show the official emblem of the University of Puerto Rico at Cayey.

b)   By the year 2028, the label must show the official emblem of the University of Puerto Rico at Ponce.

c)   By the year 2029, the label must show the official emblem of the University of Puerto Rico at Bayamón.

d)   By the year 2030, the label must show the official emblem of the University of Puerto Rico at Aguadilla.

e)   By the year 2031, the label must show the official emblem of the University of Puerto Rico at Carolina.

f)   By the year 2032, the label must show the official emblem of the University of Puerto Rico at Utuado."

Section 11.-This Joint Resolution will take effect immediately after its approval.

**Add.103**



LEY  *67*-20*22*

Yo, LCDO. JAVIER GÓMEZ CRUZ, Secretario de la Cámara de Representantes del Estado Libre Asociado de Puerto Rico,

CERTIFICO:

Que el P. de la C. 489 (conferencia), titulado

"Ley

*Para crear el Distrito Deportivo Roberto Clemente, a los fines de transformar y establecer la política pública del Estado Libre Asociado de Puerto Rico sobre el uso y operación de estas facilidades; transferir los terrenos, edificaciones, propiedades y administración al Departamento de Recreación y Deportes de Puerto Rico; disponer que la Autoridad del Distrito del Centro de Convenciones de Puerto Rico sea la encargada de la planificación y la organización del Distrito Deportivo Roberto Clemente; enmendar el Artículo 2.02 de la Ley 351-2000, según enmendada, conocida como "Ley del Distrito del Centro de Convenciones de Puerto Rico"; establecer las facultades y deberes del Secretario de Recreación y Deportes; proveer para la asignación de fondos; añadir un nuevo inciso (o) al Artículo 5 de la Ley 8-2004, según enmendada, conocida como "Ley Orgánica del Departamento de Recreación y Deportes"; derogar la Ley Núm. 133 de 9 de junio de 1973, según enmendada; derogar la Ley 164-2004, según enmendada; y para otros fines relacionados."*

ha sido aprobado por la Cámara de Representantes y el Senado del Estado Libre Asociado de Puerto Rico en la forma que expresa el documento que se acompaña.

PARA QUE ASÍ CONSTE, y para notificar al Gobernador del Estado Libre Asociado de Puerto Rico, expido la presente en mi oficina en el Capitolio, San Juan, Puerto Rico a los ocho (8) días del mes de julio del año dos mil veintidós y estampo en ella el sello de la Cámara de Representantes del Estado Libre Asociado de Puerto Rico.

Lcdo. Javier Gómez Cruz
Secretario

**Add.104**

(P. de la C. 489)
(Conferencia)

## LEY

Para crear el Distrito Deportivo Roberto Clemente, a los fines de transformar y establecer la política pública del Estado Libre Asociado de Puerto Rico sobre el uso y operación de estas facilidades; transferir los terrenos, edificaciones, propiedades y administración al Departamento de Recreación y Deportes de Puerto Rico; disponer que la Autoridad del Distrito del Centro de Convenciones de Puerto Rico sea la encargada de la planificación y la organización del Distrito Deportivo Roberto Clemente; enmendar el Artículo 2.02 de la Ley 351-2000, según enmendada, conocida como "Ley del Distrito del Centro de Convenciones de Puerto Rico"; establecer las facultades y deberes del Secretario de Recreación y Deportes; proveer para la asignación de fondos; añadir un nuevo inciso (o) al Artículo 5 de la Ley 8-2004, según enmendada, conocida como "Ley Orgánica del Departamento de Recreación y Deportes"; derogar la Ley Núm. 133 de 9 de junio de 1973, según enmendada; derogar la Ley 164-2004, según enmendada; y para otros fines relacionados.

### EXPOSICIÓN DE MOTIVOS

Roberto Clemente Walker es uno de los más grandes deportistas que ha dado Puerto Rico. Su grandeza y humildad subyace en su calidad humana, que tanto dentro como fuera del terreno lo distinguía de entre otros peloteros talentosos. A pesar de su trágico fallecimiento el 31 de diciembre de 1972, mientras llevaba ayuda como parte de un viaje humanitario hacia Nicaragua, su legado ha permanecido a través de generaciones de puertorriqueños. En 1973, Roberto Clemente se convirtió en el primer puertorriqueño e hispano en ser exaltado al Salón de la Fama del Béisbol de las Grandes Ligas.

Reconociendo los más altos valores y la inspiración que representa la figura de nuestro Roberto Clemente para los jóvenes y para las futuras generaciones de puertorriqueños, y con el propósito de honrar su memoria, esta Asamblea Legislativa entiende es meritorio que se desarrolle en Puerto Rico el legado deportivo que soñó Roberto Clemente para beneficio de nuestra juventud.

El sueño de Clemente consistía en crear un espacio para que los jóvenes puertorriqueños pudieran practicar sus actividades deportivas y a su vez desarrollar destrezas humanitarias, así como brindar clínicas deportivas a nuestra juventud. Para ejecutar este sueño, la Asamblea Legislativa aprobó la Ley Núm. 133 del 9 de junio de 1973, según enmendada (en adelante "Ley Núm. 133") mediante la cual se autorizó a la Administración de Terrenos a donar a la entidad sin fines de lucro Ciudad Deportiva

**Add.105**

Roberto Clemente, Inc., cientos de cuerdas de terreno ubicadas en el Municipio de Carolina.

Tratándose de tan importante encomienda para el pueblo de Puerto Rico, a través de los años la Legislatura ha destinado al desarrollo de la Ciudad Deportiva asignaciones presupuestarias de millones de dólares. De igual forma, la Asamblea Legislativa ha enmendado la Ley Núm. 133, con el propósito de facilitar el desarrollo de Ciudad Deportiva. Sin embargo, aun con los fondos otorgados mediante asignaciones presupuestarias de la Legislatura de Puerto Rico y con las medidas legislativas aprobadas, el centro deportivo se estancó en su reapertura.

Con la aprobación de la Ley 16-2014, la Asamblea Legislativa concedió una última oportunidad a la Ciudad Deportiva Roberto Clemente, Inc. para destinar los terrenos donados al fin público proyectado desde la aprobación de la Ley Núm. 133 en el año 1973, y desarrollar la Ciudad Deportiva Roberto Clemente para beneficio de los habitantes de Puerto Rico y del deporte.

Según recoge la Exposición de Motivos de la Ley 16-2014, la Ciudad Deportiva Roberto Clemente, Inc., había informado que tenía; "un plan de trabajo concreto para lograr la reapertura de las instalaciones de la Ciudad Deportiva y volverlas a poner a la disposición del desarrollo del deporte y la actividad física en Puerto Rico. De acuerdo con dicho plan, las instalaciones serán restauradas y estarán abiertas al público en o antes del 1 de julio de 2014".

No obstante, a lo anterior, actualmente la Ciudad Deportiva se encuentra en condiciones deplorables, los terrenos no se han desarrollado cabalmente y sus facilidades deportivas se encuentran en un grave estado de deterioro y abandono, muchas de ellas ya inservibles. Lamentablemente, los parques de béisbol se encuentran en desuso, grandes pastizales arropan las edificaciones gravemente deterioradas y el museo casi en ruina con el techo colapsado y con sus paredes agrietadas.

Así las cosas, los terrenos donde se debiese haber desarrollado a plenitud la Ciudad Deportiva Roberto Clemente se encuentran en estado de inactividad, solo siendo utilizados los dos campos de fútbol americano y la zona de jugar gotcha, ubicados a la entrada del inmenso complejo.

Este desperdicio del potencial del uso de alrededor de 300 cuerdas de terreno que no están siendo utilizadas para el servicio de nuestro pueblo no beneficia a nuestra juventud. Para esta Asamblea Legislativa es de gran importancia el poder honrar la memoria de nuestro Roberto Clemente, llevando a cabo su visión de construir una Ciudad Deportiva para beneficio de nuestros jóvenes y las futuras generaciones. A pesar de haber transcurrido sobre más de cuarenta y cinco (45) años desde la primera donación de terrenos, los mismos al día de hoy no se han desarrollado al máximo y no

están siendo utilizados para los fines que fueron cedidos a título gratuito por el Estado, por lo que no se está cumpliendo con el fin público promulgado en la Ley Núm. 133.

Por su parte, el Departamento de Recreación y Deportes del Estado Libre Asociado de Puerto Rico está facultado con todos los poderes necesarios para promover, regular y fiscalizar la recreación y el deporte en todas sus manifestaciones y modalidades en Puerto Rico. Además, cuenta con la infraestructura administrativa y operacional para llevar a cabo su misión de velar por el cumplimiento de la legislación y la reglamentación aplicable bajo su jurisdicción. De modo que, a tenor con la política pública de esta Ley, será este Departamento la agencia a la cual le corresponderá la administración del "Distrito Deportivo Roberto Clemente".

La Autoridad del Distrito del Centro de Convenciones de Puerto Rico, se encuentra en una posición única para el desarrollo del Distrito Deportivo Roberto Clemente, por lo que esta será la entidad que desarrolle los proyectos que se realicen en el mismo. La Autoridad será la encargada de la planificación y la organización del Distrito Deportivo, maximizando su potencial. El propósito es crear una alianza entre la Autoridad y el Departamento de Recreación y Deportes que faculta a la Autoridad a desarrollar las facilidades, además del plan de trabajo a desarrollarse dentro del Distrito Deportivo, dejando al Departamento de Recreación y Deportes de la titularidad del terreno, además de un rol esencial en la administración y operación de los terrenos en el día a día.

Mediante la aprobación de esta Ley, la titularidad de los terrenos de Ciudad Deportiva Roberto Clemente, con sus mejoras, revertirán al Estado Libre Asociado de Puerto Rico, serán administrados por el Departamento de Recreación y Deportes y planificados por la Autoridad del Distrito del Centro de Convenciones de Puerto Rico. Es menester destacar que, la Ley Núm. 133, según enmendada, en su Sección 2 dispuso que la donación de terrenos a "Ciudad Deportiva Roberto Clemente, Inc." estaría sujeta a tres condiciones resolutorias. La primera de estas condiciones era que los terrenos serían poseídos y utilizados "para los fines de 'Ciudad Deportiva Roberto Clemente, Inc.'". Según se ha descrito, los terrenos no se están utilizando para los fines de la referida entidad sin fines de lucro, razón que sustenta que se revierta la donación establecida por Ley.

Como parte de los esfuerzos de esta Asamblea Legislativa para la consecución de los fines de esta medida, a través de la Resolución Conjunta 16-2021, se ordenó a la Secretaria del Departamento de Transportación y Obras Públicas a confeccionar y a expedir una tablilla conmemorativa de los cincuenta (50) años del "Hit 3,000" de Roberto Clemente Walker, a partir del 1 de enero de 2022, hasta el 31 de diciembre de 2022. Los ciudadanos tendrán la opción de pagar $21.00 por la expedición de la tablilla conmemorativa a Roberto Clemente. La Sección 3 de la Resolución Conjunta dispone que "el cargo por la tablilla será de veintiún dólares ($21.00), los cuales serán

transferidos al Fondo del Distrito Deportivo Roberto Clemente, administrado por el Departamento de Hacienda, para uso exclusivo del Departamento de Recreación y Deportes".

De igual forma, la Resolución Conjunta 17-2021, ordenó a la Secretaria del Departamento de Transportación y Obras Públicas a confeccionar y a expedir un marbete conmemorativo a los cincuenta (50) años del "Hit 3,000" de Roberto Clemente Walker para el año 2022. Al pago del marbete conmemorativo, se recolectará la cantidad de $5.00 adicionales a los costos regulares por concepto de derechos, aranceles y multas. Los ciudadanos podrán realizar, además, un donativo por la cantidad de $5.00, $10.00, $20.00 o cualquier otra cantidad deseada. La Sección 6 de la referida Resolución Conjunta dispone que el costo del marbete conmemorativo y los donativos realizados por los ciudadanos, "serán destinados en su totalidad al Fondo del Distrito Roberto Clemente, administrado por el Departamento de Hacienda para uso exclusivo del Departamento de Recreación y Deportes".

A través de esta pieza legislativa, esta Asamblea Legislativa establece los cimientos para el desarrollo cabal del Distrito Deportivo Roberto Clemente al servicio pleno del pueblo de Puerto Rico, cumpliendo así con el sueño de nuestro Roberto Clemente Walker.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

Artículo 1. – Título.

Esta Ley se conocerá como la "Ley del Distrito Deportivo Roberto Clemente".

Artículo 2. – Política Pública.

Será la Política Pública del Estado Libre Asociado de Puerto Rico desarrollar a plenitud el Distrito Deportivo Roberto Clemente. La Asamblea Legislativa de Puerto Rico entiende que la propiedad donada por el Estado Libre Asociado de Puerto Rico a "Ciudad Deportiva Roberto Clemente, Inc." no ha sido utilizada para los fines públicos que fue donada por virtud de Ley, por lo cual, se ordena el traspaso al Estado Libre Asociado de Puerto Rico de todos los terrenos donados a la entidad "Ciudad Deportiva Roberto Clemente Inc.", revirtiéndose al Estado Libre Asociado de Puerto Rico la titularidad de todos los terrenos donados mediante la Ley Núm. 133 de 9 de junio de 1973, según enmendada, y mediante la Ley 164-2004, según enmendada, así como las mejoras, las estructuras, instalaciones y/o edificios que enclaven en el mismo, a nombre del Departamento de Recreación y Deportes del Estado Libre Asociado de Puerto Rico.

Artículo 3.- Transferencia.

(a) Se ordena el traspaso al Estado Libre Asociado de Puerto Rico de todos los terrenos donados a la entidad "Ciudad Deportiva Roberto Clemente Inc.", revirtiéndose al Estado Libre Asociado de Puerto Rico la titularidad de todos los terrenos donados mediante la Ley Núm. 133 de 9 de junio de 1973, según enmendada, y mediante la Ley 164-2004, según enmendada, así como las mejoras, las estructuras, instalaciones y/o edificios que enclaven en el mismo.

(b) Se ordena y se faculta al Secretario del Departamento de Recreación y Deportes del Estado Libre Asociado de Puerto Rico a aceptar de parte de la Administración de Terrenos de Puerto Rico, el traspaso al Departamento de Recreación y Deportes de la titularidad de las porciones de terrenos de las parcelas A, B, G y F de la finca Marina localizada en los barrios Cangrejo Arriba y Sabana Abajo del Municipio Autónomo de Carolina, cuya titularidad le fue cedida con condiciones mediante la Ley Núm. 133 del 9 de junio de 1973, según enmendada, así como las mejoras, las estructuras, instalaciones y/o edificios que enclaven en el mismo a nombre del Departamento de Recreación y Deportes del Estado Libre Asociado de Puerto Rico.

(c) Se ordena a la Administración de Terrenos de Puerto Rico, a que dentro del plazo de noventa (90) días siguientes a la fecha de aprobación de esta Ley, solicite todos los permisos y autorizaciones necesarias para transferir las parcelas de terreno y mejoras descritas en el inciso (a) de este Artículo y, conforme a las disposiciones establecidas en esta Ley, otorgue la correspondiente escritura transfiriendo la titularidad a favor del Departamento de Recreación y Deportes del Estado Libre Asociado de Puerto Rico.

(d) Se ordena al Registrador a cargo de la sección correspondiente del Registro de la Propiedad a que, dentro de los noventa (90) días siguientes a la fecha de su presentación para su inscripción en dicho Registro, proceda calificar la legalidad de los documentos y, de no haber defecto alguno, proceda a inscribir libre del pago de derechos las escrituras que sean otorgadas conforme a lo aquí dispuesto y que proceda además, a hacer las anotaciones e inscripciones correspondientes en los libros bajo su custodia para inscribir las referidas escrituras y reflejar lo dispuesto en esta Ley.

Artículo 4.- Distrito Deportivo Roberto Clemente.

En las fincas descritas en el Artículo 3 de esta Ley se desarrollará el Distrito Deportivo Roberto Clemente como una facilidad deportiva y recreativa para el disfrute de los puertorriqueños y el turismo deportivo. Estas facilidades mantendrán el mismo uso y propósito para el cual le está siendo transferida.

El Distrito Deportivo Roberto Clemente estará adscrito al Departamento de Recreación y Deportes para la administración y operación de los terrenos e instalaciones deportivas y recreativas.

La Autoridad del Distrito del Centro de Convenciones de Puerto Rico será la encargada de la planificación y la organización del Distrito Deportivo Roberto Clemente que incluye el desarrollo, reconstrucción y construcción de facilidades para su buen funcionamiento.

El Departamento de Recreación y Deportes y la Autoridad del Distrito del Centro de Convenciones de Puerto Rico realizarán un plan de trabajo para lograr los fines dispuestos en este Artículo.

Artículo 5. -Facultades y deberes del Secretario del Departamento de Recreación y Deportes.

El Secretario del Departamento de Recreación y Deportes de Puerto Rico brindará el apoyo administrativo necesario para la operación del Distrito Deportivo Roberto Clemente. Además, el Secretario determinará su operación y gozará de las facultades y deberes delegados en esta Ley para administrar el mismo.

El Departamento de Recreación y Deportes de Puerto Rico y la Autoridad del Distrito del Centro de Convenciones de Puerto Rico tendrán un término de cinco (5) años para el desarrollo de la propiedad conforme a lo dispuesto en esta Ley. De transcurrir el término sin que se logren los fines de esta Ley, la titularidad de la propiedad será revertida a la Administración de Terrenos.

Artículo 6.- Arrendamiento.

Solamente se permitirá el arrendamiento y sub-arrendamiento de los terrenos, así como la concesión del derecho de superficie sobre las instalaciones, edificios y estructuras del Distrito Deportivo Roberto Clemente a terceras personas naturales o jurídicas, sujeto a las disposiciones de esta Ley, los reglamentos y las leyes estatales y federales aplicables. La propiedad no podrá ser enajenada o vendida. El Departamento de Recreación y Deportes podrá otorgar tales arrendamientos a personas naturales o jurídicas, dedicadas o no al deporte, sean con fines pecuniarios o no, mediante una adecuada contraprestación y podrá asimismo allegarse fondos mediante la fijación de propaganda y anuncios en tales instalaciones. Toda contraprestación que reciba el Departamento por concepto de arrendamientos, derechos de superficie y cualquier otra carga o gravamen que se constituya serán utilizados exclusivamente para el desarrollo y mantenimiento de las áreas e instalaciones. El uso de los terrenos arrendados o de las

instalaciones, edificios o estructuras deberán ser a fines y/o complementarios con el desarrollo de facilidades deportivas dentro del distrito deportivo.

Artículo 7.- Reglamentación.

Se ordena al Departamento de Recreación y Deportes del Estado Libre Asociado de Puerto Rico y a la Autoridad del Distrito del Centro de Convenciones de Puerto Rico a establecer mediante Reglamento el procedimiento para la implementación adecuada y cumplir los fines de esta Ley. El Secretario del Departamento adoptará las reglas y reglamentos que sean necesarios para implementar esta Ley, en virtud de las disposiciones de la Ley 38-2017, según enmendada, conocida como "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico", y conforme a las leyes y reglamentos aplicables.

Artículo 8.- Contratos y convenios.

Todo contrato de arrendamiento, usufructo, o convenio de delegación de competencias o convenio de administración otorgado entre Ciudad Deportiva Roberto Clemente, Inc. y el Departamento de Recreación y Deportes, que al momento del traspaso de la titularidad de la propiedad patrimonial estuviere vigente, perderá de inmediato su vigencia y será resuelto por confusión de derechos. Asimismo, se mantendrá en vigor los que hubiesen sido otorgados entre Ciudad Deportiva Roberto Clemente, Inc., y las asociaciones recreativas, asociaciones deportivas, asociaciones de residentes, consejos de residentes; los cuales permanecerán en vigor hasta tanto se implante la reglamentación que disponga el Departamento de Recreación y Deportes. Los contratos otorgados entre Ciudad Deportiva Roberto Clemente, Inc., y personas naturales o jurídicas continuarán vigentes hasta la fecha de su expiración.

En cuanto a los contratos otorgados por Ciudad Deportiva Roberto Clemente, Inc., que al momento del traspaso de titularidad de la propiedad patrimonial estuvieren vigentes, permanecerá en vigor bajo las mismas cláusulas y condiciones establecidas al momento de su otorgamiento. Con relación a tales contratos, se dispone que el Departamento de Recreación y Deportes se subroga en el lugar de Ciudad Deportiva Roberto Clemente, Inc., con los mismos derechos y obligaciones que correspondían a este último desde la fecha de su otorgamiento.

Se exceptúan de las disposiciones contenidas en este Artículo, los contratos, convenios o acuerdos que luego de ser revisados por el Departamento de Recreación y Deportes se determine son contrarios a disposiciones de leyes federales y sus reglamentos. En estos casos, se faculta al Departamento de Recreación y Deportes a enmendar los contratos, convenios o acuerdos de manera que pueda continuar honrando las disposiciones pactadas conforme a los estatutos federales.

Artículo 9.- Responsabilidad legal.

Ciudad Deportiva Roberto Clemente, Inc. retiene responsabilidad legal con relación a todo asunto ocurrido respecto a la propiedad que se transfiere hasta el momento en que se firma la Escritura traspasando la titularidad de la misma al Departamento de Recreación y Deportes.

Luego de firmada la Escritura traspasando la titularidad de la propiedad al Departamento de Recreación y Deportes, este asume la responsabilidad legal respecto a todo asunto ocurrido en dicha propiedad de ahí en adelante.

Artículo 10.- Gravámenes.

Al revertir la titularidad al Estado Libre Asociado de Puerto Rico, las fincas que se describen en el Artículo 3 de esta Ley quedarán liberadas de toda carga o gravamen que en el pasado se haya constituido o inscrito sobre estas mediante cualquier contrato de arrendamiento, sub-arrendamiento, concesión del derecho de superficie y/o cualquier otro contrato.

Artículo 11. — Fondo del Distrito Deportivo Roberto Clemente

Se crea un Fondo en el Departamento de Hacienda de Puerto Rico el cual se denominará Fondo del Distrito Deportivo Roberto Clemente para uso exclusivo del Secretario del Departamento de Recreación y Deportes de Puerto Rico para todo lo concerniente a la operación, administración y conservación del Distrito Deportivo Roberto Clemente.

(a) El Fondo se nutrirá, además, de tiempo en tiempo, de (i) aportaciones y cualquier otro tipo de asistencia del Gobierno Federal para la que cualifique; (ii) aportaciones e inversiones de personas y entidades privadas o públicas, locales, nacionales o internacionales; y (iii) aportaciones de la Asamblea Legislativa.

(b) Los desembolsos del Fondo se harán conforme a esta Ley y a los reglamentos y los presupuestos aprobados por el Departamento de Recreación y Deportes.

(c) El remanente de los fondos que al 30 de junio de cada año no haya sido utilizado y obligado para los propósitos dispuestos, será reprogramado en el mismo Fondo del Distrito Deportivo Roberto Clemente para el próximo año fiscal, de manera que se garantice la utilización de los fondos recolectados específicamente para este fin y se cumpla con la intención del ciudadano al realizar el pago y/o donación adicional del marbete y tablilla conmemorativa a los cincuenta (50) años del "Hit 3,000" de Roberto Clemente Walker para el año 2022.

Anualmente, el Departamento de Recreación y Deportes, asignará a la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, la cantidad de ciento cincuenta mil dólares ($150,000.00) provenientes del Fondo del Distrito Deportivo Roberto Clemente, para la planificación y la organización de las facilidades.

El Departamento de Recreación y Deportes y la Autoridad del Distrito del Centro de Convenciones de Puerto Rico deberán someter anualmente, tanto a la Oficina de Gerencia y Presupuesto como a la Asamblea Legislativa, a través de la Secretaría de cada Cuerpo Parlamentario, un informe auditado sobre la utilización planificada de los recursos que serán depositados en la cuenta especial y de los fondos que el Departamento de Recreación y Deportes asigne a la Autoridad del Distrito del Centro de Convenciones de Puerto Rico. El informe anual auditado requerido será presentado no más tarde del 30 de enero de cada año.

Artículo 12.- Se enmienda el Artículo 2.02 de la Ley 351-2000, según enmendada, conocida como "Ley del Distrito del Centro de Convenciones de Puerto Rico", para que lea como sigue:

"Artículo 2.02.- Poderes específicos de la Autoridad.

La Autoridad tendrá las siguientes facultades y derechos:

(a)     …

…

(t)     Entrar en contratos y acuerdos, incluyendo, pero sin limitarse a contratos de venta, arrendamientos, empresas conjuntas y sociedades, según considere necesario para inducir a terceros a desarrollar, mejorar, operar y administrar las parcelas privadas dentro del Distrito de acuerdo con cualquier plan maestro, criterios de diseño y condiciones y restricciones adoptadas e impuestas por la Autoridad. Asimismo, la Autoridad podrá otorgar contratos para utilizar, en beneficio de la rehabilitación, desarrollo, construcción o mantenimiento de instalaciones en el Distrito Deportivo Roberto Clemente, y desembolsar, conforme a los términos y condiciones establecidos en tales contratos, todo o parte de los fondos que sean asignados por la Asamblea Legislativa a la Autoridad para esos fines, independientemente de que dichas instalaciones estén o no dentro del Distrito. De igual forma, la Autoridad será la encargada de la planificación y la organización del Distrito. Disponiéndose, además, que el Distrito Deportivo Roberto Clemente será un proyecto de mejoramiento según definido en el Artículo 1.03 (o) de esta Ley.

**Add.113**

Disponiéndose, que todo contrato y acuerdo que pretenda suscribir la Autoridad como parte de sus funciones y responsabilidades en el Distrito Deportivo Roberto Clemente, deberá estar aprobado y firmado por el Secretario del Departamento de Recreación y Deportes o cualquier otro funcionario autorizado dentro del Departamento. Ningún contrato o acuerdo en virtud de este inciso, será válido si no contiene la firma del Departamento de Recreación y Deportes.

(u)    …

…

(ff)   …"

Artículo 13.- Se se añade un nuevo inciso (o) al Artículo 5, de la Ley 8-2004, según enmendada, conocida como "Ley Orgánica del Departamento de Recreación y Deportes", para que lea como sigue:

"Artículo 5.-Funciones y Competencias del Departamento de Recreación y Deportes.

El Departamento de Recreación y Deportes tendrá, pero sin limitarse a ello, las siguientes funciones y competencias:

(a) …

…

(o) La titularidad, así como la operación, administración y conservación de las instalaciones deportivas y recreativas del Distrito Deportivo Roberto Clemente. Además, podrá otorgar contratos para utilizar, en beneficio de la rehabilitación, desarrollo, construcción, mantenimiento o administración de instalaciones en el Distrito Deportivo Roberto Clemente, y desembolsar, conforme a los términos y condiciones establecidos en tales contratos, todo o parte de los fondos que sean asignados por la Asamblea Legislativa al Departamento de Recreación y Deportes para esos fines."

Artículo. 14- Derogación.

Se derogan las siguientes leyes: Ley Núm. 133 de 9 de junio de 1973, según enmendada; y Ley 164-2004, según enmendada.

Disponiéndose que la parcela de setenta (70) cuerdas que se autorizó a la Administración de Terrenos de Puerto Rico ceder gratuitamente a la Ciudad Deportiva Roberto Clemente, Inc. mediante la Ley 164-2004, seguirá siendo parte del inventario de las propiedades de la Administración de Terrenos para su desarrollo.

Artículo 15- Normas de interpretación.

Las disposiciones de esta Ley no podrán ser interpretadas de forma que resulten inconsistentes con los derechos reconocidos por la Constitución del Estado Libre Asociado de Puerto Rico o la Constitución de los Estados Unidos de América, y la jurisprudencia interpretativa. Ninguna disposición de esta Ley se entenderá que modifica, altera o invalida cualquier acuerdo, convenio o contrato que se haya otorgado en virtud del estado de derecho anterior y que esté vigente al entrar en vigor esta Ley.

Artículo 16- Cláusula de separabilidad.

Todas aquellas leyes, reglas y reglamentos que estuvieran en conflicto con las disposiciones de esta Ley, deberán conforme a derecho armonizar con el espíritu y propósito de esta Ley de manera que se lesione en lo mínimo la política pública aquí plasmada. Si cualquier cláusula, párrafo, subpárrafo, artículo, disposición, sección, inciso o parte de esta Ley fuere declarada inconstitucional por algún tribunal con jurisdicción, la sentencia a tal efecto dictada no afectará, perjudicará ni invalidará el resto de esta Ley. El efecto de dicha sentencia quedará limitado a la cláusula, párrafo, subpárrafo, artículo, disposición, sección, inciso o parte de esta Ley que hubiese sido declarada inconstitucional.

Artículo 17- Vigencia.

Esta Ley entrará en vigor inmediatamente después de su aprobación.

.......................................................
Presidente de la Cámara

.......................................................
Presidente del Senado

Aprobada en 20 Junio 2022

Gobernador

**Add.115**



+1 206-672-5052 | support@rushtranslate.com



MEMBER #263976

# Certification of Translation Accuracy

Translation of **Law 67 2022** from **Spanish** to **English**

As an authorized representative of RushTranslate, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified and competent professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, RushTranslate assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Mike Bortscheller
Authorized Representative
Order Date: February 9, 2024

RushTranslate
640 South Fourth Street
Suite 300
Louisville, KY 40202
United States

**Add.116**




LAW _ 67_ -20_22 _

[LOGO:
CHAMBER OF REPRESENTATIVES
COMMONWEALTH OF PUERTO RICO]

I, LIC. JAVIER GÓMEZ CRUZ, Secretary of the Chamber of Representatives of the Commonwealth of Puerto Rico,

I HEREBY CERTIFY:

That the P. of C. 489 (conference), entitled

"*Law*

*In order to create the Roberto Clemente Sports District, for the purposes of transforming and establishing the public policy for the Commonwealth of Puerto Rico on the use and operation of these facilities; transfer the lands, buildings, properties and. management to the Puerto Rico Department of Sports and Recreation; to provide that the Puerto Rico Convention Center District Authority be responsible for the planning and organization of the Roberto Clemente Sports District; to amend Article 2.02 of the Law 351-2000, as amended, known as the "Puerto Rico Convention Center District Law"; to establis the powers and duties of the Secretary of Sports and Recreation; toprovide for the allocation of funds; to add a new subsection (or) to Article 5 of Law 8-2004, as amended, known as the "Organic Law of the Department of Recreation and Sports"; abolish Law No. 133 of June 9th of 1973, as amended; abolish Law 164-2004, as amended; and for other related purposes.*"

has been approved by the House of Representatives and the Senate of the Commonwealth of Puerto Rico in the manner expressed herein.

SO THAT IT IS RECORDED, and to notify the Governor of the Commonwealth of Puerto Rico, I issue this letter in my office in the Capitol, San Juan, Puerto Rico on the eighth (8) day of the month of July of the year two thousand twenty-two and I stamp on it the seal of the Chamber of Representatives of the Commonwealth of Puerto Rico.

[SIGNATURE]
Lic. Javier Gomez Cruz
Secretary

**Add.117**





**(P. of the C. 489)**
**(Conference)**

**LAW**

To create the Roberto Clemente Sports District, in order to transform and establish the public policy of the Commonwealth of Puerto Rico on the use and operation of these facilities; transfer the lands, buildings, properties and management to the Puerto Rico Department of Sports and Recreation; to provide that the Puerto Rico Convention Center District Authority is responsible for the planning and organization of the Roberto Clemente Sports District; amend Article 2.02 of Law 351-2000, as amended, known as the "Puerto Rico Convention Center District Law"; to establish the powers and duties of the Secretary of Sports and Recreation; to provide for the allocation of funds; to add a new subsection (o) to Article 5 of Law 8-2004, as amended, known as "Organic Law of the Department of Recreation and Sports"; to abolish Law No. 133 of June 9, 1973, as amended; to abolish Law 164-2004, as amended; and for other related purposes.

PREAMBLE

Roberto Clemente Walker is one of the greatest athletes that Puerto Rico has ever given. His greatness and humility underlie of his human quality, which both on and off the field set him apart from other talented players. Despite his tragic death on December 31st, 1972, while traveling with aid on a humanitarian trip to Nicaragua, his legacy has endured through generations of Puerto Ricans. In 1973, Roberto Clemente became the first Puerto Rican and Hispanic to be inducted into the Major League Baseball Hall of Fame.

Recognizing the highest values and inspiration that the figure of our Roberto Clemente represents for young people and for future generations of Puerto Ricans, and with the purpose of honoring his memory, this Legislative Assembly believes that it is meritorious that the legacy be developed in Puerto Rican sport that Roberto Clemente dreamed of for the benefit of our youth.

Clemente's dream was to create a space for young Puerto Ricans to practice their sports and, at the same time develop humanitarian skills, as well as to provide sports clinics to our youth. To execute this dream, the Legislative Assembly approved Law No. 133 of June 9, 1973, as amended (hereinafter "Law No. 133") by which Land Management was authorized to donate to the non-profit entity, Sports City

**Add.118**

2

Roberto Clemente, Inc., hundreds of acres of land located in the Municipality of Carolina.

Since it is such an important task for the people of Puerto Rico, the Legislature, over the years, has allocated budgetary assignments of millions of dollars to the development of the Sports City. Likewise, the Legislative Assembly has amended Law No. 133, with the purpose of facilitating the development of the Sports City. However, even with the funds granted through budget allocations from the Legislature of Puerto Rico and with the legislative measures approved, the sports center's reopening came to a standstill.

With the approval of Law 16-2014, the Legislative Assembly granted one last opportunity to the Roberto Clemente Sports City, Inc. to allocate the donated land for the public purpose projected since the approval of Law No. 133 in 1973, and develop the Roberto Clemente Sports City for the benefit of the inhabitants of Puerto Rico and sports.

According to the Preamble of Law 16-2014, Roberto Clemente's Sports City, Inc., had reported that it had; "a definite work plan to achieve the reopening of the Sports City facilities and make them available again for the development of sports and physical activity in Puerto Rico. In accordance with said plan, the facilities will be restored and will be open to the public on or before July 1, 2014".

Nevertheless, the Sports City is currently in deplorable conditions, the land has not been fully developed and its sports facilities are in a serious state of deterioration and abandonment, many of them already unusable. Unfortunately, the baseball parks are in disuse, large grasslands cover the seriously deteriorated buildings and the museum is almost in ruins with its roof collapsed and its walls cracked.

Thus, the land where the Roberto Clemente Sports City should have been fully developed is in a state of inactivity, where only the two American football fields and the gotcha playing area are being used, located at the entrance of the immense complex.

This waste of potential of the use of around 300 acres of land that are not being used for the service of our people does not benefit our youth. For this Legislative Assembly, it is of great importance to be able to honor the memory of our Roberto Cemente, carrying out his vision of building a Sports City for the benefit of our young people and future generations. Despite more than forty-five (45) years having passed since the first donation of land, to this day they have not been developed to their maximum potential and are not

**Add.119**




3

being utilized for the purposes for which they were transferred free of charge by the State, so the public purpose enacted in Law No. 133 is not being fulfilled.

For its part, the Puerto Rico Department of Sports and Recreation is authorized with all the necessary powers to promote, regulate and supervise recreation and sports in all their manifestations and modalities in Puerto Rico. In addition, it has the administrative and operational infrastructure to carry out its mission of ensuring compliance with the legislation and regulations applicable under its jurisdiction. Thus, in accordance with the public policy of this Law, this Department will be the agency that will be responsible for the management of the "Roberto Clemente Sports District."

The Puerto Rico Convention Center District Authority is in a unique position for the development of the Roberto Clemente Sports District, hereby this will be the entity that develops the projects carried out there. The Authority will be in charge of planning and organizing the Sports District, maximizing its potential. The purpose is to create an alliance between the Authority and the Department of Sports and Recreation that empowers the Authority to develop the facilities, in addition to the work plan to be developed within the Sports District, leaving the Department of Recreation and Sports the ownership of the land, in addition to an essential role in the management and operation of the land daily.

By the approval of this Law, the ownership of the lands of the Roberto Clemente Sports City, with its improvements, will revert to the Commonwealth of Puerto Rico, will be managed by the Department of Sports and Recreation and planned by the Puerto Rico Convention Center District Authority. It should be noted that Law No. 133, as amended, in its Section 2 provided that the donation of land to "Roberto Clemente's Sports City, Inc." would be suject to the three conditions subsequent. The first of these conditions was that the land would be owned and used "for the purposes of Roberto Clemente's Sports City, Inc."". As described herein, the land is not being used for the purposes of the non-profit entity, a reason that supports the reversal of the donation established by Law.

As part of the efforts of this Legislative Assembly to achieve the purposes of this measure, by way of Joint Resolution 16-2021, the Secretary of the Department of Transportation and Public Works was ordered to prepare and issue a commemorative license plate for the fifty (50) years of Roberto Clemente Walker's " 3,000 Hit ", starting January 1st, 2022, until December 31st, 2022. Citizens will have the option to pay $21.00 for the issuance of the Roberto Clemente commemorative license plate. Section 3 of the Joint Resolution provides that "the charge for the tablet will be twenty-one dollars ($21.00), which will be

**Add.120**




4

transferred to the Roberto Clemente Sports District Fund, managed by the Department of the Treasury, for the exclusive use of the Department of Sports and Recreation."

Likewise, Joint Resolution 17-2021 ordered the Secretary of the Department of Transportation and Public Works to prepare and issue a commemorative annual vehicle registration label for the fifty (50) years of Roberto Clemente Walker's "3,000 Hit" by the year 2022. Upon payment of the commemorative label, the amount of $5.00 will be collected in addition to the regular costs for duties, tariffs and fines. Citizens may also make a donation in the amount of $5.00, $10.00, $20.00 or any other desired amount. Section 6 of the aforementioned Joint Resolution provides that the cost of the commemorative label and the donations made by citizens, "will be allocated in their entirety to the Roberto Clemente District Fund, managed by the Department of the Treasury for the exclusive use of the Department of Sports and Recreation".

By way of this piece of legislation, this Legislative Assembly establishes the foundations for the full development of the Roberto Clemente Sports District at the full service of the people of Puerto Rico, thus fulfilling the dream of our Roberto Clemente Walker.

ORDERED *BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO*:

Article 1. -Title.

This Law will be known as the "Roberto Clemente Sports District Law."

Article 2. - Public Policy.

The Public Policy of the Commonwealth of Puerto Rico will be to fully develop the Roberto Clemente Sports District. The Legislative Assembly of Puerto Rico understands that the property donated by the Commonwealth of Puerto Rico to "Roberto Clemente's Sports City, Inc." has not been used for the public purposes that it was donated by virtue of Law, therefore, all the land donated to the entity "Roberto Clemente Sports City, Inc" is ordered to be transferred to the Commonwealth of Puerto Rico, so reverting to the Commonwealth of Puerto Rico, in the name of the Puerto Rico Department of Sports and Recreation, ownership of all lands donated by way of Law. 133 of June 9th, 1973, as amended, and by Law 164-2004, as amended, as well as the improvements, structures, facilities and/or buildings located therein.

Add.121

 

5

Article 3.-Transfer.

(a) The transfer to the Commonwealth of Puerto Rico of all lands donated to the entity "Ciudad Deportiva Roberto Clemente Inc." is ordered, so reverting to the Commonwealth of Puerto Rico the ownership of all lands donated through Law No. 133 of June 9th, 1973, as amended, and by Law 164-2004, as amended, as well as the improvements, structures, facilities and/or buildings located therein.

(b) The Secretary of the Puerto Rico Department of Sports and Recreation is ordered and authorized to accept, on behalf of the Land Management of Puerto Rico, the transfer of the ownership of the portions of land on plots A, B, G and F of the Marina farm located in the Cangrejo Arriba and Sabana Abajo neighborhoods of the Autonomous Municipality of Carolina, whose ownership was conditionally transferred by Law No. 133 of June 9th, 1973 , as amended, as well as the improvements, structures, facilities and/or buildings located therein in the name of the Department of Recreation and Sports of the Commonwealth of Puerto Rico.

(c) Puerto Rico Land Management is ordered, within a period of ninety (90) days following the date of approval of this Act, to request all permits and authorizations necessary for the transfer of the parcels of land and improvements described in subsection (a) of this Article and, in accordance with the provisions established in this Law, to grant the corresponding deed transferring ownership in favor of the Puerto Rico Department of Sports and Recreation of the Commonwealth of Puerto Rico.

(d) The Registrar in charge of the corresponding section of the Property Registry is ordered, within ninety (90) days following the date of their presentation for registration in said Registry, to certify the legality of the documents and, if there is no flaw, proceed to register, exempt from payment of fees, those deeds that are granted in accordance with the provisions herein and that, likewise, proceeds to make the corresponding annotations and inscriptions in the books under its custody to register the aforementioned deeds and reflect the provisions of this Law.

Article 4.- Roberto Clemente Sports District.

On the estates described in Article 3 of this Law, the Roberto Clemente Sports District will be developed as a sports and recreational facility for the enjoyment of Puerto Ricans and sports tourism. These facilities will maintain the same use and purpose for which they are being transferred.

**Add.122**

 

6

The Roberto Clemente Sports District will be attached to the Department of Recreation and Sports for the management and operation of the sports and recreational lands and facilities.

The Puerto Rico Convention Center District Authority will be in charge of planning and organizing the Roberto Clemente Sports District, which includes the development, reconstruction and construction of facilities for its proper functioning.

The Department of Recreation and Sports and the Puerto Rico Convention Center District Authority will carry out a work plan to achieve the purposes set forth in this Article.

Article 5. -Powers and duties of the Secretary of the Department of Recreation and Sports.

The Secretary of the Puerto Rico Department of Sports and Recreation will provide the necessary administrative support for the operation of the Roberto Clemente Sports District. Furthermore, the Secretary will determine its operation and will enjoy the powers and duties delegated in this Law to administer it.

The Puerto Rico Department of Sports and Recreation and the Puerto Rico Convention Center District Authority will have a term of five (5) years for the development of the property in accordance with the provisions of this Law. If the term expires without achieving the purposes of this Law are achieved, ownership of the property will revert to the Land Management.

Article 6.- Lease.

Only the leasing and subleasing of the land, as well as the granting of surface rights over the facilities, buildings and structures of the Roberto Clemente Sports District will be permitted to third parties, natural or legal persons, subject to the provisions of this Law, the regulations, and applicable state and federal laws. The property may not be alienated or sold. The Department Sports and Recreation may grant such leases to natural or legal persons, whether dedicated to sports or not, whether for pecuniary purposes or not, by way of appropriate consideration and may also raise funds by posting propaganda and advertisements therein. Any renumeration received by the Department for leases, surface rights and any other charge or tax to be established will be used exclusively for the development and maintenance of the areas and facilities. The use of leased land or the

Add.123

 

facilities, buildings or structures must be purposeful and/or complementary to the development of sports facilities within the sports district.

Article 7.- Regulations.

The Puerto Rico Department of Sports and Recreation the Puerto Rico Convention Center District Authority are ordered to establish through Regulation the procedure for the adequate implementation and compliance with the purposes of this Law. The Secretary of the Department will adopt the rules and regulations that are necessary to implement this Law, by virtue of the provisions of Law 38-2017, as amended, known as the "Uniform Administrative Procedure Law of the Government of Puerto Rico", and in accordance with the applicable laws and regulations

Article 8.- Contracts and agreements.

Any lease contract, usufruct, or agreement of delegation of powers or management agreement granted between Roberto Clemente's Sports City, Inc. and the Department of Sports and Recreation, which was valid at the time -of the transfer of ownership of the heritage property, will lose its validity immediately and will be resolved due to confusion of rights. Likewise, those that have been granted between Roberto Clemente's Sports City, Inc., and the recreational associations, sports associations, resident associations, resident councils; which will remain valid until the regulations established by the Department of Sports and Recreation are implemented. The contracts granted between Roberto Clemente's Sports City, Inc., and natural or legal persons will remain valid until their expiration date.

Regarding the contracts granted by Roberto Clemente's Sports City, Inc., which were valid at the time of the transfer of ownership of the property, they will remain valid under the same clauses and conditions established at the time of their granting. In relation to such contracts, it is provided that the Department of Sports and Recreation is subrogated to Roberto Clemente's Sports City, Inc., with the same rights and obligations that to the latter from the date of its granting.

Contracts, conventions or agreements that, after being reviewed by the Department of Recreation and Sports, are determined to be contrary to provisions of federal laws and their regulations are excluded from the provisions contained herein. In these cases, the Department of Recreation and Sports is authorized to amend the contracts, conventions or agreements so that it can continue to honor the agreed provisions in accordance with federal statutes.





8

Article 9.- Legal responsibility.

Roberto Clemente's Sports City, Inc. holds legal responsibility in relation to any matter that occurs regarding the property until the moment the Deed is signed, transferring the ownership thereof to the Department of Recreation and Sports.

After the Deed is signed, transferring ownership of the property to the Department of Sports and Recreation, it assumes legal responsibility for all matters that occur on said property from then on.

Article 10.- Liens.

Upon reverting the ownership to the Commonwealth of Puerto Rico, the properties described in Article 3 of this Law will be released from any charge or lien that in the past has been established or registered on them through any lease contract, sub- lease, concession of surface rights and/or any other contract.

Article 11. – Roberto Clemente Sports District Fund

A Fund is created in the Department of the Treasury of Puerto Rico which will be called the Roberto Clemente Sports District's Fund for the exclusive use of the Secretary of the Puerto Rico Department of Sports and Recreation for everything that is related to the operation, management and conservation of the Sports District. Roberto Clemente.

(a) The Fund will also be nourished from time to time, by (i) contributions and any other type of assistance for which it qualifies from the Federal Government; (ii) contributions and investments from private or public, local, national or international individuals and entities; and (iii) contributions from the Legislative Assembly.

(b) Disbursements from the Fund will be made in accordance with this Law and the regulations and budgets approved by the Department of Recreation and Sports.

(c) The remainder of the funds that as of June 30th of each year that has not been used and obligated for the established purposes, will be reprogrammed in the same Fund of the Roberto Clemente Sports District for the next fiscal year, so as to guarantee the use of the funds collected specifically for this purpose and the citizen's intention is fulfilled by making the payment and/or additional donation of the label and commemorative license plate for the fifty (50) years of "Hit 3,000" by Roberto Clemente Walker for the year 2022.

Add.125

 

9

Annually, the Department of Sports and Recreation will assign to the Puerto Rico Convention Center District Authority the amount of one hundred and fifty thousand dollars ($150,000.00) from the Roberto Clemente Sports District Fund, for the planning and organization of the facilities.

The Department of Sports and Recreation and the Puerto Rico Convention Center District Authority must submit annually, both to the Office of Management and Budget and to the Legislative Assembly, by way of the Secretariat of each Parliamentary Body, an audited report on the planned use of the resources that will be deposited in the special account and the funds that the Department of Recreation and Sports assigns to the Puerto Rico Convention Center District Authority. The required audited annual report will be submitted no later than January 30th of each year.

Article 12.- Article 2.02 of Law 351-2000, as amended, known as the "Puerto Rico Convention Center District Law", is amended so it reads as follows:

"Article 2.02.- Specific powers of the Authority.

The Authority will have the following powers and rights:

(a)    …

…

(t)    Enter into contracts and agreements, including, but not limited to, sales contracts, leases, joint ventures and partnerships, as deemed necessary to induce third parties to develop, improve, operate and manage the private parcels within the District in accordance with any master plan, design criteria and conditions and restrictions adopted and imposed by the Authority. Likewise, the Authority may grant contracts to use, for the benefit of the rehabilitation, development, construction or maintenance of facilities in the Roberto Clemente Sports District, and disburse, in accordance with the terms and conditions established in such contracts, all or part of the funds that are assigned by the Legislative Assembly to the Authority for those purposes, regardless of whether said facilities are within the District or not. Likewise, the Authority will be in charge of planning and organizing the District. Provided further, that the Roberto Clemente Sports District will be an improvement project as defined in Article 1.03 (o) of this Law.

**Add.126**


+1 206-672-5052 | support@rushtranslate.com


MEMBER #263976

10

Provinding, that all contract and agreement that the Authority intends to sign as part of its functions and responsibilities in the Roberto Clemente Sports District, must be approved and signed by the Secretary of the Department of Sports and Recreation or any other authorized official within the Department. No contract or agreement under this subsection will be valid if it does not contain the signature of the Department of Recreation and Sports.

(u)    …

…

(ff) …"

Article 13.-A new subsection (o) is added to Article 5, of Law 8-2004, as amended, known as "Organic Law of the Department of Sports and Recreation", so that it reads as follows:

"Article 5.-Functions and Powers of the Department of Recreation and Sports.

The Department of Recreation and Sports will have, but is not limited to, the following functions and powers:

(a)   ...

…

(o) The ownership, as well as the operation, management and conservation of the sports and recreational facilities of the Roberto Clemente Sports District. In addition, it may grant contracts to utilize, and disburse, for the benefit of the rehabilitation, development, construction, maintenance or management of facilities in the Roberto Clemente Sports District, and, in accordance with the terms and conditions established therein, all or part of the funds that are assigned by the Legislative Assembly to the Department of Sports and Recreation for these purposes."




11

Article. 14- Repeal.

The following laws are abolished: Law No. 133 of June 9th, 1973, as amended; and Law 164-2004, as amended.

Provided that the plot of seventy (70) acres that the Puerto Rico Land Management was authorized to be relinquished, free of charge, to the Roberto Clemente Sports City, Inc. through Law 164-2004, will continue to be part of the Land Management inventory of properties for development.

Article 15- Rules of interpretation.

The provisions of this Law may not be interpreted in a way that is inconsistent with the rights recognized by the Constitution of the Commonwealth of Puerto Rico or the Constitution of the United States of America, and interpretive jurisprudence. No provision of this Law shall be deemed to modify, alter or invalidate any agreement, convention or contract that has been granted under the previous legal status and that is in force when this Law- is passed.

Article 16- Separability clause.

All those laws, rules and regulations that conflict with the provisions of this Law must, in accordance with the law, reconcile with the spirit and purpose of this Law in such a way that the public policy set forth herein is minimally harmed. If any clause, paragraph, subparagraph, article, provision, section, subsection or part of this Law is declared unconstitutional by any court with jurisdiction, the ruling issued for that purpose will not affect, harm or invalidate the rest of this Law. The effect of said sentence will be limited to the clause, paragraph, subparagraph, article, provision, section, subsection or part of this Law: and it would have been declared unconstitutional.

Article 17- Validity.

This Law will become valid immediately after its approval.

_____
[SIGNATURE]
*PResident of the Senate*

_____
[SIGNATURE]
*President of the Chamber*

[STAMP: APPROVED IN JULY 20, 2022
[SIGNATURE]
GOVERNOR]

**Add.128**